BUCHALTER
A Professional Corporation
STEVEN M. SPECTOR (SBN: 51623)
OREN BITAN (SBN: 251056)
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-1730
Telephone: 213.891.0700
Fax: 213.896.0400
Email: sspector@buchalter.com; obitan@buchalter.com

OLSHAN FROME WOLOSKY LLP
THOMAS J. FLEMING (NYBN: 1454123)
1375 Avenue of the Americas
New York, NY 10019
Telephone: 212.451.2213
Fax: 212.451.2222
Email: tfleming@olshanlaw.com

Attorneys for Plaintiff
8TH WONDER PICTURES, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 8ᴛʜ WONDER PICTURES, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>LOCK THE DOOR, LLC, a California limited liability company; CLEAR HORIZON ENTERTAINMENT LLC, a Wyoming limited liability company; DAVID RAYMOND BROWN a/k/a DAVID BROWN and a/k/a DAVID BROWN LEVY; and JULIAN RAYMOND a/k/a JULES RAYMOND,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>1.  **BREACH OF CONTRACT (LOAN AGREEMENT);**<br>2.  **RECOVERY OF PERSONAL PROPERTY (CLAIM AND DELIVERY);**<br>3.  **FRAUD; AND**<br>4.  **AIDING AND ABETTING FRAUD** |

Plaintiff, 8ᵗʰ Wonder Pictures, LLC ("Plaintiff"), for its Complaint, alleges as follows:

///

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES
BBN 44868572v3

**NATURE OF THE ACTION**

1. On December 31, 2019, Plaintiff loaned $3,000,000 to Defendant Lock the Door LLC ("Lock the Door"), to fund the completion of a motion picture directed by Marcus Dunstan entitled "The Coll3cted," a continuation of *The Collector* series. Lock the Door has breached its obligations under that loan. Plaintiff provided Lock the Door with an opportunity to cure, but it failed to do so and is now in default. Plaintiff is thus entitled to immediate payment of its principal, plus interest and legal fees and to enforce its rights against the collateral pledged as security for the loan.

2. Defendant Lock the Door and its affiliates are entities under the control of David Raymond Brown a/k/a David Brown and a/k/a David Brown Levy. As Plaintiff recently learned, Brown has a history of fraudulent dealings with investors. Here, Brown has used his control over Lock the Door to obtain a loan from Plaintiff through knowing misrepresentations. With the assistance of defendant Raymond, Brown has diverted the loan proceeds to other projects and/or himself leaving Lock the Door insolvent.

**JURISDICTION AND VENUE**

3. This Court has subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1332(a)(1) as this case is a controversy that exceeds the sum of $75,000, exclusive of interest, between citizens of different States.

4. This Court has personal jurisdiction over Defendants, and each of them, because they are present, doing business in and/or residing in this District.

5. In the agreements discussed below, each Defendant irrevocably submitted to personal jurisdiction in this Court and the venue of this Court for any legal action filed by pursuant to the agreements.

6. Plaintiff is informed and believes and, based thereon, alleges that the Collateral is located within this District.

7. Venue is proper in the United States District Court for the Central District of California under 28 U.S.C. §§ 1391(b) and (c).

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**
BN 44868572v3

## THE PARTIES

8.      Plaintiff is a limited liability company organized and existing under the laws of the State of Delaware. Plaintiff maintains its principal place of business at 1805 West Avenue, Austin, TX 78701. Andrew Townsend, who is domiciled in Texas, is the sole member of Plaintiff. Mr. Townsend is a citizen of Texas, as is Plaintiff.

9.      Plaintiff is informed and believes and, on that basis, alleges that Lock the Door is a California limited liability company, with its principal place of business, according to the California Secretary of State records, at 9350 Wilshire Blvd. #203, Beverly Hills, CA 90212. Plaintiff is informed and believes, and on that basis, alleges, that Defendant Brown is the sole officer, a managing member, manager and/or principal of Lock the Door and a citizen of California.

10.     Plaintiff is informed and believes and, on that basis, alleges that Defendant Clear Horizon LLC ("Clear Horizon") is a Wyoming limited liability company, with its principal place of business, according to the California Secretary of State records, at 11846 Ventura Blvd. #130, Studio City, CA 91604. Plaintiff is informed and believes, and on that basis, alleges, that Defendant Brown is the sole officer, a managing member, manager and/or principal of Clear Horizon and a citizen of California.

11.     Plaintiff is informed and believes and, on that basis, alleges Defendant Brown was, and is, an individual residing and domiciled in the County of Los Angeles, State of California.

12.     Plaintiff is informed and believes and, on that basis, alleges Defendant Raymond was, and is, an individual residing and domiciled in the County of Los Angeles, State of California. Upon information and belief, Raymond is the spouse of Brown and served as the accountant for Defendant Lock the Door.

## DISREGARD OF DEFENDANT ENTITIES

13. Plaintiff is informed and believes, and on that basis alleges, that at all times mentioned herein, Lock the Door and Clear Horizon (collectively, "Defendant Entities"), and each of them, provided Defendant Brown with actual and/or ostensible authority to act on their behalf and contractually obligate each of them to enter into the agreements at issue herein. At all times mentioned herein, Defendant Brown was a principal, officer, managing agent, owner, and/or employee of each of the Defendant Entities, who was authorized to act on their behalf. Each of the entity Defendants was aware that Defendant Brown was acting on their behalf, received benefits as a result of Defendant Brown's actions taken on their behalf, and/or ratified Defendant Brown's actions, as alleged herein.

14. Each of the Defendant Entities are interrelated, share common ownership, and conduct business for and with one another. Plaintiff is informed and believes, and on that basis alleges, that at all times relevant, Defendant Entities were, and are still, owned, managed, dominated and controlled by Brown such that there is a unity of interest and ownership so that the individuality or separateness of the Defendant Entities has ceased; further, adherence to the fiction of the separateness of the Defendant Entities would, under the circumstances, sanction a fraud or promote injustice, in particular as follows:

(a) Brown treated the assets of Defendant Entities as his own; used company funds to pay his personal debts; made withdrawals of company cash for personal use; sold or assigned company assets for less than fair market value and kept the proceeds; siphoned funds from Defendant Entities for his individual benefit; made payments and took draws for himself from Defendant Entities when they were insolvent; and co-mingled Defendant Entities' assets with his personal assets.

(b) Brown failed to hold annual board and shareholder meetings or to maintain minutes and adequate corporate records and formalities for Defendant Entities.

(c)     Brown failed to adequately capitalize Defendant Entities; made distributions of capital in violation of California Corporations Code section 501; and breached his fiduciary duty to Defendant Entities' creditors, leaving them insolvent and unable to pay their creditors in the ordinary course of business.

(d)     Brown organized Defendant Entities with the intent to avoid performance by the use of the entities as shields against personal liability.

(e)     Defendant Entities were mere shells, instrumentality and conduit for the business of Brown.

15.     Accordingly, the corporate veil of Defendant Entities should be pierced and set aside to the extent that Brown bears the obligations and liabilities owing to Plaintiff to avoid a fraud or injustice.

## THE LOCK THE DOOR LOAN

16.     On or about December 31, 2019, Plaintiff entered into a Loan and Security Agreement (the "LTD Loan Agreement") with Defendant Lock the Door. The LTD Loan Agreement is annexed as Exhibit A. Pursuant to the LTD Loan Agreement, Plaintiff provided Lock the Door with a loan (the "Lock the Door Loan") in the principal amount of $3,000,000.00. On that same date, Plaintiff entered into a Security Agreement with Lock the Door pursuant to which Lock the Door granted Plaintiff a security interest in certain collateral of Lock the Door as security for full performance under the LTD Loan Agreement (the "LTD Security Agreement"). The LTD Security Agreement is annexed as Exhibit B. On that same date, Plaintiff entered into a Pledge Agreement with Clear Horizon (the "LTD Pledge Agreement"). The LTD Pledge Agreement is annexed as Exhibit C. In that agreement, Clear Horizon pledged, as further collateral for Lock the Door's performance of its obligations under the LTD Loan Agreement, its equity interests in Lock the Door equal to 100% of the Class B membership interests and 19.25 units of the Class A membership interests in Lock the Door. UCC-1 financing statements have been duly filed: (a) with the California Secretary of State, reflecting Plaintiff's security interest

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

BN 44868572v3

in "all assets" of Lock the Door, and (b) with the Wyoming Secretary of State, reflecting Plaintiff's security interest in all equity pledged by Clear Horizon. Each of those financing statements remain in full force and effect.

17.     The purpose of the Lock the Door Loan was, inter alia, to finance the production, completion and delivery of a motion picture entitled "The Coll3cted" (the "Film"), and to finance repayment in full of Lock the Door's obligations pursuant to a bridge note.

18.     Under the terms of the LTD Loan Agreement, the LTD Promissory Note matures on July 7, 2021, or such earlier date upon which repayment of the Lock the Door's obligations are accelerated in accordance with the terms of the LTD Loan Agreement. Plaintiff has the option to accelerate all of Lock the Door's obligations upon an Event of Default that is not timely remedied.

19.     In the LTD Loan Agreement, Lock the Door represented and warranted, "All financial statements, projections, estimates, information and other data furnished by the Borrower to Lender… are, in all material respects, accurate and correct…." (LTD Loan Agreement § 9.4) It further represented, "Neither this Agreement nor any document or statement furnished to the Lender by or on behalf of the Borrower ….contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements contained herein or therein not misleading." (*Id*. § 9.13) To secure the loan, Lock the Door, under the exclusive control of Brown, provided Plaintiff with a budget and cash flow schedule that indicated the Film would be completed in all respects for $5 million. Defendant Lock the Door, through Brown, also provided records indicating funding of approximately $2 million from other sources, independent of Plaintiff's $3 million loan. Lock the Door also indicated that the final week of filming had been scheduled for December 2019, but instead would take place in January 2020 once the loan proceeds were received. Both the budget and cash flow schedule were highly misleading. In reality, the loan proceeds were far less than required to complete the

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

BN 44868572v3

film. Plaintiff funded the loan on December 31, 2019, and the loan proceeds were spent in full by January 8, 2020, leaving Lock the Door unable to pay for the final phase of filming or the post-production process.

20.    In violation of Section 8.3 of the LTD Loan Agreement, Defendant Lock the Door failed to disclose the true state of affairs to Plaintiff Brown and Lock the Door instead concealed the truth, in order to avoid the inevitable notice of default. Among other things, Brown falsely claimed that production was scheduled to resume in August, offering phony news stories that he had planted. He later claimed that production would resume in February 2021 with Canadian tax credits. Brown's numerous claims that production would soon begin were all lies. Defendant Lock the Door had no funds to pay for any further film production, a fact that Brown concealed from Plaintiff.

21.    For months, Defendant Lock the Door failed to provide Plaintiff with numerous items required by the loan documents, including an Approved Production Schedule and the Control Agreement for the bank account to which Plaintiff had delivered the loan proceeds. Plaintiff later determined from to Lock the Door's business records, that the loan proceeds were likely diverted to other projects.

22.    An Event of Default under the LTD Loan Agreement occurs, inter alia, upon the "(d) [f]ailure of the Borrower [Lock the Door] to comply with any [ ] covenants on its part to be performed under the terms of th[e LTD Loan] Agreement or the other Loan Documents" and where "(l) the Borrower [Lock the Door] has given the Lender [Plaintiff] materially false and misleading information or representations." (LTD Loan Agreement, § 11.1.) Each of those Events of Default has occurred here.

## THE NOTICE OF DEFAULT

23.    Under Section 10.14 of the LTD Loan Agreement, Lock the Door agreed that, upon the request of Plaintiff, it would "execute and deliver such further documents and do such other acts and things as the Lender may reasonably request .

. .” On December 1, 2020, Plaintiff sent a letter to Plaintiff requesting that within five days, Lock the Door provide certain documents relating to production of "The Coll3cted," including the budget and schedule for production, and concerning Lock the Door's use of the loan proceeds and the status of the film's production. Lock the Door failed to do so. Plaintiff then provided Lock the Door with written notice of the following Events of Default on December 9, 2020. Each of these failures constitutes an Event of Default. For example, in addition to its default under Section 10.14 of the LTD Loan Agreement:

(A)   Under Section 6.2(a) of the LTD Loan Agreement, Lock the Door covenanted that the "The Coll3cted" would be produced in accordance with a particular Budget, Approved Production Schedule and Approved Cash Flow Schedule, and that Lock the Door would not make any material changes thereto except upon the express written authorization of Plaintiff. However, "The Coll3cted" is not being produced in accordance with the agreed Budget, Approved Production Schedule, and Approved Cash Flow Schedule. The production of "The Coll3cted" was halted at the time of the loan and has not resumed. In response to Plaintiff's requests for confirmation regarding whether or not production has since restarted, as well as other information regarding the film's production, budget and schedule, Brown has provided incomplete and misleading information. Because production never happened under the loan, Lock the Door has not complied with any production schedule or cash flow schedule.

(B)   Under Section 10.15 of the LTD Loan Agreement, Lock the Door agreed that it would cause fully executed copies of a Collection Account Control Agreement and Production Bank Account Control Agreement to be delivered to Lender. Lock the Door failed to do so.

(C)   Defendant Lock the Door has also given Plaintiff materially false and misleading information or representations. On information and belief, Lock the Door has used the proceeds of the loan for projects unrelated to "The Coll3cted," which

constitutes an Event of Default under Sections 11.1(d) and (l) of the LTD Loan Agreement.

(D)     Defendant Lock the Door is also in default of its representations in Section 9.4, regarding the accuracy of its statements; Section 9.5, regarding solvency; and Section 9.13, regarding the accuracy of its representations to Plaintiff.

24.     Pursuant to the LTD Loan Agreement, if an Event of Default exists, then, following "notice to the Borrower and reasonable opportunity to cure such Default," Plaintiff may, inter alia, (a) after at least five business days, declare all obligations of Lock the Door "to be immediately due and payable . . . without demand, presentment or notice," (b) take possession of, appoint a receiver to take possession of, or sell, lease, license or dispose of, the collateral granted to it as security for the Lock the Door Loan, (c) take over or have a designee take over the production, completion and delivery of "The Coll3cted," and (d) pursue any other remedies under the LTD Loan Agreement, other loan documents, and applicable law. (LTD Loan Agreement, § 11.2.)

25.     Lock the Door has not cured its defaults.

26.     On February 4, 2021, Plaintiff provided notice of acceleration.

## THE BROWN AND RAYMOND FRAUDULENT SCHEME

27.     Concerned by a pattern of false promises, Plaintiff undertook an effort to investigate David Brown in late 2020. Through postings on Instagram accounts made by members of Brown's family, Plaintiff learned that "Brown" was in fact David Levy. Plaintiff soon learned that David Levy had a history of bankruptcy and fraud, involving conduct repeated in connection with Plaintiff's loan.

28.     In December 2015, Brown filed for personal bankruptcy in the United States Bankruptcy Court for the Central District of California, Case No. 1:15-bk-14037. He listed "David Brown" as a former name and claimed that his actual name was "David Brown Levy." His bankruptcy petition was the direct result of fraud claims asserted against him in *Poteet et al. v. Levy*, Case No. 15-1264 (Davidson Co.

**COMPLAINT**

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 44868572v3

Tenn.). Poteet and the other plaintiffs in that case were investors in a motion picture produced by Brown who alleged that Brown had lied to them about hiring Kevin Spacey to appear in a film and used documents bearing a forged Kevin Spacey signature to obtain their funds. Brown filed for personal bankruptcy to stay the Tennessee suit. Poteet and the other investors continued to pursue their claims notwithstanding Brown's bankruptcy. In January 2020, they obtained a judgment from the bankruptcy court which found that Brown had engaged in fraud within the meaning of 11 U.S.C. § 523(a)(2), such that his debt to them was not dischargeable. Had Brown disclosed his history of bankruptcy and fraud, Plaintiff would never have advanced funds to his business.

29.    To obtain the loan for his company Lock the Door, Brown represented that The Coll3cted was close to completion and that the loan proceeds would be sufficient to complete production of the Film. Specifically, Brown represented that the movie would be complete with approximately one week of filming. He represented that the final days of filming would take place in January 2020. He provided Plaintiff with a budget of approximately $5 million for the entire project and advised that he had already invested $2 million of his own funds. Plaintiff's $3 million was the difference needed to complete the film. Plaintiff was thus assured that its loan would be sufficient to finish the Film. Brown also caused Defendant Lock the Door to represent that it was solvent. None of these statements was true.

30.    The loan proceeds were spent within days of receipt. Nothing was scheduled for January, and nothing has happened since. Brown procured Plaintiff's funds through deception and used those funds to pay old bills or even those unrelated to the Film. Far from being close to the finish of a major motion picture, Defendant Lock the Door was deeply insolvent. Notwithstanding the requirements of Section 8.3 the loan agreement, Brown and Lock the Door failed to apprise Plaintiff of the true state of affairs. Instead, Brown made a series of false statements regarding his production plans and an alleged re-start of the movie, all designed to conceal the

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

default. In June 2020, he claimed that production would finish in August. He later claimed that it would be completed in Canada in early 2021. In fact, Lock the Door had no funds and no ability to start production. Indeed, Brown knew at the outset that the loan could never be repaid based on the state of the production and the true condition of Lock the Door's finances. The general ledger for Lock the Door suggests that the loan proceeds were not even used for the Film.

31. Brown's modus operandi is deceit. In November 2019, through Lock the Door, he borrowed funds from an affiliate of plaintiff named Hungry Foolish Pictures LLC ("Hungry LLC"), assuring the lender that he would procure a completion bond for The Coll3cted. No such bond was ever purchased. At least two lenders to Lock the Door are asserting fraud claims against Brown based on misrepresentations that he made to them. Red Card LLC ("Red Card") lent $950,000 in September 2019 based on Brown's commitment to repay the loan by the earlier of October 1, 2019 or upon a refinancing. Brown represented that he needed the funds as a bridge loan and that a new lender was days away. Brown in fact obtained a loan from Hungry LLC in November 2019, but never paid Red Card. For the next several months, Brown made numerous false promises of imminent payment and even signed a Settlement Agreement in February 2020, which he had no intent to honor. In late February 2020, Red Card filed suit in Superior Court, Los Angeles County, Case No. 20 cv 08086. Brown continues to evade payment of Red Card.

32. Brown also falsely assured plaintiff that the loan by Hungry LLC would be used to pay another lender, 828 Media. That too was a lie. 828 Media is now also pursuing claims against Brown and his companies to recover on their defaulted debt. At the time of the Lock the Door loan, Brown assured plaintiff that the entity was capitalized with $2 million in equity, and that plaintiff's loan would provide the additional capital for the film. Brown failed to disclose that Lock the Door still owed approximately $2 million to other lenders, whose funds had been diverted from Lock

the Door to other David Brown projects. Alternatively, Brown's claim to have invested his own capital as equity was another lie.

33.     Brown has also perpetrated a string of frauds in connection with funds raised for Clear Distribution LLC, another company that he controls and which purportedly has the distribution rights to The Coll3cted. Through Clear Distribution, Brown deceived one lender into advancing $500,000 based on a direction of payment letter that violated the Company's lending covenants and which was unenforceable. The senior lender to Clear Distribution, the plaintiff in the case, received forged banking documents from Brown purporting to show a wire for more than $200,000 as payment on its loan. The payment never arrived. In fact, Brown diverted more than $500,000 in Clear Distribution funds that were the property of the senior lender. The funds went to Brown, Raymond and/or other Brown projects. Brown even testified under oath in Clear Distribution legal proceedings that he had a cashier's check in the amount of $130,000 that represented funds owed to the senior lender. There was no cashier's check. Brown later claimed that the statement was a misunderstanding and that he was referring to funds in transit from two distributors. That too was a lie. No funds were ever received from the alleged foreign distributors.

34.     Defendant Julian Raymond a/k/a Jules Raymond is Brown's spouse. Through funds stolen from Plaintiff, they enjoy a lavish lifestyle that includes travel on private jets, luxury homes in New York and California and luxury cars. Throughout, Brown has been assisted in his fraudulent schemes by defendant Raymond. Defendant Raymond boasts a screen credit for his role as the accountant for The Coll3cted. Brown's modus operandi depends upon a large number of ever changing bank accounts, with funds transferred among them at a rapid pace. To stymy his creditors, Brown has claimed that he has no accounting records and keeps track of his complex finances in his head. This is a lie. Defendant Raymond is the book keeper and accountant for Brown's fraudulent schemes. His work is integral to Brown's fraud. Upon information and belief, Raymond has made a host of false

entries to disguise Brown's theft and make collection of the stolen money even more challenging.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract Against Lock the Door)

### (Loan Agreement)

35.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 34, inclusive, of this Complaint and incorporates the same hereat by reference.

36.     Defendant Lock the Door has defaulted on the LTD Loan Agreement and Plaintiff has accelerated the debt, which has become due and payable.

37.     Plaintiff has heretofore made demand upon Lock the Door for payment of the amounts owed under the LTD Loan Agreement.

38.     Lock the Door has failed and refused to pay to Plaintiff the amount owing under the LTD Loan Agreement plus interest thereon.

39.     Based on the foregoing, Lock the Door owes Plaintiff the principal sum of $3,000,000 plus interest in accordance with the LTD Loan Agreement.

40.     As a result of Lock the Door's breaches of its obligations, Plaintiff has engaged counsel to enforce its rights and pursue its remedies. Based thereon, as set forth in the Note, Plaintiff is entitled to recover its attorney's fees and all costs of collection.

## SECOND CLAIM FOR RELIEF

### (Recovery of Personal Property – Against Lock The Door and Clear Horizon)

41.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 40, inclusive, of this Complaint, and incorporates the same hereat by reference.

42.     The Security Agreement provides, among other things, that upon a breach of the terms thereof, Plaintiff is entitled to take possession of the Collateral and exercise all remedies of a secured creditor. In addition, the Security Agreement

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

BN 44868572v3

provides that, upon a default, Plaintiff is granted a power of attorney by each defendant to pursue its rights in the Collateral.

43.     As a result of the defaults alleged hereinabove, Plaintiff is entitled to immediate possession of the Collateral. Plaintiff has heretofore demanded of Lock the Door that it turn over the Collateral to Plaintiff. Lock the Door has failed and refused, and continues to fail and refuse, to turn over the Collateral to Plaintiff.

44.     As a result of the defaults alleged hereinabove, Plaintiff is also entitled to immediately exercise all rights under the Pledge Agreement.

45.     Plaintiff is informed and believes and thereon alleges that the fair market value of the Collateral is sufficient to pay the debt in full or some other amount owing to be determined at time of trial according to proof. Plaintiff is informed and believes and thereon alleges that the Collateral has not been taken for a tax, assessment or fine pursuant to a statute or seized under an execution order. Plaintiff is informed and believes and thereon alleges that the Collateral is in immediate danger of destruction, serious harm, concealment, transfer, and/or removal from its existing location.

## THIRD CLAIM FOR RELIEF

### (Fraud against Defendant Brown)

46.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 45, inclusive, of this Complaint, and incorporates the same hereat by reference.

47.     Defendant Brown exercised complete domination and control over Lock the Door in respect to the transactions described herein. This domination was used to commit fraud and wrongdoing against Plaintiff, which has resulted in Plaintiff's loss.

48.     Defendant Lock the Door has at all relevant times been owned and controlled by Brown. Defendant Lock the Door failed to adhere to corporate formalities and was inadequately capitalized, and Defendant Brown commingled the assets of this entity with his personal assets and/or with assets of other entities owned

and/or controlled by Brown, and used Defendants' corporate funds for such personal use.

49.   Defendant Brown made numerous misstatements of material fact to Plaintiff. For example, as set forth in detail above, in order to induce Plaintiff to enter into the LTD Loan Agreement, Brown misrepresented that the film, The Coll3cted, was close to completion and that the loan proceeds would be sufficient to bring the film to market. He assured Plaintiff that the film was one week away from completion, that the final days of filming would be in early-to-mid-January 2019, and that Plaintiff's investment would be sufficient to bring the film to distribution. Brown also represented that Lock the Door was solvent. None of these statements was true. Brown also caused Lock the Door to spend the proceeds of the Lock the Door Loan within days of receipt. On information and belief, Brown used those funds to pay debts unrelated to the Film. Brown's fraud has left Lock the Door insolvent and unable to pay the loan.

50.   Brown made the false statements with the intent of inducing Plaintiff to loan money to entities controlled by Brown, and to enter into the loan agreements set forth herein. Brown acted with scienter. Plaintiff did, in fact, reasonably rely on Brown's misrepresentations.

51.   Accordingly, Plaintiff is entitled to recover from Defendant Brown all sums owed by Defendant Lock the Door.

## FOURTH CLAIM FOR RELIEF

### (Aiding and Abetting Fraud Against Raymond)

52.   Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 51, inclusive, of this Complaint, and incorporates the same hereat by reference.

53.   Defendant Raymond provide material assistance to Brown in his scheme to use Lock the Door as a vehicle defraud Plaintiff. Defendant Raymond acted with

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**COMPLAINT**

BN 44868572v3

full knowledge of Brown's fraudulent scheme and assisted him in devising and operating a complex web of banking and financing transactions.

54.    Accordingly Raymond should be liable to Plaintiff for all sums lost as a result of the fraudulent scheme, an amount estimated to exceed $3 million.

## PRAYER FOR RELIEF

## AS TO THE FIRST, THIRD AND FOURTH CLAIMS FOR RELIEF:

1.    Judgment in favor of Plaintiff and against Defendants, and each of them, jointly and severally, for the principal sum of $3,000,000, plus accrued and accruing interest and other charges according to proof at time of trial or entry of judgment.

## AS TO THE SECOND CLAIM FOR RELIEF:

2.    Judgment for turn over of the Collateral and pledged shares of Plaintiff, including for an order of the Court appointing a receiver to protect, preserve and dispose of the Collateral and pledged shares;

(a)    Committing or permitting any waste of the Collateral or any part thereof, or suffering or committing or permitting any act on the Collateral or any part thereof in violation of law, or removing, transferring, encumbering or otherwise disposing of any of Collateral or any part thereof;

(b)    Directly or indirectly interfering in any manner with the discharge of the Receiver's duties under his Order or the Receiver's possession of and operation or management of the Collateral;

(c)    Expending, disbursing, transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering, concealing or in any manner whatsoever dealing in or disposing of the whole or any part of the Collateral without a prior specific Court Order;

(d)    Withholding possession of any Collateral from the Receiver; and

(e)    Doing any act which will, or which will tend to, impair, defeat, divert, prevent or prejudice the preservation of the Collateral.

///

**AS TO ALL CAUSES OF ACTION:**

3.    For attorney's fees.

4.    For costs of suit herein incurred.

5.    For such other and further relief as this Court may deem just and proper.

DATED: March 19, 2021                    BUCHALTER
                                         A Professional Corporation


                                   By:   _____
                                              STEVEN M. SPECTOR
                                              OREN BITAN
                                              Attorneys for Plaintiff
                                              8TH WONDER PICTURES, LLC

# EXHIBIT A

EXECUTION VERSION

LOAN AND SECURITY AGREEMENT

dated as of

December 31, 2019

between

LOCK THE DOOR, LLC,
as the Borrower,

and

8TH WONDER PICTURES, LLC,
as the Lender

# TABLE OF CONTENTS

**Page**

## TABLE OF CONTENTS

Page

ARTICLE 1 - DEFINITIONS ............................................................................................. 1
    1.1    Defined Terms ......................................................................................... 1
    1.2    Approval and Consent............................................................................. 12
    1.3    Accounting Terms .................................................................................. 12
    1.4    Other Rules of Interpretation and Construction..................................... 12
ARTICLE 2 - LOANS ...................................................................................................... 13
    2.1    Commitment to Lend; No Re-Borrowing ............................................... 13
    2.2    Loan Procedure ...................................................................................... 13
    2.3    Lenders' Loans........................................................................................ 14
ARTICLE 3 - INTEREST, FEES, AND OTHER CHARGES ........................................... 14
    3.1    Interest Rates........................................................................................... 14
    3.2    Payments on Closing Date ...................................................................... 15
ARTICLE 4 - PAYMENTS AND REPAYMENTS ........................................................... 15
    4.1    Repayment of Loans ............................................................................... 15
    4.2    Mandatory Prepayments ......................................................................... 15
    4.3    Voluntary Prepayments........................................................................... 15
    4.4    Payments and Computations................................................................... 15
    4.5    Indemnity for Returned Payments .......................................................... 15
    4.6    Books and Records; Periodic Statements ............................................... 16
    4.7    Increased Costs ....................................................................................... 16
ARTICLE 5 - LENDING CONDITIONS .......................................................................... 17
    5.1    Conditions Precedent to the Loan........................................................... 17
ARTICLE 6 - PICTURE PRODUCTION, COMPLETION, DELIVERY AND DISTRIBUTION ............................................................................................................. 18
    6.1    Budget; Cash Flow; Screenplay; Production Schedule ......................... 19
    6.2    Picture Production................................................................................... 19
    6.3    Picture Element Changes ........................................................................ 19
    6.4    Picture Credits; Print Advertising; Posters Premier and Festival Screenings....... 19
    6.5    Residuals; Contingent Compensation; Fees........................................... 20
    6.6    Picture Exhibition .................................................................................. 20
    6.7    Sales Agent Payments ............................................................................ 20
    6.8    Distribution Agreements ......................................................................... 20
    6.9    Performance and Amendment of Agreements, Etc................................. 20
    6.10    Enforcement of Agreements ................................................................... 21
    6.11    Sales Agent Termination......................................................................... 22

# TABLE OF CONTENTS
### (Continued)

|  |  | Page |
|---|---|---|
| 6.12 | Application of Excess Production Funds | 22 |
| 6.13 | Georgia Tax Credit | 22 |
| ARTICLE 7 - | COLLATERAL | 24 |
| 7.1 | Grant of Security Interest | 24 |
| 7.2 | Perfection and Protection of the Lender's Security Interest | 28 |
| 7.3 | Assignment of Rights Only | 28 |
| 7.4 | Jurisdiction of Organization; Chief Office; Production Activities; and Physical Properties | 29 |
| 7.5 | Title to and Liens on Collateral | 29 |
| 7.6 | Access and Examination | 30 |
| 7.7 | Attorney-in-Fact | 30 |
| 7.8 | The Lender's Rights, Duties and Liabilities | 32 |
| 7.9 | Authority to Collect | 33 |
| 7.10 | Copyrights | 33 |
| 7.11 | Control of Picture Elements | 34 |
| ARTICLE 8 - | BOOKS, RECORDS; FINANCIAL REPORTING; AND NOTICES | 34 |
| 8.1 | Books and Records | 34 |
| 8.2 | Financial Information | 34 |
| 8.3 | Notice of Certain Events | 34 |
| ARTICLE 9 - | GENERAL REPRESENTATIONS AND WARRANTIES | 35 |
| 9.1 | Authorization, Validity, and Enforceability | 35 |
| 9.2 | Validity and Priority of Liens | 35 |
| 9.3 | Organization and Qualification | 35 |
| 9.4 | Financial Statements | 36 |
| 9.5 | Solvency | 36 |
| 9.6 | Rights in the Picture and Collateral | 36 |
| 9.7 | Required Payments | 36 |
| 9.8 | Litigation | 37 |
| 9.9 | No Defaults | 37 |
| 9.10 | ERISA | 37 |
| 9.11 | Taxes | 37 |
| 9.12 | Margin Stock; Investment Company; and Public Utility Holding Company | 37 |
| 9.13 | Disclosure | 38 |
| 9.14 | Material Agreements | 38 |
| 9.15 | Affiliate Transaction | 38 |
| 9.16 | Patriot Act | 38 |
| 9.17 | The Foreign Assets Control Regulations and Anti-Money Laundering | 38 |
| 9.18 | Survival of Warranties | 39 |

# TABLE OF CONTENTS
### (Continued)

| | | Page |
|---|---|---|
| ARTICLE 10 - AFFIRMATIVE AND NEGATIVE COVENANTS | | 39 |
| 10.1 | Taxes and Other Liabilities | 39 |
| 10.2 | Legal Rights and Facilities | 39 |
| 10.3 | Compliance | 39 |
| 10.4 | Maintenance | 40 |
| 10.5 | Insurance | 40 |
| 10.6 | Related Agreements | 42 |
| 10.7 | Approvals | 42 |
| 10.8 | Indebtedness | 42 |
| 10.9 | Dissolution and Sale of Assets | 42 |
| 10.10 | Use of Proceeds | 42 |
| 10.11 | Consolidation or Merger, Investments and capital expenditures | 42 |
| 10.12 | Liens | 42 |
| 10.13 | Hedge Agreements | 43 |
| 10.14 | Further Assurances | 43 |
| 10.15 | Control Agreements | 43 |
| 10.16 | Corporate Separateness | 43 |
| 10.17 | Post Closing Covenants | 43 |
| ARTICLE 11 - EVENTS OF DEFAULT; REMEDIES | | 43 |
| 11.1 | Events of Default | 43 |
| 11.2 | Remedies | 45 |
| 11.3 | Cumulative Remedies; No Prior Recourse to Collateral | 48 |
| 11.4 | Failure or Indulgence Not Waiver | 48 |
| 11.5 | Performance of Obligations by Lender | 48 |
| ARTICLE 12 - TERM AND TERMINATION | | 48 |
| 12.1 | Termination | 48 |
| ARTICLE 13 - MISCELLANEOUS | | 49 |
| 13.1 | Severability | 49 |
| 13.2 | Governing Law | 49 |
| 13.3 | Jurisdiction | 49 |
| 13.4 | Waiver of Jury Trial, Etc | 50 |
| 13.5 | Expenses and Fees | 50 |
| 13.6 | Taxes | 50 |
| 13.7 | Notices | 51 |
| 13.8 | Assignments; Participations | 52 |
| 13.9 | Indemnification | 52 |
| 13.10 | USA Patriot Act et al | 53 |
| 13.11 | Final Agreement | 53 |

## TABLE OF CONTENTS
### (Continued)

| | | **Page** |
|---|---|---|
| 13.12 | Counterparts | 53 |
| 13.13 | No Beneficiaries | 53 |
| 13.14 | Amendments, Etc | 53 |
| 13.15 | Relationship of Parties | 54 |
| 13.16 | WAIVER WITH RESPECT TO DAMAGES | 54 |

# LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement ("Agreement") is made and entered into as of December 31, 2019 by and between LOCK THE DOOR, LLC, a California limited liability company (the "Borrower"), on the one hand, and 8TH WONDER PICTURES, LLC, a Delaware limited liability company (the "Lender"), on the other hand.

## RECITALS

This Agreement is entered into in reference to the following facts:

The Borrower has requested that the Lender provide the Borrower with a non-revolving credit facility in the aggregate original principal amount of up to $3,000,000 (Three Million USD) for (i) for the purpose of financing the production, completion and delivery of a motion picture currently entitled "The Coll3cted,"; (ii) repayment in full of the obligations of the Borrower to Lender pursuant to that certain Promissory Note (Bridge Note) dated as of November 18, 2019 (the "Bridge Note"); and (iii) the other purposes and on the terms contemplated herein.

The Lender is willing to provide the Loans on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, the Borrower and the Lender each hereby agree as follows:

## ARTICLE 1 - DEFINITIONS

1.1    Defined Terms.  Capitalized terms used herein shall have the following meanings:

"828" means 828 Media Capital LLC.

"Acceptable Distribution Agreement" means a Distribution Agreement approved by the Lender as an "Acceptable Distribution Agreement" and that at all times meets all of the following criteria:

(a)    The Lender has received an original or copy thereof and an original Assignment therefor, that have been duly executed and delivered by each party thereto;

(b)    The terms thereof are Acceptable Terms (unless otherwise approved by the Lender in its sole and absolute discretion);

(c)    The Distribution Agreement complies with all of the Borrower's representations, warranties, and covenants under the Loan Documents with respect to Distribution Agreements; and

(d)    The Distributor is not subject to any Bankruptcy Proceedings.

"Acceptable Terms" means the terms of any Distribution Agreement that meets the minimum sales estimates as set forth under the IPA.

"Advances" has the meaning assigned thereto in Section 2.1

"<u>Affiliate</u>" means, as to any Person, any other Person who directly or indirectly, controls, is controlled by, or is under common control with such Person.  A Person shall be deemed to control another Person if the controlling Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of the other Person, whether through the ownership of voting securities, by contract, or otherwise. In addition, a Person, ten percent (10%) of more of whose equity securities are owned by another Person, shall be deemed to an "Affiliate" of such Person.

"<u>Agreement</u>" means this Loan and Security Agreement.

"<u>Approved Cash Flow Schedule</u>" means the final cash flow schedule for the Picture, identified as such in writing by the Lender, the Borrower, and all third Persons having approval rights with respect thereto.

"<u>Approved Production Schedule</u>" means, collectively, the final production schedule for the Picture and the final post-production schedules for the Picture, identified as such in writing by the Lender, the Borrower, and all third Persons having approval rights with respect thereto.

"<u>Assignment</u>" means with respect to any Distribution Agreement, a notice of assignment, direction to pay, or interparty agreement in the form approved by the Lender.

"<u>Attorney Costs</u>" means all fees of the legal counsel engaged by Lender on or prior to the Closing Date to negotiate and close the Loan evidenced by this Agreement, which shall equal no more than the sum of $25,000, and any related out-of-pocket disbursements, search, filing, travel, courier, messenger, copying, and other fees and expenses reasonably incurred by such counsel, and shall be included in, and withheld from, the Loan.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code (11 U.S.C. § 101 *et seq*.).

"<u>Bankruptcy Proceeding</u>" means, for any Person, (a) that such Person shall generally not pay its debts as they become due or shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors; or such Person shall commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it a bankrupt or insolvent or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any Debtor Relief Law or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property or shall file an answer or other pleading in any such case, proceeding or other action admitting the material allegations of any petition, complaint or similar pleading filed against it or consenting to the relief sought therein; or such Person shall take any action to authorize, or in contemplation of, any of the foregoing, or (b) any involuntary case, proceeding or other action against such Person shall be commenced seeking to have an order for relief entered against it as debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts under any Debtor Relief Law or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its property, and such case, proceeding or other action (i) results in the entry of any order for relief against it, or (ii) shall remain undismissed for a period of thirty (30) days;

"Borrowing Certificate" means a certificate substantially in the form attached hereto as Exhibit A.

"Bridge Note" has the meaning given to such term in the recitals hereof.

"Budget" means the final budget for the Picture, identified as such in writing by the Lender, the Borrower, and all third Persons having approval rights with respect thereto, which reflects a total amount (excluding financing and legal fees and expenses) to be approved by the Lender.

"Business Day" means any day that is not a Saturday, Sunday, or a day on which banks in Los Angeles, California or Austin, Texas, are required or permitted to be closed.

"CAMA" or "Collection Account Control Agreement" mean a "Collection Account Management Agreement" or any similar agreement in form customary for single-picture financing transactions in the U.S., by and among Freeway CAM BV, Stichting Freeway Custody, the Borrower, the Lender and the other parties thereto, in form and substance approved by the parties hereto and as otherwise agreed in the IPA.

"Capital Adequacy Regulation" means any guideline, request or directive of any central bank or other governmental authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy of any bank or of any corporation controlling a bank.

"Change in Control" shall mean (i) David Brown shall cease either (a) to own, directly or indirectly, all of the equity interests in the Borrower or (b) to have managerial control of the Borrower.

"Chain of Title Documents" means all documents evidencing the chain of title for the Picture.

"Change in Law" shall mean the occurrence after the date of this Agreement of any of the following:  (i) the adoption or taking effect of any law, rule, regulation or treaty, (ii) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any governmental authority or (iii) compliance by the Lender with any request, guideline, requirement or directive (whether or not having the force of law) of any governmental authority made or issued after the date of this Agreement; provided that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted, issued or implemented.

"Clear Distribution" means Clear Distributions, LLC, a California limited liability company, d/b/a Clear Horizon.

"Closing Date" means January 7, 2020.

3

"Collateral" has the meaning assigned thereto in Section 7.1.

"Collateral Proceeds" means (i) all "proceeds", as such term is defined in the UCC, and (ii) all amounts acquired or paid to or derived by or payable directly and indirectly to the Borrower, the Sales Agent, any Licensing Intermediary or any third Persons on account of the sale, lease, licensing, exchange, distribution, exploitation, or other disposition of any item of the Collateral, including, without limitation, the Georgia Tax Credits, money, royalties, fees, commissions, charges, payments, proceeds of any letter of credit, advances, income, profit and other forms of payment, proceeds of any insurance for any of the Collateral, and any sums payable to the Borrower, the Sales Agent, any Licensing Intermediaries and any other third Persons or any of their respective Affiliates under or in relation to the Distribution Agreements and/or any proceeds of the Georgia Tax Credit.

"Collection Account" means the bank account established and controlled by Freeway CAM B.V. pursuant to the CAMA.

"Commitment Amount" means the sum of $3,000,000.

"Copyright Mortgage and Assignment" means the Copyright Mortgage and Assignment, dated as of the date hereof from the Borrower in favor of Lender.

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event, act or condition that with the giving of notice or the passage of time would constitute an Event of Default.

"Default Rate" means a rate of interest that is two percent (2%) per month, compounded monthly.

"Delivery" means (a) with respect to the Sales Agent, "Delivery" (as such term is defined in the Sales Agent Agreement) and (b) with respect to delivery to any Distributor (i) on or before the applicable Delivery Date (if any is applicable) of either a notice of availability of certain Delivery Items and/or delivery of those Delivery Items to such Distributor and/or to a designated film laboratory, all as specified in the applicable Assignment, subject to the cure procedures and cure periods, if any, provided in Assignment, or (ii) if such Distributor has not entered into an Assignment, then in strict accordance with the terms of the applicable Distribution Agreement.

"Delivery Date" means (a) with respect to the Sales Agent, the date specified in the Sales Agent Agreement on or before which the Delivery Items are to be delivered and/or made available to the Sales Agent, and (b) with respect to a Distributor, the date specified in the applicable Assignment (if any date is specified at all) (or, if such Distributor has not entered into an Assignment or inter-party agreement, then in strict accordance with the terms of the applicable Distribution Agreement) on or before which the Delivery Items are to be delivered and/or made available to such Distributor, as such dates references in clauses (a) and (b) may be extended by events of force majeure (not in excess of 30 calendar days).

4

"Delivery Items" means (a) with respect to the Sales Agent, the items listed in the Sales Agent Agreement that must be delivered and/or made available by the Borrower to the Sales Agent, and (b) with respect to such Distributor, the Delivery Items that must be delivered and/or a made available to such Distributor specified and in accordance with the terms of the applicable Assignment (or, if such Distributor has not entered into an Assignment, then in strict accordance with the terms of the applicable Distribution Agreement).

"Distribution Agreement" means an agreement, meeting the Acceptable Terms, between the Borrower or the Sales Agent on behalf of the Borrower, on the one hand, and a Distributor, on the other hand, now or hereafter entered into, pursuant to which such Distributor has been granted, sold, conveyed, licensed, sub-licensed, leased, sub-leased, or otherwise transferred all or any part of those rights in the Picture, and any permitted amendments, modifications and supplements thereto.

"Distribution Agreement Proceeds" means all Collateral Proceeds derived from the Distribution Agreements.

"Distributor" means a Person (other than the Borrower or the Sales Agent) that entered into a Distribution Agreement.

"Dollars" or "$" means the lawful currency of the United States of America.

"Equipment" means (a) all "equipment", as such term is defined in the UCC, and (b) all machinery, electrical and electronic components, equipment, fixtures, furniture, office machinery, vehicles, trailers, implements and other tangible personal property of every kind and description used or useful in connection with the Picture (including, without limitation, all wardrobe, props, mikes, scenery, sound stages, movable, permanent or vehicular dressing rooms, sets, lighting equipment, cameras and other photographic, sound recording and editing equipment, projectors, film developing equipment and machinery) and all goods of like kind or type hereafter acquired by the Borrower in substitution or replacement thereof, and all additions and accessions thereto, wherever any of the foregoing is located.

"Essential Element" means Josh Stewart in the role of "Arkin" (or by whatever other name this character may be known in the completed Picture) through the completion of principal photography.

"Event of Default" has the meaning specified in Article 11.

"Final Cast List" means the final cast list for the Picture of the Picture, including all of the actors.

"GAAP" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable statue and authority within the US accounting profession) which are applicable to the circumstances as of the date of determination.

"Georgia Film Office" means the Georgia Department of Economic Development or such other office or department as designated by the State of Georgia to handle the approval and all other aspect of the Georgia Tax Credit for the Film.

"Georgia Tax Credit(s)" means the film production and/or post production tax credits or other similar benefits available to the Borrower with respect to the Film pursuant to the laws and regulations of the State of Georgia (in each case as the same may be amended from time to time) in connection with the production of the Film.

"Georgia Tax Credit Proceeds" means all Collateral Proceeds from the Georgia Tax Credits Rights.

"Georgia Film Credit Regulations" means the Regulations of the Commissioner of the Georgia State Department of Economic Development (as the same may be amended from time to time).

"Georgia Film Production Tax Credit Certificate" means the "certificate of tax credit" (as defined in the Georgia Film Credit Regulations) issued by the Georgia Film Office that states the amount of the Georgia Tax Credit for which the Borrower has qualified.

"Georgia Tax Credit Calculation" means a calculation of the Georgia Tax Credit Estimate provided by Mock and Associates (a) on or prior to the Effective Date or (b) as reasonably requested by Lender at any time thereafter, and in each such case accompanied by a list of assumptions used in preparing such estimate.

"Georgia Tax Credit Rights" shall mean the rights of Borrower to any Georgia Tax Credit or similar benefits relating to the Film pursuant to any Georgia law, regulation or statute.

"Guild" means the Screen Actors Guild-American Federation of Television and Radio Artists, Directors Guild of America, Inc., Writers Guild of America, West, Inc., Writers Guild of America, East, Inc., and any other trade organization or union having jurisdiction over the employment and/or engagement of individuals providing services in connection with the Picture.

"Guild Subordination Agreement" means a subordination agreement, the terms of which have been approved by the Lender and its counsel, between the Lender and a Guild, pursuant to which, the Guild subordinates any Lien which it may have in the Collateral to the Lender's Lien hereunder until the Obligations have been repaid in full or pursuant to which the Lender subordinates any Lien which it may have in the Collateral to such Guild's Lien.

"Hedge Agreement" shall mean (a) any agreement, arrangement, device or instrument with respect to any swap, forward, future or derivative transaction, foreign or financial exchange transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, interest rate cap or collar protection agreements or interest rate options, puts and warrants and so-called "rate swap" and "hedging" agreements or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; and (b) any and all cancellations, buy-backs, reversals, terminations or assignments of any of the foregoing.

"Interest Rate" means twenty percent (20.0%) per annum.

"IPA" means the Inter Party Agreement dated as of the date hereof among the Borrower, the Lender, the Sales Agent, and 828.

"Laboratory" means a laboratory, sound, post-production, or other similar facility that has been approved by the Lender, the Borrower, and the Sales Agent and been engaged to perform transfers, telecine, or other services for the Picture or holds at any time the original Picture Elements (or any of them).

"Laboratory Control Agreement" means a Laboratory Control Agreement among the Lender, the Borrower, the Sales Agent, and the applicable Laboratory, in a form reasonably approved by the Lender.

"Lender" has the meaning given in the introductory paragraph of this Agreement.

"Lender Advances" has the meaning given in Section 2.2.

"Lender Executive Producer Agreement" means the executive producer agreement dated as of the date hereof between the Borrower and Lender.

"Lender Production Fee" means the sum of  $175,000, which shall be included in, and paid out from, the Budget in connection with the Lender Executive Producer Agreement.

"Licensing Intermediary" means any other Person approved by the Lender that has been granted distribution rights in the Picture by the Sales Agent in order to mitigate foreign withholding taxes.

"Licensing Intermediary Agreements" collectively means (a) all license agreements between the Sales Agent and a Licensing Intermediary, including all supplements, addenda, modifications, amendments, extensions and replacements thereof and the exhibits attached thereto, pursuant to which such Licensing Intermediary has been granted certain distribution rights in and to the Picture throughout certain territories, and (b) all sales agent agreements between a Licensing Intermediary and any Person in connection with the Picture, including all supplements, addenda, modifications, amendments, extensions and replacements thereof and the exhibits attached thereto, pursuant to which such Person has been retained as such Licensing Intermediary's sales agent for the Picture throughout certain territories.

"Licensing Intermediary Security Agreement" collectively means each security agreement entered into among, *inter alia,* a Licensing Intermediary, the Lender and the Borrower with respect to the Picture, including all supplements, addenda, modifications, amendments, extensions and replacements thereof and the exhibits attached thereto.

"Lien" means any interest in property securing an obligation owed to, or a claim by, a Person other than the owner of the property, whether such interest is based on the common law, statute, or contract, and including without limitation, a security interest, charge, claim, or lien arising from a mortgage, deed of trust, encumbrance, pledge, hypothecation, assignment, deposit arrangement, agreement, security agreement, conditional sale or trust receipt or a lease,

7

consignment or bailment for security purposes, or other security device or arrangement of any kind or nature whatsoever (including, without limitation, any financing or similar statement or notice filed under the UCC, as in effect from time to time in the relevant jurisdiction, or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing).

"Literary Property" means all rights of every kind and nature (including, without limitation, copyrights) in and to the Screenplay (including any and all drafts, versions and variations thereof) and any other literary, musical, dramatic or other literary material of any kind or nature upon which, in whole or in part, the Picture is or may be based, or from which the Picture has been or may be adapted or inspired, or which may be or has been used or included in the Picture, including, without limitation, all scripts, scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, characters, manuscripts, story boards or other properties or materials of any kind or nature (including, without limitation, electronic data wherever maintained, stored or otherwise located) in whatever state of completion and all drafts, versions and variations thereof.

"Loan(s)" has the meaning assigned thereto in Section 2.1.

"Loan Documents" means this Agreement, the Note, the Assignments, the Copyright Mortgage and Assignment, the Chain of Title Documents, the Sales Agent Interparty Agreement, the Lender Executive Producer Agreement, the Powers of Attorney, the Membership Interest Pledge Agreement, and all other agreements, instruments, and documents heretofore, now or hereafter evidencing, securing, guaranteeing, or otherwise relating to the Obligations, the Collateral or any collateral granted to Lender under the Accommodation Security Agreement, the Lender's Lien, or any other aspect of the transactions contemplated by this Agreement and reasonably required by Lender.

"Make Whole Amount" has the meaning set forth in Section 4.3.

"Material Adverse Effect" means a change or effect that (a) could have a material and adverse effect upon (i) the operations, business, properties, assets, liabilities (actual or contingent) or financial or other condition of the Borrower or the Sales Agent, or (ii) the prospects of the Borrower or the Sales Agent, (b) materially impairs the legal right, power or authority of the Borrower, the Sales Agent, or  any of their respective Affiliates to perform their respective obligations under the Loan Documents to which they are a party, (c) materially impairs the ability of the Borrower, the Sales Agent, a Distributor, or any of  their respective Affiliates to perform their respective obligations under any Loan Document or Distribution Agreement to which they are a party, (d) materially impairs the legality, validity, binding effect or enforceability of, or materially impairs the rights, remedies and benefits available to Lender under the Loan Documents, (e) has a material adverse effect on the amount of revenue to be received by the Borrower, the Sales Agent or any of  respective Affiliates taken as a whole (or the anticipated time of receipt of such revenue) to be used to satisfy the Obligations in an amount that could adversely affect the ability of the Borrower to repay all or any portion of the Obligations in full when due, or (f) results in the Lender not having a first priority perfected Lien in all of the Collateral; provided, however, that any event or condition will be deemed to have a "Material Adverse Effect" if such event or condition when taken together with all other events and conditions occurring or in existence at such time (including all other events and conditions which, but for the fact that a

representation, warranty or covenant is subject to a "Material Adverse Effect" exception, would cause such representation or warranty contained herein to be untrue or such covenant to be breached) could be expected to result in a "Material Adverse Effect" hereunder even though, individually, such event or condition would not do so.

"Maturity Date" means the date that is the 18-month anniversary of the Closing Date, or in either case such earlier date upon which repayment of the Obligations are accelerated in accordance with the terms of this Agreement.

"Membership Interest Pledge Agreement" means the Pledge Agreement, dated as of the date hereof, by the Borrower in favor of the Lender, pursuant to which Clear Horizon Entertainment LLC has pledged one hundred percent (100%) of the membership interests in the Borrower as security for the Obligations.

"Minimum Guaranteed Payment" means the amount of the non-refundable advance or guaranty (without deduction of any withholding or remittance taxes, except as specified in the applicable Assignment) sums payable in Dollars or other currency expressly approved by the Lender prior to the Maturity Date by a Distributor to the Sales Agent or to the Borrower, as applicable, under the terms of a Distribution Agreement for the right to exploit the Picture in the territory specified therein.

"Non-Technical Specifications" means that the Delivery Items for the Picture, as reflected therein, are based on the Screenplay for the Picture with such minor revisions or alterations made thereto, up to and through the completion of principal photography as may be necessitated by the exigencies of production, and other minor changes and/or customary on-the-floor changes or editorial changes, but which in no event materially alter the story line, plot, or nature of any principal characters.

"Note" means the Note in the form attached hereto as Exhibit B.

"

"Obligations" means, collectively, (i) all present and future loans, advances, liabilities, obligations, covenants, duties, and indebtedness owing by the Borrower to the Lender (including without limitation, the Lender Production Fee and the Make Whole Amount), whether or not arising under this Agreement or any of the other Loan Documents, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, opening of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including, without limitation, all principal, interest (including interest accruing prior to and after the initiation of any Bankruptcy Proceeding, whether or not allowed), charges, expenses, fees, reasonable outside attorneys' fees, filing fees and any other sums chargeable to the Borrower hereunder or under any other Loan Document, and (ii) with regard to any other lender transactions whatsoever arising out of this Agreement between the Lender, on the one hand, and the Borrower, on the other hand, and the performance of all representations, warranties, agreements, covenants and other obligations of Borrower and the Sales Agent hereunder, under the Note, and under any other Loan Document entered into by any of the foregoing.

"Other Taxes" has the meaning assigned thereto in Section 13.6(b).

"Permitted Liens" means (a) the Lien of the Lender under this Agreement and the other Loan Documents; (b) the rights granted to Distributors under Acceptable Distribution Agreements, and to the Licensing Intermediaries under the Licensing Intermediary Agreements, provided such Liens and rights granted to the Distributors and Licensing Intermediaries are subordinate to the Lien and rights of the Lender under this Agreement and the other Loan Documents until payment of the subject Minimum Guaranteed Payment (as to Distribution Agreements pursuant to which Minimum Guaranteed Payments are payable); (c) any claim, charge, encumbrance, or Lien of the Laboratory provided for under the Laboratory Control Agreement, provided such liens, charges and encumbrances (i) occur in the ordinary course of making the Picture, (ii) are for an aggregate amount which does not at any time exceed the sum of $50,000 and (iii) are security for amounts that, at the time the lien is granted, are not yet due and payable or are being contested in good faith; (d) mechanics, workmen's, materialman's and repairmen's Liens provided (i) such Liens arise from claims arising in the ordinary course of business, (ii) such Liens are for an aggregate amount which does not at any time exceed the sum of $50,000, and (iii) such Liens arise from claims which are not in default or are being contested in good faith; and (e) any Guild Subordination Agreement.

"Person" means any natural person, corporation (including a business trust), partnership, limited liability company, joint venture, association, trust or unincorporated organization or any other business, legal or judicial entity, or a nation, state, government entity or any agency or political subdivision thereof.

"Physical Properties" means all physical properties of every kind or nature of or relating to the Picture in whatever state of completion and all versions thereof, including, without limitation, all physical properties relating to the development, production, completion, delivery, exhibition, distribution or other exploitation of the Picture, and all versions thereof or any part thereof, including, without limitation, the Literary Property, and all Picture Elements.

"Picture" shall mean the motion picture currently entitled "The Coll3cted", by whatever title such motion picture is known at any time, including the sound recordings thereof, as well as trailers and clips thereof, produced by means of any photographic, electronic, mechanical or other processes or devices now or hereafter known, invented, used or contemplated, by which photographs, films, drawings, images or other visual reproductions or representations are or may be printed, imprinted, recorded or otherwise preserved on film, tape or any other material of any description (whether translucent or not) for later projection, exhibition or transmission by any means or media now known or hereafter devised, in such manner that the same are or appear to be in motion or in sequence on a screen, mirror, tube or other medium or device, whether or not accompanied by sound recording.

"Picture Elements" means all physical, digital and electronic elements of the Picture, including all negatives, duplicate negatives, digital internegatives or interpositives, fine grain prints, soundtracks, positive prints (cutouts and trims excepted), and sound, all video formats (including PAL/NTSC), and other physical and/or digital properties in connection with the Picture, including, without limitation, all disc drives, digital storage devices of any description or nature, exposed film, developed film, positives, negatives, prints, answer prints, special effects, pre-print materials (including interpositives, negatives, duplicate negatives, internegatives, color reversals,

10

intermediates, lavenders, fine grain master prints and matrices and all other forms of pre-print elements which may be necessary or useful to produce prints or other copies or additional pre-print elements, whether now known or hereafter devised), soundtracks, recordings, audio and video tapes and discs of all types and gauges, cutouts, trims, non-analog recordings and tapes, including without limitation, any video digital recordings and HDTV format recordings, and any and all other physical and digital properties of every kind and nature relating to the Picture in whatever state of completion, and all duplicates, drafts, versions, variations and copies of each thereof.

"Powers of Attorney" means powers of attorney from the Borrower to Lender to exercise various of Borrower's respective rights in connection with the Picture.

"Powers of Sale" means powers of sale in a form approved by the Lender entered into by the Borrower, and any other Person required to enter into a power of sale by Lender.

"Production Bank Account" means a bank account as follows:

Bank Name: City National Bank
Bank Address:   400 North Roxbury Drive, Beverly Hills, CA 90210
Account Name: Lock the Door LLC
ABA (routing) number 122016066
Account number: 127815275
Swift Code CINAUS6L.

"Sales Agent" means Clear Distribution.

"Sales Agent Agreement" means the Sales Agency Agreement dated as of May 20, 2019 between the Borrower and the Sales Agent with respect to the Picture.

"Sales Agent Interparty Agreement" or "IPA" means that certain Interparty Agreement dated as the date hereof among the Sales Agent, the Borrower, and the Lender.

"Screenplay" means the final screenplay of the Picture, dated September 5, 2019, which is more particularly described in Schedule 1 attached hereto and incorporated herein by this reference.

"Taxes" has the meaning assigned thereto in Section 13.6(a).

"Technical Specifications" shall mean that: (i) the Picture shall have a running time of no less than 86 minutes, including main and end titles; (ii) the Picture will be produced in color in compliance with usual first-class theatrical feature film production requirements, have an aspect ratio of 1.85 or 2.35:1, and technical standards and will be completely finished and assembled, fully edited, titled, and fully synchronized with sound, music, sound effects and English language dialogue not post-synched or dubbed (except for incidental dialogue required by the Screenplay to be in a language other than English and also except for looped dialogue), and, in all respects, suitable for exhibition in first-class theatres in the United States for general release and public exhibition throughout the world; and (iii) the Delivery Items will be of a technical quality ready and suitable for the manufacture of release prints, print, and pre-print materials of first class

technical quality and other materials suitable for the commercial exploitation of the Picture in the United States.

"Termination Date" means the earliest to occur of (a) the Maturity Date, (b) the date the credit facility provided hereunder is terminated by the Lender pursuant to Section 11.2, and (c) the date this Agreement is otherwise terminated for any reason whatsoever.

"Unacceptable Distributor" means any Person that is subject to a Bankruptcy Proceeding, and a Person that does not meet the minimum requirements set forth in the IPA.

"UCC" means the Uniform Commercial Code – Secured Transactions (or any successor statute) of the State of New York or of any other state the laws of which are required thereof to be applied in connection with the issue of perfection of Liens.

1.2     Approval and Consent.  The words "acceptance", "approval", "approved" and "consent" as used herein with reference to an acceptance, approval or consent right granted to Lender, or any action requiring the consent of Lender, means that Lender shall have the right in its sole and absolute discretion to accept, approve or consent, or to withhold acceptance, approval or consent, of the subject matter with respect to which the acceptance, approval or consent is required.

1.3     Accounting Terms.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP and, except where otherwise specified, all financial data submitted in connection with this Agreement shall be prepared in accordance with GAAP.

1.4     Other Rules of Interpretation and Construction.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)     The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  The word "or" is not exclusive.  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any organizational or governing document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, amendments and restatements, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed

to have the same meaning and effect and to refer to any and all real and personal property and tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)     This Agreement shall be subject to the IPA at all times, and in the event of a conflict between any provision herein and the IPA, the terms of the IPA shall prevail.

(c)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(d)     <u>Section Headings</u>.   Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(e)     <u>Times of Day</u>.  Unless otherwise specified, all references herein to times of day shall be references to Pacific time (daylight or standard, as applicable).

## ARTICLE 2 -  LOANS

2.1     <u>Commitment to Lend; No Re-Borrowing</u>.  Subject to satisfaction of all of the terms and conditions of this Agreement, including the conditions precedent in Article 5 (if any), the Lender hereby agrees, upon the request of the Borrower by delivery of the Borrowing Certificate (or at the request of the Lender or its designees pursuant to any power of attorney on the Borrower's behalf) on the Closing Date  to make a non-revolving loan in the amount of the Commitment Amount (hereinafter referred to as the "<u>Loan</u>" or "<u>Advance</u>") to the Borrower for the purpose of paying a portion of the expenses of producing, completing and delivering the Picture; provided, however, that the Lender shall not be obligated to make the Loan if a Default or an Event of Default has occurred and is continuing.  Once repaid, amounts constituting the Commitment Amount may not be re-borrowed.

2.2     <u>Loan Procedure</u>.

(a)     Upon satisfaction of the applicable conditions precedent set forth in <u>Article 5</u>, the Lender shall make the Commitment Amount available to the Borrower by crediting the Production Bank Account in the amount of the Commitment Amount (except for any part thereof paid by the Lender to third Persons or to itself as permitted hereunder).

(b)     (i) Notwithstanding anything to the contrary herein, the Lender is hereby authorized by the Borrower, from time to time in the Lender's sole and absolute discretion to make Advances to the Borrower that the Lender in its reasonable business judgment deems necessary or desirable (A) to preserve or protect the Collateral, or any portion thereof, (B) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations, or (C) to pay any other amount chargeable to the Borrower pursuant to the terms of this Agreement or any other Loan Document, including, without limitation, costs, fees and expenses as described in <u>Section 13.6</u> (the Advances described in this <u>Section 2.2(d)(i)</u> being hereinafter referred to individually as a "<u>Lender Advance</u>" and collectively as the "<u>Lender Advances</u>").

(ii)     The Lender Advances shall be repayable on demand and secured by the Collateral, shall constitute Loans and Obligations hereunder, may be in excess of the Commitment Amount, and shall bear interest at the Interest Rates then applicable to the Loans. The Lender shall notify the Borrower in writing of each Lender Advance, which notice shall include a description of the purpose of the Lender Advance; provided that the Lender's failure to notify the Borrower of any Lender Advance shall not affect the validity, enforceability or collectability of any Lender Advance.

(c)     The Lender shall record in its register the principal amount of the Advances owing to the Lender from time to time.  In addition, the Lender is authorized, at the Lender's option, to note the date and amount of each payment or prepayment of principal of the Advances in its books and records, including computer records, such books and records constituting rebuttable presumptive evidence, absent manifest error, of the accuracy of the information contained therein.

(d)     Subject to the terms of this Agreement, the Lender shall be obligated to make Advances hereunder, only for the following purposes and in the following amounts (not to exceed the Commitment Amount), all in connection with the pre-production, production and completion of the Picture, and the proceeds thereof shall not be available for any other purpose: (i) the payment of the direct Picture production costs and expenses set forth in the Budget; (ii) repayment in full of amounts owing by the Borrower under the Bridge Note; and (iii) the payment of interest, Attorney Costs, the Lender Production Fee, and other fees and expenses due or reimbursable to the Lender hereunder.

2.3     Lenders' Loans.  The Lender shall be deemed to have made the Loan in accordance with Section 2.2 on behalf of the Borrower and the Lender may apply the proceeds of such Loans as follows: if a Default or Event of Default shall have occurred and is continuing, the Lender, in consultation with the Borrower, may make additional Advances in excess of the amount of the Commitment Amount and pay the proceeds thereof directly to the Persons providing rights, services, facilities, locations and materials in connection with the production, completion, Delivery and exploitation of the Picture as well as in connection with the protection and exercise of Lender's rights in the Collateral.

### ARTICLE 3 - INTEREST, FEES, AND OTHER CHARGES

3.1     Interest Rates.

(a)     Except as otherwise provided herein, all outstanding Obligations shall bear interest on the unpaid principal amount thereof (including, to the extent permitted by law, on interest thereon not paid when due) from the date made (provided that the Loan made on the Closing Date shall bear interest from December 31, 2019) until paid in full in cash at a per annum rate equal to the Interest Rate; provided, however, that upon the occurrence of a Default or Event of Default, and in any event commencing on the twelve (12) month anniversary of the Closing Date, all outstanding Obligations shall bear interest at the Default Rate, compounded monthly.

(b)     Except as otherwise provided herein, all interest shall be payable in arrears on the Maturity Date.  All computations of interest (at the Interest Rate) hereunder shall be made

on the basis of a year of three hundred sixty (360) days for the actual number of days (including the first day but, excluding the last day) elapsed.

3.2     Payments on Closing Date.  The Loan made on the Closing Date shall include, and the Borrower hereby authorizes and directs the Lender to pay from such Loan proceeds: (i) to the Lender Production Fee, and (iii) the Attorney Costs.

## ARTICLE 4 - PAYMENTS AND REPAYMENTS

4.1     Repayment of Loans.  The Borrower shall repay the outstanding principal balance of the Loans and all other Obligations in full, plus all accrued but unpaid interest thereon, on the Maturity Date or upon earlier acceleration hereunder.

4.2     Mandatory Prepayments.   The Borrower shall prepay the Obligations by the following amounts, as and when received by or are payable to the Borrower, unless otherwise indicated herein: (a) all Collateral Proceeds; (b) all insurance proceeds to the extent and as provided in Section 10.5; and (c) as otherwise provided hereunder.

4.3     Voluntary Prepayments.   Upon at least two (2) Business Days prior notice to Lender, the Borrower may at its option prepay the Obligations in full or in part in a minimum amount of $25,000 and integral multiples thereof, without premium or penalty except for the Make Whole Amount defined below.  Once such notice of prepayment has been given, the principal amount of the Loan(s) specified in such notice shall become due and payable on the date specified in the notice, together with the applicable Make Whole Amount defined below   Any principal amount voluntarily prepaid by the Borrower pursuant to this Section 4.3 shall be accompanied by an amount equal to the interest on such principal that would have accrued through and including the eighteenth-month anniversary of the Closing Date absent such prepayment (the "Make Whole Amount").

4.4     Payments and Computations.

(a)     All payments to be made by the Borrower shall be made without reduction, reserve, discount, withholding, credit, set-off, recoupment or counterclaim, and irrespective of any claim that the Borrower may have against the Lender.  Except as otherwise expressly provided herein, all payments made by the Borrower shall be made to the Lender at the Lender's address set forth in Section 13.7, shall be made in Dollars and in immediately available funds, no later than 1:00 p.m. (Los Angeles, California time) on the day specified herein.  Any payment received later than 1:00 p.m. (Los Angeles, California time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue.

(b)     Whenever any payment is due on a day other than a Business Day, such payment shall be made on the following Business Day, without being subject to the assessment of a late charge, and such extension of time shall be included in the computation of interest or fees thereon, as the case may be

4.5     Indemnity for Returned Payments.  If, after receipt of any payment of, or proceeds applied to the payment of, all or any part of the Obligations, the Lender is for any reason compelled to surrender such payment or proceeds to any Person, because such payment or application of

proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason, then the Obligations or part thereof intended to be satisfied shall be revived and continue and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Lender, and the Borrower shall be liable to pay to the Lender, and hereby does indemnify the Lender and hold the Lender harmless for, the amount of such payment or proceeds surrendered. The provisions of this <u>Section 4.5</u> shall be and remain effective notwithstanding any contrary action that may have been taken by the Lender in reliance upon such payment or application of proceeds, and any such contrary action so taken shall be without prejudice to the Lender's rights under this Agreement and shall be deemed to have been conditioned upon such payment or application of proceeds having become final and irrevocable.  The provisions of this <u>Section 4.5</u> shall survive the termination of this Agreement.

4.6     <u>Books and Records; Periodic Statements</u>.  The Lender's books and records showing the Obligations and the transactions pursuant to this Agreement and the other Loan Documents shall be admissible in any action or proceeding arising therefrom, and shall, absent manifest error, constitute rebuttable presumptive proof thereof, irrespective of whether any Obligation is also evidenced by a promissory note or other instrument.  The Lender shall provide to the Borrower a periodic statement of the Loans, payments, and other transactions pursuant to this Agreement.

4.7     <u>Increased Costs</u>.

(a)     If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, the Lender;

(ii)     subject the Lender to any Taxes (other than taxes imposed on the Lender's income or measured by the overall net income or gross receipts of the Lender, and franchise taxes imposed on it, by the jurisdiction under the laws of which the Lender is organized or any political subdivision thereof) on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on the Lender any other condition, cost or expense (other than Taxes) affecting this Agreement, any other Loan Document or the Loan;

and the result of any of the foregoing shall be to increase the cost to the Lender of making or maintaining the Loan, or to reduce the amount of any sum received or receivable by the Lender, (whether of principal, interest or any other amount) then, upon request of the Lender, the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.

(b)     <u>Capital Requirements</u>.  If the Lender determines that any Change in Law affecting the Lender or the Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on the Lender's capital or on the capital of the Lender's holding company, if any, as a consequence of this Agreement, the Commitment of such Lender or the Advances made by, the Lender, to a level below that which

the Lender or the Lender's holding company could have achieved but for such Change in Law (taking into consideration the Lender's policies and the policies of the Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender or the Lender's holding company for any such reduction suffered.

ARTICLE 5 - LENDING CONDITIONS

The obligation of the Lender to make the Loan hereunder shall be subject to satisfaction of all of the conditions of this <u>Article 5</u> being satisfied at the time thereof.

5.1    <u>Conditions Precedent to the Loan</u>.  The obligation of the Lender to make the   Loan is subject to the following conditions precedent having been satisfied in a manner satisfactory to the Lender and its counsel:

(a)    The Lender has received, in an acceptable form and substance (as determined solely by the Lender), which are hereby acknowledged as received and accepted, fully executed documentation, including the Chain of Title Documents, evidencing that the Borrower owns all rights in and to the Screenplay and in the underlying and included Literary Property in perpetuity, throughout the world and all rights in connection therewith, and that all payments for such rights have been paid;

(b)    All appropriate documents (including Form PA), which are hereby acknowledged as received and accepted, evidencing the Borrower's rights in and to the Screenplay and the underlying Literary Property have been duly submitted to and accepted for recordation in all appropriate governmental offices, including the United States Registrar of Copyrights, accompanied by the required filing fees, or if not yet submitted, are ready to be submitted, and if accompanied by the required fees, will be so accepted;

(c)    [Reserved]

(d)    The Lender shall have received this Agreement and all other items requested by the Lender, together with all exhibits, attachments and supplementary documents which are not elsewhere identified in this <u>Article 5</u>, and executed and delivered by all parties thereto when the nature of such items so requires;

(e)    The Lender shall have received executed copies of the Loan Documents;

(f)    The Borrower shall have performed and complied with all covenants, agreements, and conditions contained herein and the other Loan Documents to which it is a party that are required to be performed or complied with by the Borrower before or on the Closing Date;

(g)    No Default or Event of Default shall exist on the Closing Date, or would exist after giving effect to the Loans to be made on such date;

(h)    There shall exist no action, suit, investigation, litigation or proceeding affecting the Borrower and the Sales Agent, pending or threatened before any court, governmental agency, or arbitrator that might reasonably be expected to have a Material Adverse Effect;

17

(i)      Each of the Essential Element and the other principal actors have executed his/her actor's agreement, deal memos or certificates of engagement;

(j)      All proceedings taken in connection with the execution of this Agreement and all other Loan Documents and all documents and papers relating thereto shall be satisfactory in form, scope, and substance to the Lender and its counsel;

(k)      The Lender shall have received a fully executed copy of a so-called "Pre-CAMA", which need not include any Guild signatures or approvals, but shall otherwise be acceptable to the Lender, the Borrower and 828.

(l)      The following statements shall be true, and the acceptance by the Borrower of any extension of credit shall be deemed to be a statement to the effect set forth in clauses (i) and (ii), with the same effect as the delivery to the Lender of a certificate signed by the president and chief financial officer of the Borrower, dated the date of such extension of credit, stating that:

(i)      The representations and warranties contained in this Agreement and the other Loan Documents are true and correct in all material respects on and as of the date of such extension of credit as though made on and as of such date (provided that any representation or warranty qualified by materiality shall be true and correct in all respects), except to the extent any representation or warranty is made as of a specific date, in which case such representation or warranty shall be true and correct as of such date; and

(ii)      No event has occurred and is continuing, or would result from such extension of credit, which constitutes a Default or an Event of Default;

(m)      The Lender shall have received such other approvals, opinions or documents as it may reasonably request;

(n)      No order, judgment or decree of any governmental authority and no law, rule or regulation applicable to the Lender shall purport by its terms to enjoin, restrain or otherwise prohibit the making of such Loan; and

(o)      Since the Closing Date, there shall have occurred no Material Adverse Effect;

Unless waived in writing by the Lender, the acceptance by the Borrower of any Loans made on the Closing Date shall be deemed to be a representation and warranty made by the Borrower to the effect that all of the conditions to the making of such Loans set forth above in this Section 5.1 have been satisfied, with the same effect as delivery to Lender of a certificate signed by the president and chief financial officer or manager or managing member of the Borrower, dated the Closing Date, to such effect.  The waiver of any condition precedent by the Lender for the making of any Loan shall not operate as a waiver to the making of any subsequent Loan and shall not create a course of conduct or course of dealing between the Borrower and the Lender.

## ARTICLE 6 - PICTURE PRODUCTION, COMPLETION, DELIVERY AND DISTRIBUTION

The Borrower hereby warrants, represents, covenants and agrees as follows.

18

6.1     Budget; Cash Flow; Screenplay; Production Schedule.  The Borrower represents and warrants that:

(a)     True and complete copies of the Budget, the Approved Cash Flow Schedule, the Screenplay, and the Approved Production Schedule and, upon request of the Lender, any agreements with any Person whose services are a requirement of any such agreements or who have any claims of any nature to rights in the Picture or the proceeds of the distribution thereof, have been or will be furnished to Lender;

(b)     The Borrower, the Essential Element, and any other Person having approval rights with respect thereto have approved the Budget, Approved Cash Flow Schedule, Screenplay, and the Approved Production Schedule; and

(c)     The Budget includes provisions for all expenses necessary for the production of the Delivery Items in accordance with the terms of this Agreement and the Distribution Agreements, including, but not limited to, any and all costs of music, including all worldwide licenses and rights.

6.2     Picture Production.

(a)     The Picture shall be produced (and all elements thereof, including the Delivery Items and the Picture Elements) in accordance the Budget, the Screenplay, the Approved Production Schedule, and the Approved Cash Flow Schedule, and in a manner consistent with the provisions of this Agreement, the Distribution Agreements, the Assignments and the other Loan Documents.  The Borrower shall not make or permit to be made any material changes, modifications, or revisions the Budget, the Screenplay, the Approved Production Schedule, or the Approved Cash Flow Schedule without the express written authorization of Lender.

(b)     The Borrower shall not make (or permit) any change in the Budget that would increase, in the aggregate, the amount thereof or any other changes therein without the prior written approval of Lender or its designee and any other Person having approval rights with respect to such changes.

(c)     The Borrower shall cause the Picture and the Delivery Items, as appropriate, to strictly conform to all of the Technical Specifications and Non-Technical Specifications.

6.3     Picture Element Changes.  Except as permitted by the express terms of this Agreement or the Assignments (as applicable), the Borrower shall not make, agree to make, or permit to be made any variation or modification in any of the elements of the Picture that are subject to approval or consent pursuant to the Distribution Agreements, any Assignment or this Agreement, without the prior written consent of the Lender or its designee.

6.4     Picture Credits; Print Advertising; Posters Premier and Festival Screenings.  The Borrower shall accord the Lender presentation credit (including any animated logo credit, as supplied by the Lender) on a most favored nations status with any other production company in all respects except as to position, and one (1) "Producer" credit to the Lender's designee, on a single card, in the main title sequence of the Picture (i.e., where the director and writer credits appear, whether located at the beginning or end of the Picture) in all positive prints thereof and in

19

all paid advertisements with respect to the marketing thereof, which credit shall be in such name as the Lender shall advise the Borrower prior to "Picture Lock", as such term is understood in the entertainment industry. Upon theatrical release of the Picture, Borrower shall promptly furnish Lender with two (2) one-sheet posters created in connection with the release of the Picture and with four (4) Blu-Ray copies of the Picture and as and when it becomes commercially available. The Lender shall be provided with at least four (4) tickets to each celebrity premiere of the Picture (if any) and all festival screenings of the Picture for which either the public or any of the producers, Director, and/or key cast are invited to attend.

6.5     Residuals; Contingent Compensation; Fees.

Except for the expenses and fees of the collection account management agent as set forth in the CAMA, or as required by any Guild, or as set forth under the terms of the IPA, the Borrower shall not enter into any agreement to pay any Person from the Collateral Proceeds any residuals, profit participations, deferred compensation, contingent compensation, whether computed on the basis of the Collateral Proceeds, net receipts from exploitation of the Picture, or otherwise (whether in a fixed amount or computed on a percentage basis), unless all such payments are subordinated and subject to the rights of the Lender under the Loan Documents, and the Borrower shall not pay any such payments from the Collateral Proceeds until all Obligation have been satisfied in full, in each case unless approved by the Lender.  The Lender shall not have any obligation to pay any such payments to any Person unless approved in advance by Lender in writing.

6.6     Picture Exhibition.  Except for screening of the Picture to prospective Distributors, in connection with market research, and at film festivals and film markets as the Borrower or the Sales Agent deems necessary or prudent in connection with the marketing of rights to the Picture in the ordinary course of business, before repayment of all Obligations in full, the Borrower shall not (or permit any other Person to) exhibit the Picture for any Person other than Persons involved in the production of the Picture, the Sales Agent, and the Lender or the Lender's authorized representatives, without the Lender's prior approval, which approval will not be unreasonably withheld.  For the avoidance of doubt, nothing herein shall prevent the screening or release of the Picture by any Distributor under any Distribution Agreement following payment by such Distributor of the minimum guaranty or similar payment due by it upon Delivery of the Picture pursuant to the terms of the applicable Distribution Agreement and related Assignment.

6.7     Sales Agent Payments.  Notwithstanding anything to the contrary in any agreement relating to the Picture the payment of any fees, commissions, distribution and marketing costs incurred by and payable or reimbursable to the Sales Agent or its Affiliates from the Collateral Proceeds shall be as set forth under the terms of the IPA.

6.8     Distribution Agreements.  The terms, requirements, and approvals necessary to enter into any Distribution Agreement shall be as set forth under the terms of the IPA.

6.9     Performance and Amendment of Agreements, Etc.

(a)     The Borrower shall cooperate with the Sales Agent to effect Delivery to the Sales Agent and shall effect (or cause the Sales Agent to effect) Delivery to all Distributors.  The Borrower shall cooperate with the Sales Agent to supervise and monitor the performance of and

20

payments by the Sales Agent under the Sales Agent Agreement and by all Distributors under all Distribution Agreements.

(b)     The Borrower shall fully perform all of its obligations under the Sales Agent Agreement (as modified by the Sales Agent Interparty Agreement), any Distribution Agreements to which it is a party, and shall enforce all of its rights and remedies thereunder in a commercially reasonable fashion and as it deems appropriate in its prudent business judgment; provided, however, that the Borrower shall not take any action or fail to take any action with respect to the Sales Agent Agreement, or a Distribution Agreement to which it is a party, that would result in a waiver or other loss of any material right or remedy of the Borrower or Lender thereunder.

6.10    Enforcement of Agreements.

(a)     The Borrower shall notify the Lender in writing, promptly after the Borrower becomes aware thereof, of any event or fact that would reasonably give rise to a breach of the Sales Agent Agreement, any Distribution Agreement, the Sales Agent Interparty Agreement, or any Assignment and shall diligently pursue such right and report to the Lender on all further developments with respect thereto.

(b)     Until all Obligations have been indefeasibly paid and performed in full, the Borrower shall, at its expense, make collection (and cause the Sales Agent to make collection) and take all appropriate legal action necessary (and require the Sales Agent and each Licensing Intermediary to take such action) to enforce collection, of all payments, receipts and revenues, as and when due, that may be owing by a Distributor under a Distribution Agreement, or from any other Person pursuant to any other agreement entered into by the Borrower or the Sales Agent (or any Licensing Intermediary) with respect to the Collateral, and shall remit or cause to be remitted all sums so collected to the Collection Account.  If any Collateral Proceeds not directly deposited into the Collection Account by a Distributor, the Borrower shall require the Sales Agent (or any Licensing Intermediary) to deposit (or have deposited or credited) such Collateral Proceeds to the Collection Account within two (2) Business Days of the Sales Agent's receipt thereof.  If the Borrower and/or the Sales Agent (or any Licensing Intermediary) fails after the Lender's demand to pursue diligently any right under any Distribution Agreement or any other agreement entered into by the Borrower or the Sales Agent (or any Licensing Intermediary) with respect to the Collateral, or if a Default or Event of Default then exists, the Lender may directly enforce (or cause its designee(s) to enforce) such right in its own or the Borrower's name and may enter into such settlements or other agreements with respect thereto as the Lender shall determine.

(c)     In any suit, proceeding, arbitration proceeding or action brought by the Lender under or with respect to any Distribution Agreement or Assignment, or any other agreement entered into by the Borrower or the Sales Agent with respect to the Collateral for any sum owing thereunder or to enforce any provision thereof, the Borrower shall indemnify and hold the Lender harmless from and against all expense, loss or damage suffered by reason of any defense, setoff, counterclaims, recoupment, or reduction of liability whatsoever of a Distributor or other obligor thereunder arising out of a breach by the Borrower or the Sales Agent (as the case may be) of any obligation thereunder or arising out of any other agreement, indebtedness or liability at any time owing from the Borrower or the Sales Agent (as the case may be) to or in favor of such obligor or its successors or assigns.

6.11    Sales Agent Termination.

(a)    If (i) a Default or Event of Default has occurred (including, without limitation, under Section 11.1(v)), or (ii) the Borrower or the Sales Agent fails to use commercially reasonable efforts to collect from any Distributor any deposits and other amounts due prior to the Maturity Date from such Distributor or fails or refuses to deposit any of the Collateral Proceeds in its possession or control into the Collection Account as and when due hereunder, then at any time thereafter prior to such cure, the Lender may, at its option and upon notice to the Borrower and the Sales Agent, and subject to the terms of the Sales Agent Interparty Agreement and the IPA, terminate the Sales Agent Agreement and all rights of the Sales Agent and/or the Borrower to distribute or otherwise exploit the Picture, whether under the Sales Agent Agreement or otherwise.

(b)    Upon the Lender's notice of termination pursuant to Section 6.12(a), and without further action or notice by the Lender or any other Person: (i) the Sales Agent's right, title and interest in and to the Picture and to any other item of Collateral (including, without limitation, any Liens) shall automatically revert to the Borrower (or the Lender, as the case may be); (ii) the Sales Agent Agreement shall automatically terminate; (iii) all rights of the Borrower and the Sales Agent to distribute or otherwise market the Picture shall be terminated; and (iv) the Lender shall be entitled to exercise its rights under the Power of Attorney and replace the Sales Agent with a Person selected by the Lender or market the Picture itself or through its designees, including the right to sell any and all rights in and to the Picture that have not been sold by the Borrower (or the Sales Agent or any Licensing Intermediary on the Borrower's behalf) on terms and conditions that the Lender, in its sole and absolute discretion, deems appropriate under the circumstances. The Borrower hereby ratifies all acts of the Lender taken pursuant to this Section 6.12. The Lender shall not be liable for any acts or omissions or for any error of judgment or mistake of law with respect to any action taken or not taken pursuant to this Section 6.12.

6.12    Application of Excess Production Funds. The Borrower shall remit to the Lender any production funds that are unspent after Delivery has been effected to the Sales Agent and each other Distributor (foreign and domestic) and the Lender shall apply such production funds to the Obligations in such order as the Lender may elect in its sole and absolute discretion.

6.13    Georgia Tax Credit.

(a)    The Borrower shall take, and shall cooperate with the Lender to take, as applicable, all appropriate actions required by any applicable governmental authority to qualify for the Georgia Tax Credit Rights for the Picture, including, without limitation:

(i)    spending production costs as set forth in the Budget and performing all post-production services, including visual effects, in the applicable jurisdictions;

(ii)    (a) compliance with the Georgia Act; (b) submission of the final application for the Georgia Tax Credit in a timely manner; (c) submission of the Borrower's federal and state income tax returns in a timely manner, if required for the Borrower's receipt of the Georgia Tax Credit; and (d) compliance with all applicable record retention requirements under the Georgia Act or otherwise in connection with the Georgia Tax Credit;

(iii)     producing the Picture in accordance with the conditions specified in the Georgia Tax Credit Documents and the Budget;

(iv)     performing all acts, undertaking all obligations and executing and delivering all documents and instruments to any Person as may be required to obtain the Georgia Tax Credit for the Picture;

(v)     not using any of the Georgia Tax Credit to offset (or use as a credit) against any tax liability that the Borrower or any of its members or Affiliates may have to the State of Georgia;

(vi)     paying any outstanding tax liability, the nonpayment of which would otherwise result in a reduction of or a withholding by the applicable Georgia taxing authority from the Georgia Tax Credit;

(vii)     not effecting any transaction or taking any action (and not allowing any other Person to effect any transaction or taking any action) that may result in the recapture, disallowance, recovery, reduction, repayment, forfeiture, decertification, or any other action that would have the effect of reducing the Georgia Tax Credit for the Picture to an amount materially less than the Georgia Tax Credit Calculation;

(viii)     actively protecting, maintaining and enforcing such rights as it may have to receive the Georgia Tax Credit;

(ix)     not creating or permitting to exist any Lien over any right to receive the Georgia Tax Credit;

(x)     keeping in safe custody full, complete and accurate books of account and records relating to the expenditure by it on the production, completion and delivery of the Picture and making available to the Lender all such books of account and records and all other information in its possession or control that may be reasonably necessary or of reasonable assistance to enable the Lender to verify the amount of the expenditures qualifying for the Georgia Tax Credit for the Picture and to verify the performance by Borrower of all its obligations relating to the Georgia Tax Credit for the Picture; and

(xi)     not filing any applications, agreements, instruments or documents pertaining to the Georgia Tax Credit Rights (the "Georgia Tax Credit Applications") with any governmental authority unless and until the Borrower has first submitted true, complete and correct copies thereof to the Lender for the Lender's review and approval and the Lender has given its prior written approval thereof.

(b)     The Borrower shall ensure that with respect to the Georgia Tax Credit Applications the Borrower shall include all of the information, facts, agreements and all other matters of any kind whatsoever that are required to be disclosed or provided to any governmental authority with respect to the Borrower or the Picture qualifying for the Georgia Tax Credit Rights.

(c)     The Borrower shall not effect any transaction or take any other action that would interfere with the Lender's rights pursuant to the Georgia Tax Credit Documents or that

23

would cause the Georgia Tax Credit Rights for the Picture to be materially less than the amounts reflected in the Georgia Tax Credit Calculation.

(d)     The Borrower shall require any proceeds from the Georgia Tax Credit received by any Person to be promptly deposited (without reduction, unless otherwise authorized by this Agreement, the IPA, or by the Lender in writing) in to the Georgia Tax Credit Collection Account (but only if it is permitted to do so pursuant to the applicable laws and regulations governing film production tax credits).  If the proceeds are to be paid by check, the Borrower shall require such check to be delivered to the Lender for deposit into the Georgia Tax Credit Collection Account or such other account of the Borrower as is directed by the Lender.  If, notwithstanding the foregoing, the Borrower receives any proceeds of the Georgia Tax Credit or any portion thereof, the Borrower shall hold such sums in trust for the Lender and shall promptly remit all of such sums, without offset, counterclaim or other deduction, directly to the Lender for deposit in to the Georgia Tax Credit Collection Account.

(e)     The Borrower shall timely prepare, execute and file all documents, returns and certificates that the Lender reasonably determines are necessary (and in such form as the Lender deems necessary) in order to effectively cause the Borrower to elect to be a tax paying Person under the relevant federal and Georgia state statutes, rules and regulations so that the Borrower (and not any member or Affiliate of Borrower) is the sole Person legally entitled to apply for and receive any portion of the Georgia Tax Credit or the proceeds thereof (other than the Lender to the extent provided under the Loan Documents).

## ARTICLE 7 - COLLATERAL

7.1     <u>Grant of Security Interest</u>.  As security for all of the Obligations, the Borrower hereby grants to Lender a continuing security interest in, Lien on, and right of set-off against, all of the Borrower's right, title and interest in and to all of the Borrower's personal property, tangible and intangible, including, without limitation (each of the following terms, if defined in the UCC, having the meaning assigned such term in the UCC), (I) all accounts, deposit accounts, goods, equipment, general intangibles, inventory, investment property, letter of credit rights, negotiable collateral, in perpetuity throughout the universe, whether now owned or hereafter acquired or created, including all products and Collateral Proceeds thereof, including insurance proceeds (to the extent any materials and/or rights in and to the Picture, the Screenplay, or any other Collateral are not yet in existence or not yet acquired, such materials and rights are (to the extent applicable) hereby assigned and conveyed to Lender by way of present assignment of future interests), and (II) all of the Borrower's assets listed below in this <u>Section 7.1</u> (collectively referred to herein as the "Collateral"):

(a)     The Screenplay, the Picture, and all of the Borrower's other personal property, tangible and intangible, including all accounts, deposit accounts, equipment, general intangibles, inventory, investment property, letter of credit rights, negotiable collateral;

(b)     The Literary Property;

(c)     The Physical Properties;

(d)     All Picture Elements;

(e)      All rights of every kind or nature in and to any and all music and musical compositions created for, used in or to be used in connection with the Picture including, without limitation, all copyrights therein and all rights to perform, copy, record, re-record, produce, publish, reproduce or synchronize any or all of said music and musical compositions as well as all other rights to exploit such music including record, soundtrack recording, and music publishing rights;

(f)      All collateral, allied, ancillary, subsidiary, internet, publishing and merchandising rights of every kind and nature, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made or acquired, without limitation, derived from, appurtenant to or related to the Picture or the Literary Property or any part thereof, and all property and things of value pertaining thereto and all products and proceeds thereof, whether now in existence of hereafter made, acquired or produced, including, without limitation, all production, exploitation, reissue, remake, sequel, serial or series production rights by use of film, tape or any other recording devices now known or hereafter devised, whether based upon, derived from or inspired by the Picture, the Literary Property or any part thereof; all rights to use, exploit and license others to use or exploit any and all novelization, publishing, commercial tie-ups and merchandising rights of every kind and nature, including, without limitation, all novelization, publishing, merchandising rights and commercial tie-ups arising out of or connected with or inspired by the Picture or the Literary Property, the title or titles of the Picture, the characters appearing in the Picture or said Literary Property and/or the names or characteristics of said characters, and including further, without limitation, any and all commercial exploitation in connection with or related to the Picture, all remakes or sequels thereof and/or said Literary Property;

(g)      To the extent necessary or desirable to complete the Picture, all rights of every kind or nature, present and future, in and to all agreements relating to the development, production, completion, delivery and exploitation of the Picture, including, without limitation, all agreements for personal services, including the services of writers, directors, cast, producers, special effects personnel, personnel, animators, cameramen and other creative, artistic and technical staff and agreements for the use of studio space, Equipment, facilities, locations, animation services, special effects services and laboratory contracts;

(h)      All insurance and insurance policies heretofore or hereafter placed upon the Picture or the insurable properties thereof and/or any Person or Persons engaged in the development, production, completion, delivery or exploitation of the Picture and the proceeds thereof;

(i)      All copyrights, rights in copyrights, interests in copyrights and renewals and extensions of copyrights, domestic and foreign, common law and statutory, heretofore or hereafter obtained upon the Picture or the Literary Property or any part thereof, and the right (but not the obligation) to make publication thereof for copyright purposes, to register a claim under copyright, and the right (but not the obligation) to renew and extend such copyrights, and the right (but not the obligation) to sue in the name of the Borrower or in the name of Lender for past, present and future infringements of copyright;

25

(j)     All rights to produce, acquire, release, sell, distribute, sub distribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize or otherwise exploit the Picture, the Literary Property and any and all rights therein (including, without limitation, the rights referred to in Subsection 7.1(e) above) in perpetuity, without limitation, in any manner and in any media whatsoever throughout the universe, including, without limitation, by projection, radio, all forms of television (including, without limitation, free, pay, toll, cable, sustaining subscription, sponsored and direct satellite broadcast), in theaters, non-theatrically, on the internet, on cassettes, cartridges and discs and by any and all other scientific, mechanical or electronic means, methods, processes or devices now known or hereafter conceived, devised or created;

(k)     All rights of any kind or nature, direct or indirect, to acquire, produce, develop, reacquire, finance, release, sell, distribute, sub distribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Picture, or any rights in the Picture, including, without limitation, pursuant to agreements between the Borrower and any Affiliate of the Borrower which relate to the ownership, production or financing of the Picture;

(l)     All contract rights and general intangibles which may arise in connection with the creation, production, completion, delivery, financing, ownership, possession or exploitation of the Picture or which grant to any Person any right to acquire, produce, develop, reacquire, finance, release, sell, distribute, sub distribute, lease, sublease, market, license, sublicense, exhibit, broadcast, transmit, reproduce, publicize, or otherwise exploit the Picture or any rights in the Picture and all collateral, allied, ancillary, subsidiary and merchandising rights therein, and all properties and things of value pertaining thereto and all products and proceeds thereof whether now in existence or hereafter made, acquired or produced and the rights and property set forth in Sections 7.1(a) through (w), including, without limitation, all such rights pursuant to agreements between the Borrower and any Affiliate of the Borrower which relate to the ownership, production, distribution or financing of the Picture;

(m)     All rent, revenues, income, compensation, products, increases, proceeds (including the proceeds of letters of credit) and profits or other property obtained or to be obtained from the production, release, sale, distribution, sub distribution, lease, sublease, marketing, licensing, sublicensing, exhibition, broadcast, transmission, reproduction, publication, ownership, exploitation or other uses or disposition of the Picture and the Literary Property (or any rights therein or part thereof), in any and all media, including, without limitation, the properties thereof and of any collateral, allied, ancillary, merchandising and subsidiary rights therein and thereto, and amounts recovered as damages by reason of unfair competition, the infringement of copyright, breach of any contract or infringement of any rights, or derived therefrom in any manner whatsoever;

(n)     Any and all documents, receipts or books and records, including, without limitation, documents or receipts of any kind or nature issued by any pledgeholder, warehouseman or bailee with respect to the Picture and any element thereof;

(o)     All accounts, accounts receivable, contract rights and general intangibles (as such terms are defined in the UCC) in connection with or relating to the Picture and to the

26

Physical Properties, including all rights to receive the payment of money under present or future contracts or agreements (whether or not earned by performance) from the sale, distribution, exhibition, disposition, leasing, subleasing, licensing, sublicensing and other exploitation of the Picture or the Literary Property or any part thereof or any rights therein in any medium, whether now known or hereafter developed, by any means, method, process or device in any market; and

(p)     All of the Borrower's right, title and interest in, to and under the Georgia Tax Credit Documents, the Distribution Agreements, and the Sales Agent Agreement, and any and all other agreements relating to the exploitation of the Picture, including the Borrower's rights to receive payments thereunder, and all other rights to receive film rentals, license fees, distribution fees, producer's shares, royalties and other amounts of every description including, without limitation, from (1) theatrical exhibitors, non-theatrical exhibitors, television networks and stations and airlines, cable television systems, pay television operators, whether on a subscription, per program charge basis or otherwise, and other exhibitors, (2) distributors, sub distributors, lessees, sublessees, licensees and sublicensees   and (3) any other Person that distributes, exhibits or exploits the Picture or the Literary Property or elements or components of the Picture or the Literary Property or rights relating thereto;

(q)     All of the Borrower's right, title and interest in and to any and all sums paid or payable to the Borrower now due or which hereinafter may become due to the Borrower by any state, federal, provincial, or other governmental body or authority directly or indirectly as a tax credit, tax refund, tax rebate, tax subsidy, production credit or similar government benefit (including without limitation the Georgia Tax Credit), or by any tax shelter, or pursuant to any sale and leaseback transaction, any co-production structure, or any similar transaction, and any and all allied, ancillary and subsidiary rights therein;

(r)     All Equipment;

(s)     All title or titles of the Picture, all of the Borrower's rights to the exclusive use thereof including rights protected pursuant to trademark, service mark, unfair competition and/or other laws, rules or principles of law or equity;

(t)     All cash and cash equivalents of the Borrower and all drafts, checks, certificates of deposit, notes, bills of exchange and other writings or negotiable instruments which evidence a right to the payment of money and are not themselves security agreements or leases and are of a type which is in the ordinary course of business transferred by delivery with any necessary endorsement or necessary assignment whether now owned or hereafter acquired

(u)     All inventions, processes, formulae, licenses, patents, patent rights, trademarks, trademark rights, service marks, service mark rights, trade names, trade name rights, logos, indicia, corporate and the Borrower names, business source or business identifiers and renewals and extensions thereof, domestic and foreign, whether now owned or hereafter acquired, and the accompanying good will and other like business property rights relating to the Picture, and the right (but not the obligation) to register claim under trademark or patent and to renew and extend such trademarks or patents and the right (but not the obligation) to sue in the name of Borrower or in the name of Lender for past, present or future infringement of trademark or patent;

(v)    All other property of any kind of the Borrower in the possession or under the control of the Lenders or a bailee of the Lender or any of Lender's or the Lender's Affiliates; and

(w)    All accessions to, substitution for, and replacements, products and proceeds of the foregoing, including, without limitation, proceeds of any insurance policies and claims against third Persons, with respect to the foregoing.

7.2    <u>Perfection and Protection of the Lender's Security Interest</u>.  The Borrower shall at its expense perform all steps reasonably requested by the Lender within a reasonable time to perfect, maintain, protect, and enforce the Lender's Lien in the Collateral and the priority thereof (i.e., a first priority (except as set forth in the definition for "Permitted Liens") Lien), including, without limitation: (a) executing, filing, recording, and refiling such financing statements, continuation statements, copyright mortgages, form PAs, and copyright assignments, and (b) taking such other steps as Lender may deem necessary or appropriate and wherever required or permitted by law in order to perfect or preserve the Lender's first priority Lien in the Collateral. The Borrower shall do such further acts and things and execute and deliver to the Lender such additional conveyances, assignments, agreements, and instruments as the Lender may require or deem advisable to carry into effect the purposes of this Agreement or to better assure and confirm to the Lender its rights, powers, and remedies hereunder.  The Borrower appoints the Lender as the Borrower's attorney-in-fact (with full powers of substitution and delegation), to: (a) file or record financing statements and amendments thereto (including filing such statements and amendments by electronic means with or without a signature as authorized or required by applicable law or filing procedures), form PAs, copyright mortgages, copyright assignments, and any other documents in all appropriate governmental offices, including the United States Registrar of Copyrights, accompanied by the required filing fees, relative to all or any part of the Collateral; (b) take all other steps necessary or desirable in the Lender's judgment to perfect, protect, enforce, preserve, or continue the first priority Lien granted herein without the signature of the Borrower where permitted by law; and (c) do such further acts and things and execute such additional conveyances, assignments, agreements, and instruments as the Lender may reasonably require or deem advisable to carry into effect the purposes of this Agreement and the other Loan Documents or to better assure and confirm to the Lender its rights, powers, and remedies hereunder and thereunder.  The Lender shall provide the Borrower with a copy of each document executed by the Lender pursuant to the power of attorney set forth in this <u>Section 7.2</u>, provided that the Lender's failure to provide any such document to the Borrower shall not be deemed a breach hereunder or affect the validity or effectiveness of such document.

7.3    <u>Assignment of Rights Only</u>.  The Lender shall have under this Agreement and the other Loan Documents a collateral assignment and assignment of proceeds of and Lien on only the benefits of and rights under the Sales Agent Agreement, the Distribution Agreements, the Georgia Tax Credit Documents, and the other Collateral, and shall not assume the obligations and duties thereunder.  All such obligations and duties of the Borrower and the Sales Agent under the Sales Agent Agreement, the Distribution Agreements, and the other Collateral shall be and remain enforceable only against the Borrower and/or the Sales Agent, as applicable, and shall not be enforceable against the Lender.  Notwithstanding any provision hereof to the contrary, the Borrower shall at all times remain liable to observe and perform all of its duties and obligations, if any, under the Sales Agent Agreement, the Distribution Agreements and the other Collateral, and the Lender's

exercise of any of its rights with respect to the Collateral shall not release the Borrower from any of such duties and obligations. The Lender shall not be obligated to perform or fulfill any of the Borrower's duties or obligations, if any, under the Sales Agent Agreement or any of the Distribution Agreements or to make any payment thereunder, or to make any inquiry as to the nature or sufficiency of any payment or property received by it thereunder or the sufficiency of performance by any party thereunder, or to present or file any claim, or to take any action to collect or enforce any performance, any payment of any amounts, or any delivery of any property.

7.4   <u>Jurisdiction of Organization; Chief Office; Production Activities; and Physical Properties</u>.   The Borrower represents and warrants to the Lender that the Borrower's chief executive office, its books and records, and the Physical Properties (to the extent owned by or in the possession of the Borrower) are located at the address specified in <u>Section 13.7</u>, or at permitted laboratories in accordance with <u>Section 7.11</u>, and its jurisdiction of organization is the State of California.   The Borrower covenants and agrees that if (a) the jurisdiction of its organization, or the title or titles of the Picture, or the name, or any trade name of the Borrower is to be changed or modified in any manner, (b) the Borrower proposes to acquire or use a new trade name, (c) the chief executive office of the Borrower is to be relocated to a place other than its present address as stated in <u>Section 13.7</u>, or (d) there is proposed to be a change in location or name of any laboratory, special effects studio, sound studio, other processing or storage entity or any sound studio, other processing or storage entity or any bailee that holds, or that is expected to process, any Picture Elements, then the Borrower shall so notify the Lender in writing at least 30 days prior to making any such change or modification and, prior to making any such change or modification, shall execute and deliver to the Lender such further documents and do such other acts and things as the Lender may request in order to carry out the purposes of this Agreement, including, without limitation, the execution and delivery of financing statements, amendments, copyright assignments and mortgages, and Laboratory Control Agreements, necessary or desirable to continue and/or perfect the Lender's Lien in the Collateral.

7.5   <u>Title to and Liens on Collateral</u>.

(a)   The Borrower represents and warrants to the Lender and agrees with the Lender that (i) all of the Collateral is and will continue to be owned by the Borrower, or the Borrower's rights in the Collateral are held by it, as the case may be, free and clear of all Liens, except for Permitted Liens, (ii) the Lender's Lien in the Collateral will not be subject to any prior Lien (except as set forth in the definition for "Permitted Liens"), and (iii) the Borrower covenants that it will not sell, offer to sell, hypothecate or otherwise dispose of any Collateral, or any part thereof or interest therein, at any time, except for Permitted Liens, the license granted by the Borrower to the Sales Agent pursuant to the Sales Agent Agreement, or with the prior written consent of the Lender, which consent may be withheld in the Lender's sole and absolute discretion.

(b)   The Borrower will appear in, contest and defend against any action or proceeding purporting to affect title to or any other interest in any portion of the Collateral, or the rights or powers of the Lender, its successors or assigns, or the right or interest of the Lender, legal or beneficial, in any portion of the Collateral; and will pay all reasonable costs and expenses, including costs of evidence of title and reasonable outside attorneys' fees, in any such action or proceeding in which the Lender may appear.

29

7.6     Access and Examination.  Until the Obligations have been indefeasibly repaid in full in cash, the Lender shall have the access to any of the Borrower's properties or assets that relate to the Picture and the right to examine, audit, make extracts from or copies of and inspect any and all of the Borrower's books and records that pertain to the Picture and discuss the Borrower's affairs with the Borrower's officers and management and, upon prior notice to the Borrower, its independent accountants.  Upon the occurrence of a Default or Event of Default, at such time or times as the Lender may request, the Borrower will, at its cost and expense, prepare a list or lists in such form as shall be satisfactory to the requesting party, certified by a duly authorized officer of the Borrower, describing in such detail as the requesting party shall require, the Collateral, and specifying the location of such Collateral and the Borrower's records pertaining thereto and permit the requesting party to inspect such Collateral or any part thereof at such place as the Collateral may be held or located or at such other reasonable place. If at any time when no Default or Event of Default has occurred and is continuing, the Lender wishes to confirm with account debtors and other payors the amounts and terms of any receivables, the Lender will so notify the Borrower.  The Lender agrees to have such confirmation made through the Borrower's auditors.  If for any reason such auditors fail to proceed with the confirmations in a timely manner, the Lender may proceed to make such confirmations directly with account debtors and other payors after prior written notice to the Borrower.  The Borrower hereby agrees that, upon the occurrence and during the continuance of a Default or Event of Default, the Lender shall be entitled to confirm directly with account debtors and other payors, the amounts and terms of all accounts receivable.

7.7     Attorney-in-Fact.  The Borrower hereby constitutes and appoints the Lender as its true and lawful attorney-in-fact, in its place and stead and with full power of substitution, either in the Lender's own name or in the name of the Borrower, following the occurrence of Default or Event of Default after Lender has provided notice of such Default or Event of Default to the Borrower and (other than in the case of an Event of Default pursuant to Sections 11.1(a), (b), (g) (j) or (k)) allowed a reasonable period for Borrower to cure, in no event less than ten (10) business days to do the following at any time the Lender deems the taking of any such action or execution of any such document to be necessary and desirable for the production, completion and Delivery of the Picture and the timely repayment of the Obligations (this power being coupled  with an interest and being irrevocable until the indefeasible payment in full of the Obligations and the termination of the Lender's obligations to make Loans hereunder):

(a)     Endorse any notes, checks, drafts, money orders, or other evidences of payment payable to the Borrower relating to the Collateral that may come into the possession of the Lender and obtain, take possession of, substitute the Lender or any designee of the Lender for the Borrower as the owner of, or signatory on, and otherwise apply in any manner, all deposit accounts, cash or cash equivalents, instruments and general intangibles of, relating to or derived from the Collateral, and all proceeds thereof including, without limitation, , interest, chattel paper, notes, certificates, writings, distributions, dividends, profits, rights, benefits, premiums and other payments and rights to payment, held by any Person for or in the name of the Borrower;

(b)     Enforce all of the Borrower's rights under and pursuant to all agreements with respect to the Collateral, all for the sole benefit of the Lender, and to enter into such other agreements as may be necessary or desirable to complete the production of the Picture, and the distribution and exploitation thereof;

(c)     Enter into and perform such agreements as may be necessary or desirable in order to carry out the terms, covenants, and conditions of this Agreement which are required to be observed or performed by the Borrower;

(d)     Execute such other and further mortgages, pledges, and collateral assignment and assignment of proceeds with respect to the Collateral as the Lender may reasonably require solely for the purpose of protecting, maintaining, or enforcing the Lien granted to the Lender pursuant to this Agreement and the other Loan Documents;

(e)     Take over and complete production of and delivery of the Picture (including, without limitation, completing post-production and editing and locking the Picture and effecting Delivery to the Sales Agent and to Distributors);

(f)     Lease, license, sell or otherwise dispose of (and entering into agreements to lease, license and/or dispose of) the Borrower's rights or interests in and to the Picture that have not been disposed of by the Borrower (or to engage others to do so), with the costs and expenses thereof to be recoupable by the Lender; and further including the right to cause the Borrower to enter into Distribution Agreements for territories domestic and foreign and in any or all media and formats;

(g)     Renegotiate the Sales Agent Agreement, the Sales Agent Interparty Agreement, the Distribution Agreements, the Assignments, or such other agreements as the Lender has a Lien on pursuant to the terms of this Agreement and the other Loan Documents as the Lender in its sole and exclusive discretion deems proper;

(h)     Require, demand, collect, receive, settle, adjust, compromise and to give acquittances and receipts for the payment of any and all money payable pursuant to the Sales Agent Agreement or the Distribution Agreements or such other agreements included in the Collateral and such licenses and agreements as the Lender may enter into as aforesaid;

(i)     File any claims and/or proofs of claim, to commence, maintain or discontinue any actions, suits or other proceedings deemed by the Lender advisable for the purpose of collecting or enforcing payment of any such money;

(j)     Execute any and all such instruments, agreements or documents, and do all things as may be necessary or desirable to carry out the purposes of this Agreement and the other Loan Documents;

(k)     Apply any receipts so derived from the Lender's exercise of this power-of-attorney to the Obligations as herein provided;

(l)     Upon the occurrence and during the continuance of a "Default" under the Sales Agent Interparty Agreement, terminate the Sales Agent's rights under the Sales Agent Agreement as provided in the Sales Agent Interparty Agreement solely with respect to unsold rights and/or engage a sales agent to sell and/or market such unsold rights;

(m)     Terminate the IPA in accordance with its terms;

31

(n)     Settle, compromise, prosecute or defend any action, claim or proceeding with respect thereto and to sell, assign, pledge, transfer and make any agreement respecting, or otherwise deal with, the same;

(o)     Effect Delivery to the Sales Agent and to all Distributors;

(p)     Make any adjustments to the Budget, and make any expenditures, as it deems necessary and appropriate based upon the exigencies of post-production and/or other developments in order to complete and Deliver the Picture in accordance with the requirements contained in any Distribution Agreement; and

(q)     Do any and all other acts necessary and proper to carry out the intent of this Loan Agreement and the other Loan Documents;

provided, however, that nothing herein contained shall be construed as requiring or obligating the Lender to make any demand, or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or notice or take any action with respect to any of the Collateral or the money due or to become due thereunder or the property covered thereby, and no action taken or omitted to be taken by the Lender with respect to any of the Collateral shall give rise to any defense, counterclaim or setoff in favor of the Borrower or to any claim or action against the Lender.   Except for willful misconduct, intentional tort or gross (but not mere) negligence (as determined by a final and non-appealable judgment of a court of competent jurisdiction), the Borrower ratifies and confirms all acts taken by the Lender as such attorney-in-fact or its substitutes by virtue of this power of attorney.  This power, being coupled with an interest, is irrevocable until the Obligations have been fully satisfied and the Lender's commitment to make Loans hereunder has terminated.  The Lender shall provide the Borrower with a copy of each document executed by Lender on the Borrower's behalf pursuant to this Section 7.7.

7.8     The Lender's Rights, Duties and Liabilities.  Except for liabilities resulting from actions initiated by the Lender under its rights pursuant to Section 7.7, the Borrower assumes all responsibility and liability arising from or relating to the use, sale or other disposition of the Collateral.  Except for liabilities resulting from actions initiated by Lender under its rights pursuant to Section 7.7, neither the Lender nor any of its respective officers, directors, attorneys, employees or agents shall be liable or responsible in any way for the safekeeping of any of the Collateral, or for any loss or damage thereto, or for any diminution in the value thereof, or for any act of default of any carrier, forwarding agency or other person whomsoever.  The Obligations shall not be affected by any failure of the Lender to take any steps to perfect the Lender's Liens or to collect or realize upon the Collateral, nor shall loss of or damage to the Collateral, except as a consequence of the willful misconduct, intentional acts or gross (but not mere) negligence (as determined by a final and non-appealable judgment of a court of competent jurisdiction) by the Lender and/or its attorneys or Affiliates, release the Borrower from any of the Obligations.  The Lender may (but shall not be required to), without notice to or consent from the Borrower, sue upon or otherwise collect, extend the time for payment of, modify or amend the terms of, compromise or settle for cash, credit, or otherwise upon any terms, grant other indulgences, extensions, renewals, compositions, or releases, and take or omit to take any other action with respect to the Collateral, any security therefor, any agreement relating thereto, any insurance applicable thereto, or any

Person liable directly or indirectly in connection with any of the foregoing, without discharging or otherwise affecting the liability of the Borrower for the Obligations or under this Agreement or any Loan Document or any other agreement now or hereafter existing between the Lender, on the one hand, and the Borrower, on the other hand.

7.9    Authority to Collect.

(a)    The Borrower shall take and shall direct the Sales Agent and each Licensing Intermediary to take all steps necessary and within its powers to cause all Collateral Proceeds, including all Minimum Guaranteed Payments payable under any and all Distribution Agreements, to be paid directly by any Distributor or other obligor thereof to the Collection Account or to the Lender for deposit into the Collection Account, for the benefit of the Lender, to be applied by the Lender to the repayment of the Obligations.  All collections received in the Collection Account or directly by the Borrower or Lender, and all funds in any other account to which such collections are deposited, shall be the sole property of the Lender and subject to the Lender's sole control and the terms hereof.

(b)    Upon receipt by the Borrower or the Sales Agent of any Collateral Proceeds or of any check, draft, note, trade acceptance or other instrument evidencing an obligation to pay any such Collateral Proceeds, the Borrower shall (and shall cause the Sales Agent to agree to) hold the same in trust for Lender and forthwith (but in any event no later than two (2) Business Days after receipt), without any notice or demand whatsoever (all such notices, demands or other actions being expressly waived), to endorse, transfer and deliver any such sums or instruments, or both, to the Collection Account, for the benefit of the Lender.

(c)    If, notwithstanding the Borrower's direction to pay all Collateral Proceeds to the Collection Account or directly to Lender, any Collateral Proceeds, including sums paid by the Sales Agent and/or any Distributors under the Distribution Agreements, are paid to the Borrower or any of its Affiliates, then the Borrower shall: (i) segregate and hold in trust all of such Collateral Proceeds that it receives; and (ii) remit such Collateral Proceeds in the form received (properly endorsed to the order of Lender or for collection in accordance with Lender's instructions) directly to the Lender for deposit to the Collection Account not later than two (2) Business Days following the earlier of (x) the day of its receipt of a written demand from the Lender therefor or (y) the first day the Borrower or the Sales Agent has actual knowledge that the Borrower, the Sales Agent or any of their Affiliates has been paid any such Collateral Proceeds. The Borrower shall not commingle (and shall require the Sales Agent to agree not to commingle) any of the Collateral Proceeds with its funds or the funds of any other Person.

(d)    From and after the Closing Date, Lender shall have exclusive control over and the sole right to withdraw funds from the Collection Account.

7.10    Copyrights.  As soon as it is reasonably practical for the Picture to be copyrighted, the Borrower shall promptly take all actions necessary to copyright the Picture and to register such copyright in the name of the Borrower for the United States territory in conformity with the laws of the United States, and contemporaneously therewith shall execute and record a copyright mortgage and assignment and power of attorney in favor of the Lender, granting to the Lender a Lien, which shall be perfected and of first priority (subject only to Permitted Liens)  on the

Borrower's rights therein for the purpose of securing the Obligations, and immediately deliver to Lender written evidence of any and all such copyright registrations and mortgages.

7.11    Control of Picture Elements.   The Borrower shall only deliver or cause to be delivered to a Laboratory all of the original Picture Elements and shall deliver to the Lender a fully executed Laboratory Control Agreement for such Laboratory prior to any such delivery.   The Borrower shall not deliver or deposit any of the Picture Elements in any film or sound laboratory without first obtaining and delivering to the Lender a fully executed Laboratory Control Agreement.   No print, preprint, sound or other Picture Elements shall be deposited at any Laboratory or maintained at any place without the prior written consent of Lender and compliance with the requirements of this Section 7.11.

### ARTICLE 8 - BOOKS, RECORDS; FINANCIAL REPORTING; AND NOTICES

8.1    Books and Records.

(a)    The Borrower shall maintain a system of accounting established and administered in accordance with Production Bank Accounting standards as applied in the motion picture industry in Los Angeles, California, to the production of first-class motion pictures and keep adequate records and books of account in which complete entries in accordance with such accounting principles will be made.

(b)    The Borrower shall maintain, at all times, correct and complete books and records with respect to the Collateral that are as complete and comprehensive as those customarily maintained by others engaged in the production of first class motion pictures, including all books, records, contracts, production notes and all other information and data of every kind relating to the Picture, the Collateral, and the production, distribution, or exploitation thereof.

8.2    Financial Information.   The Borrower shall promptly furnish to the Lender, at the Lender's request, all financial and other information relating to the production, distribution, and exploitation of the Picture.

8.3    Notice of Certain Events.   The Borrower shall promptly notify Lender in writing of the following matters: (a) any Material Adverse Effect, Event of Default or Default; (b) any material default under the Sales Agent Agreement, the Sales Agent Interparty Agreement, any Assignment, any Georgia Tax Credit Document, any Distribution Agreement, and any other agreement material to the business, prospects, assets, liabilities, financial or other condition or results of operations of the Borrower or the Sales Agent to which the Borrower or the Sales Agent is a party or by which the Borrower or the Sales Agent or any of their respective properties may be bound; (c) immediately after becoming aware thereof, any pending or threatened action, suit, proceeding, or counterclaim by any Person, or any pending or threatened investigation by a governmental authority, which action, suit, proceeding, counterclaim or investigation seeks damages in excess of $10,000 (which amount shall not be fully covered by insurance), or that could reasonably be expected to have a Material Adverse Effect; and (d) immediately after becoming aware thereof, any pending or threatened strike, work stoppage, unfair labor practice claim, or other labor dispute affecting the Borrower in a manner that could reasonably be expected to have a Material Adverse Effect.

## ARTICLE 9 - GENERAL REPRESENTATIONS AND WARRANTIES

The Borrower warrants and represents to the Lender and (except with respect to any representation or warranty that is stated to be made as of a specific date which shall be deemed repeated as of such date), the Borrower shall be deemed to have repeated each such representation and warranty on each date that any Obligation remains outstanding, as follows:

9.1     Authorization, Validity, and Enforceability.

(a)     The Borrower has the power and authority to execute, deliver and perform this Agreement and the other Loan Documents to which it is a party, to incur the Obligations, and to grant to the Lender Liens upon and in the Collateral.  The Borrower has taken all necessary action (including, without limitation, obtaining approval of its members and managers if necessary) to authorize its execution, delivery, and performance of this Agreement and the other Loan Documents to which it is a party.  No consent, approval, or authorization of, or declaration or filing with, any governmental authority, and no consent of any other Person, is required in connection with the Borrower's execution, delivery and performance of this Agreement and the other Loan Documents, except for those already duly obtained.

(b)     This Agreement and the other Loan Documents to which it is a party have been duly executed and delivered by the Borrower, and constitute the legal, valid and binding obligation of the Borrower, enforceable against it in accordance with its terms without defense, setoff or counterclaim, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other similar laws affecting creditors' rights generally and by general principles of equity.

(c)     The Borrower's execution, delivery, and performance of this Agreement, and the other Loan Documents to which it is a party do not and will not conflict with, or constitute a violation or breach of, or constitute a default under, or result in the creation or imposition of any Lien (other than Permitted Liens) upon the property of the Borrower by reason of the terms of (i) any contract, mortgage, lease, agreement, indenture, or instrument to which the Borrower is a party or which is binding upon it, (ii) any judgment, law, statute, rule or governmental regulation applicable to the Borrower, or (iii) the certificate of formation or the operating agreement of the Borrower.

9.2     Validity and Priority of Liens.  The provisions of this Agreement and the other Loan Documents create legal and valid Liens on all the Collateral in favor of Lender and such Liens constitute perfected and continuing Liens on all the Collateral, having priority over all other Liens on the Collateral except for Permitted Liens, securing all the Obligations, and enforceable against the Borrower.

9.3     Organization and Qualification.  The Borrower (a) is duly formed and organized and validly existing in good standing under the laws of the State of California, (b) is qualified to do business as a foreign limited liability company and is in good standing in each jurisdiction in which the failure to so qualify or be in good standing could reasonably be expected to have a material adverse effect on the Borrower's property, business, operations, prospects or condition (financial or otherwise), (c) has all requisite power and authority to conduct its business and to

own its property, and (d) has been formed solely for the purpose of the production and exploitation of the Picture as contemplated by this Agreement and the other Loan Documents and has no other assets, liabilities or operations other than in connection with the production and exploitation of the Picture.

9.4     <u>Financial Statements</u>.  All financial statements, projections, estimates, information, and other data furnished by the Borrower to Lender in connection with the Borrower's application for credit hereunder, if any, are, in all material respects, accurate and correct and accurately reflect, in all material respects, the financial condition of the Person to whom such statements relate as of the date thereof.

9.5     <u>Solvency</u>.  The Borrower is solvent prior to and will remain solvent after giving effect to the Loans on the Closing Date and shall remain solvent during the term hereof.

9.6     <u>Rights in the Picture and Collateral</u>.

(a)     The Borrower owns (or has sufficient rights under license with respect to) all rights in the Picture and in the other Collateral necessary to enable the Borrower to fully perform all of its obligations, representations, warranties and agreements under this Agreement and the other Loan Documents to which it is a party.

(b)     The Borrower has acquired or been licensed, now owns and will own or have rights under license during production of the Picture and continuing through satisfaction of all Obligations, subject only to those rights granted pursuant to the Sales Agent Agreement and the Distribution Agreements, (i) all right, title and interest, including copyrights in and to the Literary Property, including the Screenplay, (ii) all right, title and interest necessary to make, distribute, exhibit and otherwise exploit the Picture, including, without limitation, all necessary rights in the literary, musical or other property or ideas used in the Picture, (iii) the right to exhibit the Picture on in theatres, on television, through subscription video-on-demand, by means of video cassettes and videodisks or in any other media or manner, by any means now known or unknown, and (iv) the sole right to exploit all ancillary rights in and to the Picture, subject to the Chain of Title Documents and payment of necessary performing rights fees in respect of the music in the Picture.

(c)     All material or matter used in or in connection with the Picture, including dialogue, characters, titles, episodes and events, shall be original and owned by or licensed to the Borrower, or in the public domain, and will not infringe any copyrights, statutory or common law, or constitute a libel, slander or invasion of privacy of any Person, or otherwise infringe on or violate the rights or any other Person whomsoever, in any fashion whatsoever.

(d)     The Borrower has all rights necessary to the Georgia Tax Credit Rights to cause the Borrower to receive the Georgia Tax Credit.

9.7     <u>Required Payments</u>.  All rents, royalties and other amounts due and payable by the Borrower under contracts, leases, license agreements and other instruments relating to the Collateral, including without limitation contracts, options, leases or agreements relating to the Literary Property, the Chain of Title Documents, the services of all persons or entities rendering services in connection with the Picture, and the furnishing of goods, processing, equipment and

materials used in connection with the Picture have been paid if due, or will be paid within ten (10) business days of the Closing Date, if by reason of nonpayment thereof the value of any part of the Collateral or the Lien of Lender therein may be materially impaired, and the Borrower is not in material default under any such contract, lease, license agreement or other instrument so that such material impairment has now occurred.

9.8 <u>Litigation</u>. There are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower or before any court or governmental agency, arbitrator or instrumentality, domestic or foreign, relating to the Screenplay, the Picture, the Sales Agent Agreement, the Georgia Tax Credit Rights, any Distribution Agreement or rights therein or thereto or otherwise, which if determined adversely to such Person could reasonably be expected to have a Material Adverse Effect.

9.9 <u>No Defaults</u>. The Borrower is not in default under this Agreement, any of the other Loan Documents, the Sales Agent Agreement, any of the Distribution Agreements in effect as of the date hereof, or any other documents affecting the Collateral.

9.10 <u>ERISA</u>. Neither the Borrower nor any member of a controlled group of corporations (as defined in Section 1563 of the Code), nor any trade or businesses which are under common control with the Borrower (as provided in Section 414(c) of the Code) nor any member of any affiliated service group of the Borrower (as provided in Section 414(m) of the Code) now has, nor will they have prior to repayment in full of the Obligations, any plan subject to Title IV of the Employee Retirement Income Security Act of 1974, as amended, or any such plan to which the Borrower, any member of a "controlled group" or affiliated service group, or any trade or business under common control with the Borrower (as aforesaid) is required to contribute on behalf of its employees.

9.11 <u>Taxes</u>. The Borrower has filed all tax returns and other reports which it was required by law to file on or prior to the date hereof and has paid all taxes, assessments, fees, and other governmental charges, and penalties and interest, if any, against it or its property, income, or franchise, that are due and payable (except to the extent that (a) any such taxes, assessments, fees, and other governmental charges, and penalties and interest are diligently contested in good faith by appropriate proceedings and proper reserves are established on the books of the Borrower as provided in GAAP, and (b) a stay of enforcement of any Liens arising from the nonpayment thereof when due is in effect).

9.12 <u>Margin Stock; Investment Company; and Public Utility Holding Company</u>. The Borrower shall use the proceeds of the Loan to pay the direct production costs of the Picture, and the fees and costs expressly identified herein, and for no other purpose. The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System of the United States), and no part of the proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock. The Borrower is not an "investment company" nor an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended (15 U.S.C. §§80(a)(l), et seq.). The Borrower is not a "holding

37

company" or a "subsidiary company" of a "holding company" or an affiliate of a "holding company" within the meaning of the Public Utility Holding Company Act of 1935, as amended.

9.13    Disclosure.  Neither this Agreement nor any document or statement furnished to the Lender by or on behalf of the Borrower or any of their respective Affiliates contains any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements contained herein or therein not misleading.

9.14    Material Agreements.  The Borrower has furnished to Lender all requested copies of all material agreements, indentures, and other instruments relating to the Picture, or pursuant to which is has incurred or may be obligated, whether directly or indirectly for borrowed money.

9.15    Affiliate Transaction.  The Borrower has not entered into any agreements or other transactions with any of its Affiliates other than those contemplated by this Agreement and the Loan Documents.

9.16    Patriot Act.  The Borrower is in compliance in all material respects with (a) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department and any other enabling legislation or executive order relating thereto, (b) the Patriot Act and (c) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations.  No part of the proceeds of the Loan will be used directly or, to the knowledge of the Borrower, indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

9.17    The Foreign Assets Control Regulations and Anti-Money Laundering.  The Borrower and each of its officers, directors, employees and agents are in compliance with and will remain in compliance in all material respects with all United States economic sanctions laws, executive orders and implementing regulations (collectively, "Sanctions") as promulgated by the United States Treasury Department's Office of Foreign Assets Control ("OFAC") and the U.S. Department of State, and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it.  The Borrower and each of its directors, officers, employees and agents (i) is not a Person designated by the United States government on the list of the Specially Designated Nationals and Blocked Persons (the "***SDN List***") with which a United States Person cannot deal with or otherwise engage in business transactions, (ii) is not a Person who is otherwise the target of United States economic sanctions laws such that a United States Person cannot deal or otherwise engage in business transactions with such Person and (iii) is not controlled by (including without limitation by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of United States economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Credit Document would be prohibited under United States law (persons described in (i)-(iii) foregoing being "***Sanctioned Persons***").  The Borrower and each of its officers, directors, employees and agents is in compliance with all anti-corruption laws in all material respects and will remain in compliance in all material respects with such laws. The Borrower will maintain in effect and enforce policies and procedures designed to promote compliance in all material respects

by the Borrower and its directors, officers, employees and agents with such laws and applicable sanctions.  The Borrower will not request any Loan, and the Borrower Parties shall not use, the proceeds of any Loan, (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any anti-corruption laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any country, region or territory which is itself the subject or target of any Sanctions, to the extent such activities, business or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States, or (C) in any manner that would result in the violation of  any Sanctions applicable to any party hereto.

9.18    <u>Survival of Warranties</u>.  All covenants, agreements, representations and warranties made under this Agreement or in any of the other Loan Documents shall survive the execution and delivery of this Agreement, the making of the Loans hereunder, and the execution and delivery of the Note and shall continue in full force and effect until the full and final payment and performance of all the Obligations and termination of this Agreement.

<u>ARTICLE 10 - AFFIRMATIVE AND NEGATIVE COVENANTS</u>

The Borrower covenants to the Lender, until all of the Obligations have been satisfied and Lender's commitment to make Loans hereunder has terminated, as follows:

10.1    <u>Taxes and Other Liabilities</u>.  The Borrower shall pay and discharge, before the same become delinquent and before penalties accrue thereon, all taxes, assessments and governmental charges upon or against it or upon its income or profits or upon any of its properties, and all its other liabilities at any time existing, except to the extent and so long as: (a) the same are being contested in good faith and by appropriate proceedings in such manner as not to cause any Material Adverse Effect or the loss of any right of redemption from any sale thereunder; and (b) it shall have set aside on its books reserves (segregated to the extent required by GAAP) adequate with respect thereto; and further to pay all governmental charges or taxes (except income, franchise or other similar taxes on the Lender ) at any time payable or ruled to be payable in respect of the existence, execution or delivery of this Agreement or the other Loan Documents by reason of any existing or hereafter enacted federal or state statute.  If required pursuant to the Georgia Act or other applicable laws, rules, or regulations, the Borrower shall prepare, execute and file all documents and returns necessary to be treated as a tax paying entity for the purposes of federal and Georgia state laws, rules and regulations so that it is and remains eligible receive payment of the  Georgia Tax Credit.

10.2    <u>Legal Rights and Facilities</u>.  The Borrower shall maintain and preserve its legal existence and all rights, privileges, franchises and other authority necessary for the conduct of its business.

10.3    <u>Compliance</u>.  The Borrower shall materially comply with all laws, rules and regulations relating to, and shall pay prior to delinquency all license fees, registration fees, taxes, guild or union pension, health and welfare payments, supplemental market, reuse and other required payments and assessments, and all other charges, including, without limitation, non-governmental levies or assessments, that may be levied upon or assessed against, or which may become a Lien on, the ownership, operation, possession, maintenance, exploitation, exhibition or

39

use of, the Collateral, or that create or may create a Lien upon the Collateral, or any part thereof. The Borrower shall pay prior to delinquency all required guild or union residual payments arising prior to Delivery to the Sales Agent and to all Distributors, and the Borrower shall cause (or shall cause the Sales Agent to cause) the Sales Agent and all Distributors to pay prior to delinquency all required guild or union residual payments arising after Delivery to the Sales Agent and such Distributors.

10.4   <u>Maintenance</u>.  The Borrower shall maintain the Collateral and all other material properties, Equipment and facilities in good order and repair; conduct its business in an orderly manner without interruption; and refrain from any material change in the nature of its business.

10.5   <u>Insurance</u>.

(a)   At all times, at its sole cost and expense, the Borrower shall maintain insurance against loss or damage to the Collateral with responsible and reputable insurance companies or associations approved by the Lender in such amounts and covering such risks as are usually carried by companies engaged in similar businesses and owning similar property in the same general area as the area in which such property is located, including, without limitation, fire, public liability, property damage, miscellaneous equipment, prop and special equipment, sets and wardrobe all risk floaters, pre-production, production, extra expense, domestic comprehensive general and automobile liability, foreign comprehensive general liability, domestic workers' compensation and employer's liability, foreign workers' compensation, guild accident insurance, errors and omissions, cast insurance in an amount which is not less than the amount of the Budget, negative insurance in an amount which is not less than the amount of the Budget and projected interest, props, wardrobe, director, soundtrack and faulty stock, camera and processing, and interruption of business and political risk insurance.

(b)   Without limiting the generality of the foregoing, the Borrower shall (i) maintain errors and omissions insurance, covering, among other things, the legal liability and defense of the Borrower against lawsuits alleging the unauthorized use of title, format, ideas, characters, plots, plagiarism, copyright infringement and unfair competition, and (ii) protect against alleged libel, slander, defamation of character and invasion of privacy.  The errors and omissions policy shall be in a minimum amount of $1,000,000 per occurrence and $3,000,000 in the aggregate, with a deductible of not more than $25,000, and a period of coverage of not less than three (3) years from the date of the first Loan (plus such longer periods as such coverage is required to be in effect pursuant to any Distribution Agreement); and (ii) comprehensive general liability insurance covering the Borrower against, among other things, all claims for bodily injury, personal injury or property damage that may arise in connection with the Picture, including, without limitation, coverage for all owned, non-owned and hired vehicles (both on and off camera) with a minimum liability limits of $1,000,000.

(c)   All such insurance policies covering the Collateral shall name the Borrower as named insured and shall name Lender as additional insured without the Lender being liable for premiums or other costs or expenses.  Each such policy shall bear a standard first mortgagee endorsement in favor of the Lender and shall provide for all losses to be paid to the Borrower, and for losses to be adjusted with the insurer by the Borrower; <u>provided</u> that, if the insurer shall have received written notice from Lender that a Default or Event of Default has occurred and is

continuing unremedied, any such payment for loss or destruction of or damage to the Collateral shall be paid directly to the Lender and any such adjustments shall be made solely by the Lender. Such insurance policies shall provide that (i) the term "net insurable amount" or "net insurable cost" shall be deemed to include all of the Lender's interest and fees hereunder, and (ii) the "extra expense" policy covers any additional interest cost that is incurred as a result of delays in the production of the Picture which are the result of losses covered by the extra expense policy. All such insurance payments received by the Lender while a Default or Event of Default shall have occurred and be continuing unremedied shall be held or applied by the Lender as provided in Section 10.5(h).

(d)     At least thirty (30) days prior to the expiration of each such policy, the Borrower shall furnish the Lender with evidence satisfactory to the Lender of the payment of premium and the reissuance of a policy continuing insurance in force as required by this Agreement. All such policies or certificates shall contain a provision that such policies will not be canceled or materially amended, which term shall include any reduction in the scope or limits of coverage, without at least thirty (30) days' prior written notice by such insurer to the Lender. If the Borrower fails to provide, maintain, keep in force or deliver and furnish to the Lender the policies of insurance required by this Section 10.5, then the Lender may, but shall not be obligated to, procure such insurance or single interest insurance for such risks covering the Lender's interests, and the Borrower will pay all premiums thereon promptly upon demand by the Lender, together with interest thereon at the rate then applicable to the Loans made to the Borrower hereunder from the date of expenditure by the Lender until reimbursement by the Borrower.

(e)     All policies of insurance required to be furnished by Borrower pursuant to this Section 10.5 (except for errors and omissions insurance, worker's compensation insurance and other third party liability insurance) shall have attached thereto a lender's loss payable endorsement or its equivalent, or a loss payable clause acceptable to the Lender, for the benefit of the Lender.

(f)     The Borrower shall observe and comply with the requirements of all policies of insurance required to be maintained hereunder and shall so perform and satisfy the requirements thereof so that the insurance policies are at all times in full force and effect.

(g)     Upon request by the Lender, the Borrower shall furnish the Lender a certificate of an officer of the Borrower containing a detailed list of the insurance policies of the Borrower required by or referred to in this Section 10.5 then outstanding and in force.

(h)     All insurance money received by the Lender shall be held by the Lender to secure the payment and performance by the Borrower of the Obligations under this Agreement and the other Loan Documents and shall be applied against and reduce such Obligations as provided in this Agreement.

(i)     Notwithstanding any provisions of this Agreement, the Sales Agent Agreement, the Distribution Agreements, or any other agreement to the contrary, if any claim should arise under any of the policies of insurance to be provided under said agreements, with respect to which the insurer is to make a payment to the Borrower (as distinguished from a payment to a third Person) such payment shall be disbursed as follows:

(i)     If the Picture has been completed or the production thereof abandoned (e.g., for purposes of this paragraph only, the Picture shall be deemed abandoned if a cast insurance claim is made and thereafter the role with respect to which cast insurance reimbursement is sought is not subsequently photographed, or if a negative insurance claim is made and thereafter no photography takes place to replace the lost negative), or there shall have occurred an Event of Default, such proceeds shall first be paid to the Lender and applied to the repayment of the Obligations until the Obligations have been repaid in full, and finally any balance shall be paid to the Borrower (or to the Sales Agent, if directed by the Borrower); and

(ii)    If the Picture has not been completed or abandoned and no Event of Default has occurred and is continuing, such proceeds, to the extent necessary, shall be used to pay production costs of the Picture.  The balance, if any, shall be paid to the Borrower (or to the Sales Agent, if directed by the Borrower).

10.6    <u>Related Agreements</u>.    The Borrower shall perform and observe all material agreements, covenants, representations and warranties of the Borrower under the Sales Agent Agreement, the Distribution Agreements, the Sales Agent Interparty Agreement, and any other document or agreement entered into in connection with or related to the production, completion, Delivery, or exploitation of the Picture (including, without limitation, any document or agreement entered into in connection with or related to the Literary Property).

10.7    <u>Approvals</u>.  The Borrower shall obtain, from time to time, all approvals, permits and consents necessary to allow the Borrower to remit payments to Lender in Dollars from all appropriate governmental authorities having jurisdiction thereof.

10.8    <u>Indebtedness</u>.  The Borrower shall not incur any indebtedness or guaranty any other indebtedness, other than pursuant to this Agreement or indebtedness that is not for borrowed money in the ordinary course of producing the Picture (e.g., credit arrangements for equipment).

10.9    <u>Dissolution and Sale of Assets</u>.  The Borrower shall not wind up, liquidate or dissolve its affairs, or sell, lease, license, transfer, or otherwise dispose of or grant an interest in all or a substantial part of the Collateral or its other properties and assets or change its legal or trade name.  The Borrower shall not make any distributions or dividends to any of the holders of its equity in their capacities as such.

10.10    <u>Use of Proceeds</u>.  The Borrower shall not use the proceeds of any Loan made by Lender hereunder for any purpose or thing other than the items set forth <u>in Section 2.2(f)</u>.

10.11    <u>Consolidation or Merger, Investments and capital expenditures</u>.  The Borrower shall not consolidate with or merge into any other Person.   The Borrower shall not make any investments other than in cash equivalents or in connection with the production and exploitation of the Picture.  The Borrower shall not make any capital expenditures other than in connection with the production and exploitation of the Picture.

10.12    <u>Liens</u>.  The Borrower shall not directly or indirectly create, incur or suffer to exist, and shall promptly discharge or cause to be discharged, any Lien on or with respect to the Collateral other than Permitted Liens.

10.13   Hedge Agreements.   The Borrower shall not enter into any Hedge Agreements, except Hedge Agreements approved by the Lender and entered into solely in order to effectively cap, collar or exchange foreign currency rates with respect to the Obligations.

10.14   Further Assurances.   The Borrower shall, at any time or from time to time upon the request of the Lender, execute and deliver such further documents and do such other acts and things as the Lender may reasonably request in order to effect fully the purposes of this Agreement the other Loan Documents and to provide for the payment and performance of the Obligations of the Borrower in accordance with the terms of this Agreement and the other Loan Documents.

10.15   Control Agreements.   The Borrower shall cause fully executed copies of the Collection Account Control Agreement and the Production Bank Account control agreement to be delivered to the Lender promptly following the establishment of the Collection Account and the Production Bank Account, respectively.

10.16   Corporate Separateness.   The Borrower shall maintain its existence separate from that as each of its Affiliates, including, without limitation, by taking the following actions (except to the extent permitted by this Agreement and the other Loan Documents):

(a)   Not diverting any of its funds to any Affiliate or commingling any of its funds with the funds of any of its Affiliates;

(b)   Entering into all transactions between the Borrower and its Affiliates on an arm's length basis; and

(c)   Conducting its affairs in its own name and in accordance with its organization documents and observing all necessary, appropriate and customary corporate or equivalent formalities, including, but not limited to, holding all regular and special meetings necessary to authorize all its actions, keeping separate and materially accurate minutes of its meetings, passing all resolutions or consents necessary to authorize actions taken or to be taken, and maintaining, in all material respects, accurate and separate books, records and accounts, including, but not limited to, payroll and intercompany transaction accounts.

10.17   Post Closing Covenants.   The Borrower shall take such actions and execute and deliver such documents as are specified on Schedule 1.

### ARTICLE 11 - EVENTS OF DEFAULT; REMEDIES

11.1   Events of Default.   It shall constitute an event of default ("Event of Default") if any one or more of the following shall occur for any reason:

(a)   Failure of the Borrower to pay the principal of or interest on any of the Obligations when the same becomes due;

(b)   Failure by the Borrower to pay any fees, expenses, or any other Obligation not otherwise specified in the foregoing clause "(a)" within five (5) Business Days beyond any grace period following the date such item is due, whether upon demand or otherwise;

(c)     Any representation or warranty made by the Borrower in this Agreement or in any of the other Loan Documents to which it is a party, or any financial statement, or report furnished by the Borrower at any time to Lender shall prove to be untrue in any material respect (or in the case of a representation and warranty qualified by materiality, untrue in any respect) as of the date on which made or furnished;

(d)     Failure of the Borrower to comply with any other covenants on its part to be performed under the terms of this Agreement or the other Loan Documents;

(e)     Failure of the Borrower or the Sales Agent to comply with any other covenants on its part to be performed under the terms of the Sales Agent Agreement, any Distribution Agreement, the Georgia Tax Credit Document or the IPA ;

(f)     Any money judgment, writ or warrant of attachment, or similar process shall be entered or filed against any of the Borrower or the Sales Agent and shall remain unvacated, unbonded or unstayed for a period of thirty (30) days or in any event later than five (5) days before the date of any proposed sale thereunder;

(g)     The Borrower or the Sales Agent shall be subject to a Bankruptcy Proceeding;

(h)     There shall occur a Change in Control;

(i)     Any sale of, or agreement to sell, any of the Collateral or any material portion of the other assets of Borrower without the Lender's reasonable approval, other than as expressly allowed under the Loan Documents or IPA;

(j)     This Agreement, any other Loan Document or any other instrument delivered hereunder or thereunder shall at any time after its execution and delivery and for any reason cease to be in full force and effect, or shall be declared to be null and void, or the validity or enforceability thereof shall be contested by Borrower, or Borrower shall deny that it has any further obligation under this Agreement, any other Loan Document or any other instrument delivered hereunder or thereunder;

(k)     The Lender fails to have an enforceable first lien (except as set forth in the definition for "Permitted Liens") on or security interest in any property given as security pursuant to this Agreement and/or the Loan Documents;

(l)     The Borrower has given the Lender materially false or misleading information or representations;

(m)     Any non-frivolous lawsuit or lawsuits are filed on behalf of one or more trade creditors against the Borrower in an aggregate amount of Fifty Thousand Dollars ($50,000.00) or more in excess of any insurance coverage of the Borrower;

(n)     Any government authority takes action that the Lender reasonably believes materially adversely affects the Borrower's financial condition or ability to repay the Obligations;

44

(o)      A Material Adverse Effect occurs;

(p)      The occurrence of any one or more of the following events with respect to the Borrower, provided such event or events could reasonably be expected, in the judgment of the Lender, to subject the Lender to any tax, penalty or liability (or any combination of the foregoing) which, in the aggregate, could have a Material Adverse Effect on the financial condition of the Borrower with respect to any ERISA plan (if applicable);

(i)      A reportable event shall occur with respect to a plan which is, in the reasonable judgment of the Lender likely to result in the termination of such plan for purposes of Title IV of ERISA;

(ii)      Any plan termination (or commencement of proceedings to terminate a plan) or the Borrower's full or partial withdrawal from a plan;

(q)      The abandonment of the production of the Picture;

(r)      The occurrence of a "Termination Event" or "Event of Default" under the Sales Agent Interparty Agreement.

(s)      The Borrower shall default with respect to any payment of any indebtedness in excess of $10,000 in the aggregate at any one time outstanding when due, or in the performance of any other obligation incurred in connection with any such indebtedness if the effect of such non-payment default is to accelerate the maturity of such indebtedness or to permit the holder thereof to cause such indebtedness to become due prior to its stated maturity and such default shall not be remedied, cured, waived or consented to within the period of grace with respect thereto;

11.2   Remedies.  If any Default exists, after notice to the Borrower and reasonable opportunity to cure such Default:

(a)      If an unremedied Default exists, Lender may, in the discretion of the Lender, without additional notice to or additional demand on the Borrower, restrict the amount of or refuse to make any Loan.  If an unremedied Event of Default endures for five (5) business days or longer, the Lender may, in the Lender's sole and absolute discretion, do one or more of the following in addition to the actions described in the preceding sentence, at any time or times and in any order, without additional notice to or additional demand on the Borrower: (i) terminate this Agreement and all obligations of Lender to make any Loan hereunder; (ii) declare any or all Obligations to be immediately due and payable (provided that in the case of an Event of Default under Section 11.1(g), all of the Obligations shall automatically become due and payable), all without demand, presentment or notice, all of which are expressly and irrevocably waived; and (iii) pursue its other rights and remedies under the Loan Documents and applicable law.  The foregoing shall not be construed to limit the discretion of the Lender to take any actions described above at any other time. If Default or Event of Default exists, the Lender shall have, in addition to all other rights of the Lender hereunder, the rights and remedies of a secured party under the UCC.  The Lender may require the Borrower to assemble the Collateral and make it available to the Lender at a place or places to be designated by the Lender.

(b)     If Default or Event of Default exists, the Lender may, in the Lender's sole and absolute discretion, in its name or in the name of the Borrower, or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement deemed desirable with respect to, any of the Collateral, but shall be under no obligation so to do, or the Lender may extend the time of payment, arrange for payment in installments, or otherwise modify the term of, or release, any of the Collateral, without thereby incurring responsibility to, or discharging or otherwise affecting the liability of, the Borrower.  The Lender will not be required to take any steps to preserve any rights against prior parties to the Collateral.  If the Borrower fails to make payment or take any action required under the Sales Agent Agreement, the Distribution Agreements, any other Loan Document, or any other agreement or document that the Borrower is party to, the Lender may make such payments and take all such actions as the Lender deem necessary to protect the Lender's Lien in the Collateral and/or the value thereof.  The Lender is hereby authorized (without limiting the general nature of the authority hereinabove conferred) to pay, purchase, contest or compromise any Liens which the Lender believe appear to be equal to, prior to or superior to the Lien of the Lender in the Collateral.

(c)     The Lender may take possession of the Collateral together with all additions and accessories thereto, demand and receive such possession from any person who has possession thereof, remove, keep and store the Collateral or any portion thereof, or put a custodian in charge thereof, and take such other measures as it may deem reasonably necessary or proper for the care or protection thereof.

(d)     The Lender may, with or without taking possession thereof, sell, lease, license, or cause to be sold, or otherwise disposed of, at such price or prices as the Lender shall in its sole and absolute discretion so determine, and for cash or on credit or for future delivery, without assumption of any credit risk, and in a commercially reasonable manner, all or any portion of the Collateral, at any public or private disposition thereof, without demand of performance or notice of intention to sell or of time or place of sale; provided, however, that unless the Collateral in the Lender's possession is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Lender shall give the Borrower notice of the time and place of any public disposition thereof or of the time after which any private disposition thereof is to be made.  The requirement of notice shall be met if notice of disposition is delivered or mailed, by registered mail, postage prepaid, to the Borrower as set forth in Section 13.7 or such other address as the Borrower may by notice have furnished the Lender in writing for such purpose at least ten (10) days prior to the time of such disposition.  Each acquirer at any such disposition (including, if applicable, the Lender) shall hold the property acquired absolutely free from any claim or right of whatever kind including any equity of redemption and the Borrower hereby waives (to the extent permitted by law) all rights of redemption, stay and/or appraisal which it now has or may have at any time in the future under any rule of law or statute now existing or hereafter enacted.  Any public or private disposition of the Collateral or any part thereof shall be held at such time or times within ordinary business hours and at such place or places as the Lender may fix in the notice of disposition.  At any such disposition, the Collateral, or any portion thereof, to be disposed of may be disposed of in one lot as an entirety or in separate parcels, as the Lender may (in the Lender's sole and absolute discretion) determine and, if permitted by law, the Lender may bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness) for and purchase the Collateral or any portion thereof for the account of the Lender.  The Lender shall

not be obligated to make any disposition of the whole or any part of the Collateral if it shall determine not to do so, regardless of the fact that notice of disposition of the Collateral may have been given. The Lender may by announcement at the time and place fixed for disposition, without prior notice or publication, adjourn any public or private disposition of the Collateral or cause the same to be adjourned from time to time, and such disposition may, without further notice, be made at the time and place to which the same was so adjourned. In case a disposition of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Lender until the sale price is paid by the purchaser or purchasers thereof, but the Lender shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so disposed of and, in case of any such failure, such Collateral may be sold again upon like notice.

(e)     Any Laboratory that has possession of any of the Collateral is hereby constituted and appointed by the Borrower as pledgeholder for the Lender. The Lender may authorize each such pledgeholder to sell all or any portion of the Collateral upon the order and direction of the Lender, and the Borrower hereby waives all claims for damages, or otherwise, for any action taken by such pledgeholder.

(f)     The Lender shall be entitled to the appointment of a receiver to take possession of all or any portion of the Collateral and to exercise such powers as the court shall confer upon the receiver. The Borrower, to the fullest extent permitted by law, hereby waives notice and the right to receive notice of any application by the Lender for such appointment; provided, however, that the Lender shall endeavor to send the Borrower a courtesy notice of such application, and provided further that, notwithstanding any such application or appointment, the Lender shall be entitled to apply, without notice to the Borrower, any cash or cash items constituting Collateral in the possession of the Lender to payment of the Obligations under this Agreement, the Note and the other Loan Documents.

(g)     The Lender may, but shall not be obligated to, take over or have a designee take over the production, completion and delivery of the Picture. If the Lender or its designee takes over production of the Picture, subject to existing third party agreements, the Lender or such designee may substitute personnel, cut, edit, score and make such changes in the Picture as it may desire, or abandon production of the Picture, and be free of any obligation to make any payment in any such event of any fee payable to the Borrower in connection with the production of the Picture. The Borrower hereby agrees to waive any right to claim that it sustained any loss or damage by reason or as a result of any action taken by the Lender or its designees pursuant to this Section 11.2(h).

(h)     Upon any disposition of any item of Collateral by the Lender hereunder (whether by virtue of the power of attorney herein granted, pursuant to judicial process or otherwise), the receipt of the Lender or the officer making the disposition shall be a sufficient discharge to the purchaser or purchasers of such item or items of Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Lender or such officer or be answerable in any way for the misapplication or non-application thereof.

(i)      The Lender is hereby authorized at any time and from time to time, with reasonable notice to the Borrower other than during the continuance of an Event of Default, to setoff and apply any and all deposits (general or special, time or demand, provisional or final) at any time held, including amounts in the Collection Account, any other account maintained by the Lender, any certificate of deposit, and any other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document, irrespective of whether or not the Lender shall have made any demand under this Agreement, the Note or any other Loan Document.  The Lender agrees promptly to notify the Borrower after any such setoff and application.  The rights of the Lender under this Section 11.2(j) are in addition to other rights and remedies (including, without limitation, other rights of setoff) that the Lender may have.

11.3    Cumulative Remedies; No Prior Recourse to Collateral.  The enumeration herein of the Lender's rights and remedies is not intended to be exclusive, and such rights and remedies are in addition to and not by way of limitation of any other rights or remedies that the Lender may have under the UCC or other applicable law.  The Lender shall have the right, in its sole and absolute discretion to determine which rights and remedies are to be exercised and in which order. The exercise of one right or remedy shall not preclude the exercise of any others, all of which shall be cumulative.  The Lender may, without limitation, proceed directly against the Borrower to collect the Obligations without any prior recourse to the Collateral.

11.4    Failure or Indulgence Not Waiver.  No failure or delay on the part of the Lender any holder of the Note in the exercise of any power, right, remedy or privilege under this Agreement, the Note or any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right, remedy or privilege preclude any other or further exercise thereof or of any other right, power, remedy or privilege. All rights and remedies existing under this Agreement, the Note and the other Loan Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available.

11.5    Performance of Obligations by Lender.  If the Borrower shall fail to do any act or thing which it has covenanted to do hereunder, under any other Loan Document, the Sales Agent Agreement, the Sales Agent Interparty Agreement, or the Distribution Agreements or otherwise, or if any representation or warranty of the Borrower under any such agreement shall be breached, the Lender may (but shall not be obligated to) perform such act or thing on behalf of the Borrower or cause it to be done or remedy any such breach, and there shall be added to the liabilities of the Borrower secured hereunder the cost or expense incurred by the Lender in so doing, and any and all amounts expended by the Lender in taking any such action shall be repayable to it upon demand being made to the Borrower therefor and shall bear interest at the rate of interest then applicable to the Loans made to the Borrower hereunder from and including the date advanced to the date of repayment.

## ARTICLE 12 - TERM AND TERMINATION

12.1    Termination.  The Lender may terminate this Agreement without notice upon the occurrence and during the continuance of a Default or Event of Default for longer than five (5) business days.  This Agreement shall also terminate when all Obligations have been fully and

indefeasibly paid and performed and the Lender's commitment to make the Loan has terminated. Upon the effective date of termination, all Obligations shall become immediately due and payable in full.  Notwithstanding such termination, the Borrower shall remain bound by all of the terms and conditions of this Agreement until all Obligations have been paid in full in cash, and the Lender shall retain all rights and remedies hereunder (including, without limitation, the Lien on and all rights and remedies with respect to the Collateral).  Upon the indefeasible payment in full of all Obligations and the termination of this Agreement, the Lender shall, at the Borrower's request and sole expense, assign and deliver to the Borrower, and the Borrower shall provide a receipt for, all Collateral in which the Lender shall have any interest hereunder or which shall then be held by the Lender or in its possession and, if requested by the Borrower, the Lender shall execute and deliver to the Borrower at the Borrower's sole expense, for filing in each office in which any financing statement relative to the Collateral, or any part thereof, shall have been filed, termination statements under the UCC and a quitclaim and reconveyance of the Lender's rights under the Copyright Mortgage and Assignments releasing the Lender's Lien therein, all without recourse upon or warranty by the Lender and at the sole cost and expense of the Borrower.  For the purposes hereof, the Obligations shall only be deemed paid in full when all components thereof have been indefeasibly paid in full.

## ARTICLE 13 - MISCELLANEOUS

13.1    <u>Severability</u>.  In case any provision of this Agreement, the Note or of any other Loan Document shall be invalid, illegal or unenforceable in any jurisdiction then such provision shall to the extent of such prohibition or unenforceability be deemed severed from the remainder of such agreement and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

13.2    <u>Governing Law</u>.  This Agreement and the other Loan Documents and all other documents provided for therein and the rights and obligations of the parties thereto shall be governed by and construed and enforced in accordance with, the laws of the State of New York without reference to its conflict or choice of law principles.

13.3    <u>Jurisdiction</u>.  Any legal action or proceeding with respect to this Agreement, the other Loan Documents or any other agreement, document or other instrument executed in connection herewith or therewith, or any action or proceeding to execute or otherwise enforce any judgment obtained against the Borrower or any of its properties, may be brought in the state or federal courts of the State of New York, as the Lender may elect, provided always that suit also may be brought in the courts of any country or place where the Borrower or any of its assets may be found, and, by execution and delivery of this Agreement, the Borrower irrevocably submits to each such jurisdiction.  The Borrower irrevocably waives any objection which it may now or hereafter have to the venue of any suit, action or proceeding, arising out of or relating to this Agreement, the other Loan Documents or any other agreement, document or other instrument executed in connection herewith brought in the state or federal courts of the State of New York, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Notwithstanding the foregoing, New York shall be the sole venue for any dispute the Borrower initiates against the Lender.

13.4    <u>Waiver of Jury Trial, Etc.</u>  TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE BORROWER AND THE LENDER HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY.  THE BORROWER FURTHER WAIVES ANY RIGHTS OF SETOFF, AND THE RIGHT TO IMPOSE COUNTERCLAIMS (OTHER THAN THOSE RIGHTS OF SETOFF AND COUNTERCLAIMS ARISING SOLELY AND DIRECTLY FROM THE PICTURE OR THIS AGREEMENT) IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE OBLIGATIONS OR THE COLLATERAL, OR ANY INSTRUMENT OR DOCUMENT DELIVERED PURSUANT HERETO OR THERETO, OR ANY OTHER CLAIM OR DISPUTE HOWSOEVER ARISING, BETWEEN THE BORROWER, ON THE ONE HAND, AND THE LENDER ON THE OTHER HAND.  Each of the parties expressly agrees that service of process in any judicial or other proceeding (including proceedings to judicially confirm any arbitration award) may be made in accordance with the provisions of <u>Section 13.7</u> and shall be deemed effective as provided therein.

13.5    <u>Expenses and Fees</u>.  The Borrower shall pay on demand all reasonable actual out-of-pocket costs and expenses, including reasonable outside attorneys' fees up to the limits of the Attorney Costs, and reasonable outside attorneys' expenses, , incurred by the Lender in connection with the negotiation, preparation and filing of this Agreement, the other Loan Documents and the other agreements and documents referred to herein through the Closing Date , and shall additionally pay all actual out-of-pocket costs and expenses, including reasonable outside attorneys' fees and court costs, incurred by the Lender after the Closing Date in connection with this Agreement, the other Loan Documents and the Picture.  The Borrower shall pay on demand all reasonable actual out-of-pocket costs and expenses related to necessary amendments to the Loan Documents and this Agreement, costs and expenses of preserving and protecting the Collateral, costs and expenses (including reasonable outside attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce the Lender's Liens, sell or otherwise realize upon the Collateral and otherwise enforce the provisions of the Loan Documents or to defend any claims made or threatened against Lender and/or the Lender arising out of the transactions contemplated hereby, and in connection with the enforcement of the rights of the Lender thereunder or in connection with the realization upon any Collateral (including the costs of any "workout" of the Borrower's obligations and Lender's enforcement of its rights in any Bankruptcy Proceeding).

13.6    <u>Taxes</u>.

(a)    All payments (including payments of principal, interest and all fees and other Obligations) by the Borrower hereunder the other Loan Documents shall be made free and clear of and without deduction for any and all present or future non-US taxes and other taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, <u>excluding</u>, taxes imposed on the Lender's income or measured by the overall net income or gross receipts of the Lender, and franchise taxes imposed on it, by the jurisdiction under the laws of which the Lender is organized or any political subdivision thereof (all such non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to as "Taxes").  If the Borrower, the Sales Agent, any of their Affiliates or any Distributor shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder to the Lender, (i) the sum payable shall be increased as may be necessary so that after making all required

deductions (including deductions applicable to additional sums payable under this <u>Section 13.6</u>) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law.

(b)     In addition, the Borrower shall pay all present and future stamp and documentary taxes and all other excise or property taxes, charges and similar levies that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement and the other Loan Documents (hereinafter referred to as "<u>Other Taxes</u>").

(c)     The Borrower will indemnify the Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this <u>Section 13.6</u>) paid by the Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted.  This indemnification shall be made within thirty (30) days from the date the Lender makes written demand therefor.  The affected Lender shall, at the time of any written demand for indemnification under this subsection (c), provide to the Borrower a receipt for, or other evidence of the payment of, the Taxes or Other Taxes for which indemnification is sought.

(d)     Within thirty (30) days after the date of any payment of Taxes, the Borrower will furnish to the Lender, at its address referred to in <u>Section 13.7</u>, the original or a certified copy of a receipt evidencing payment thereof.  If no Taxes are payable in respect of any payment hereunder with respect to which a claim for indemnity has been made hereunder, the Borrower will furnish to the Lender, at such address, a certificate from each appropriate taxing authority, or an opinion of counsel acceptable to the Lender, in either case stating that such payment is exempt from or not subject to Taxes.

(e)     Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this <u>Section 13.6</u> shall survive the payment in full of the Obligations and termination of his Agreement.

13.7   <u>Notices</u>.  In order to be effective under the terms hereof, except as otherwise expressly provided herein, any notice, approval, authorization, consent, request, demand or other communication provided for hereunder or under any of the other Loan Documents to be given shall be in writing and shall be delivered personally, by certified mail, return receipt requested, postage prepaid, or by transmission by a telecommunications device, and shall be effective (a) on the day when personally served, including delivery by overnight mail and courier service, (b) on the third day after its deposit in the United States mail, postage paid, and (c) on the Business Day of confirmed transmission by telecommunications device.  The addresses of the parties hereto (until notice of a change thereof is served as provided in this <u>Section 13.7</u>) shall be as follows:

To the Borrower:

Lock the Door, LLC
827 N Hollywood Way, #512
Burbank, CA 91505
Attention: David Brown

With a courtesy copy to:

Creativ Law Professional Corp.
Attention: Harry Finkel, Esq.
8730 Wilshire Blvd, Suite 350
Beverly Hills, CA 90211
Email:  harry@creativlaw.com

To the Lender:

8th Wonder Pictures, LLC
1805 West Avenue
Austin, TX 78701
Attention: Andrew Townsend

With a courtesy copy to:

Winston & Strawn LLP.
Attention: Warren Loui, Esq.
333 South Grand Avenue
Los Angeles, CA 90071
Email:  warren.loui@winston.com

13.8    Assignments; Participations.

(a)    The Lender may, at any time and from time to time, without notice to Borrower, sell, transfer, assign or grant participations in any or all of its rights and obligations hereunder or under the Note without the consent of or notice to Borrower; Borrower authorizes Lender to forward to such assignee, transferee or assignee, transferee or participant or prospective participant all documents and information relating to Borrower or the Loan as Lender determines necessary or desirable.  Borrower may not assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender and any purported assignment shall be void and of no force or effect.  This Agreement shall be binding upon and inure to the benefit of Borrower and its permitted successors and assigns and Lender and its successors and assigns.

(b)    Notwithstanding any other provision in this Agreement, Lender may at any time create a security interest in, or pledge, all or any portion of its rights under and interest in this Agreement and any Note held by the Lender, in favor of any Federal Reserve Lender, in accordance with Regulation A of the Federal Reserve Board or U.S. Treasury Regulation 31 CFR §203.14, and such Federal Reserve Lender may enforce such pledge or security interest in any manner permitted under applicable law.

13.9    Indemnification.  The Borrower shall, at all times, defend and indemnify and hold the Lender (which for the purposes of this paragraph shall include the shareholders, partners, members, officers, directors, employees, representatives, attorneys and agents of Lender) harmless from and against any and all liabilities, claims, demands, causes of action, losses, damages, settlements, judgments or recoveries resulting from any alleged or actual breach of the warranties, agreements or covenants made by the Borrower herein, and from any suit or proceeding of any kind or nature whatsoever against Lender arising from or connected with the transactions contemplated by this Agreement, the other Loan Documents or any of the documents, instruments or agreements to be executed pursuant hereto or any of the rights and properties assigned to Lender hereunder, or any rights otherwise granted to Lender, including reasonable outside attorneys' fees and costs and expenses incurred by Lender, all of which shall be charged to and paid by the Borrower and shall be secured by the Collateral hereunder; provided, however, the Borrower shall have no obligation under this Section with respect to any such event resulting from Lender's and/or

such Lender's gross negligence or willful misconduct (as determined by the final, non-appealable order of a court of competent jurisdiction).

13.10   <u>USA Patriot Act et al.</u>  Lender notify the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "<u>Patriot Act</u>"), the Lender are required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow Lender to identify the Borrower in accordance with the Patriot Act.  To the extent applicable, Borrower confirms that it is in compliance with the Patriot Act.  No part of the proceeds of the Loans have been or will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

13.11   <u>Final Agreement.</u>  This Agreement and the other Loan Documents are intended by the Borrower, the Lender to be the final, complete, and exclusive expression of the agreement between them.  This Agreement and the other Loan Documents supersede any and all prior oral or written agreements relating to the subject matter hereof, including any term sheets, deal memoranda, or other written document.  No modification, rescission, waiver, release, or amendment of any provision of this Agreement or any other Loan Document shall be made, except by a written agreement signed by the Borrower and duly authorized officers of Lender.

13.12   <u>Counterparts.</u>  This Agreement and the other Loan Documents may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument, respectively.  Delivery of an executed counterpart of this Agreement by facsimile or transmitted electronically (i.e., in a Tagged Image Format File ("TIFF") or Portable Document Format ("PDF")) shall be equally effective as delivery of a manually executed counterpart of this Agreement.  Any party delivering an executed counterpart by facsimile or electronically (i.e., in a TIFF or PDF)  shall also deliver a manually executed counterpart of this Agreement, but failure to do so shall not affect the validity, enforceability, or binding effect of this Agreement.

13.13   <u>No Beneficiaries.</u>  The parties hereto do not intend by the inclusion of references to various third Person agreements to create any third Person beneficiary rights herein or under any of those agreements.  Without limiting the generality of the foregoing, Lender does not intend by the inclusion of references to payments to various third Persons in the definition of Permitted Liens or otherwise to give rise to any rights as a third party beneficiary in such Persons herein or under any of the agreements referenced in the definition of Permitted Liens.

13.14   <u>Amendments, Etc.</u>  Except as otherwise expressly provided herein, no modification, amendment or waiver of any provision of this Agreement, and no consent to any departure by Borrower herefrom, shall in any event be effective unless the same shall be in writing and signed by Lender, and acknowledged and agreed to by Borrower and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

13.15   <u>Relationship of Parties</u>.   The relationship of the Lender, on the one hand, and Borrower, on the other hand, is solely one of lender and borrower, and this Agreement does not constitute a partnership or joint venture between the Lender, on the one hand, and Borrower, on the other hand.   Borrower is not the representative or agent of Lender, and the Lender is not a representative or agent of Borrower.

13.16   <u>WAIVER WITH RESPECT TO DAMAGES</u>.   THE PARTIES SHALL NOT ASSERT, AND HEREBY WAIVE, ANY CLAIMS AGAINST THE OTHER ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS AGREEMENT, ANY OTHER LOAN DOCUMENT, ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

*[SIGNATURES ON NEXT PAGE]*

IN WITNESS WHEREOF, the parties hereto have each executed this Agreement as of the date first above written.

BORROWER

LOCK THE DOOR, LLC

By: _____
    Name:  **David Brown**
    Title:  **Authorized Signer**

*Signature Page to Loan and Security Agreement*

"LENDER"

8th WONDER PICTURES, LLC

By: _____
        Name: Andrew Townsend
        Title:  Managing Member

*Signature Page to Loan and Security Agreement*

EXHIBITS AND SCHEDULES
TO
LOAN AND SECURITY AGREEMENT

EXHIBIT A                    Form of Borrowing Certificate
EXHIBIT B                    Form of Note



SCHEDULE 1                   Post-Closing Covenants

EXHIBIT A
TO
LOAN AND SECURITY AGREEMENT


FORM OF BORROWING CERTIFICATE

[see attached]

EXHIBIT B
TO
FORM OF LOAN AND SECURITY AGREEMENT

<u>FORM OF NOTE</u>

[see attached]

**EXECUTION VERSION**

**PROMISSORY NOTE**
**"THE COLL3CTED"**

$3,000,000

Los Angeles, California
As of December 31, 2019 (the "Effective Date")

FOR VALUE RECEIVED, the undersigned, Lock The Door, LLC, a California limited liability company ("Borrower"), hereby promises to pay to the order of 8th Wonder Pictures, LLC, a Delaware limited liability company, or to the holder of this Note, ("Lender") up to the principal amount of Three Million Dollars ($3,000,000) in lawful money of the United States (the "Note"), plus all accrued and unpaid interest, on or before the Maturity Date as determined pursuant to that certain Loan Agreement by and between Borrower and Lender dated December 31, 2019 (the "Loan Agreement") or as otherwise provided herein or in the Loan Agreement.

This Note is provided pursuant to the Loan Agreement with respect to the motion picture presently entitled "*The Coll3cted*", as such Loan Agreement may be amended, supplemented or otherwise modified from time to time.  Capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Loan Agreement.  The Loan Agreement, and all terms set forth therein, are incorporated herein by this reference.  In the event of any conflict between the terms of this Note and the terms of the Loan Agreement, the terms of the Loan Agreement shall prevail.

Borrower promises to pay Interest on the principal amount of all loans made by Lender to Borrower pursuant to the Loan Agreement from December 31, 2019 until such principal amount is paid in full, at such interest rates, and payable at such times, as are specified in the Loan Agreement, as well as any and all other costs, fees, expenses or charges payable to Lender pursuant to the Loan Agreement, this Note, or any other agreement between Lender and Borrower.

All payments in respect of this Note shall be made to Lender, via wire transfer pursuant to the wire transfer details provided by Lender to Borrower or at such other place as may be timely and reasonably designated in writing by Lender with sufficient prior notice.

Borrower waives protest, diligence, presentment, and notice of dishonor in connection with the delivery, acceptance, performance and enforcement of this Note. Lender shall at all times have the right to proceed against any portion of the security held for this Note in such order and in such manner as Lender may deem fit, without waiving any rights with respect to any other security.  No delay or omission on the part of Lender in exercising any right hereunder or under this Note or the Loan Agreement shall operate as a waiver of such right or of any other right under this Note or any other agreement or document relating to this Note.

No covenant, condition, right or remedy in this Note may be waived, or modified orally, by course of conduct or previous acceptance or otherwise unless such waiver or modification is specifically agreed to in writing and signed by Lender.  Without limiting the foregoing, no previous waiver and no failure or delay by Lender in acting with respect to the terms of this Note shall constitute a waiver of any breach, default or failure of a condition under this Note.

In accordance with the terms of the Loan Agreement, Borrower agrees to pay all costs of collection when incurred, including reasonable outside attorneys' fees, whether or not suit or any other action is filed,

AmericasActive:14290624.4

and all reasonable third party, out-of-pocket costs and reasonable outside attorneys' fees incurred in realizing upon any collateral securing this Note as well as all such amounts incurred in connection with enforcement of any award, order or judgment. If an action is filed, including arbitration, and Lender is determined under such proceeding to have prevailed, Borrower promises to pay all reasonable third party, out-of-pocket costs and expenses incurred in connection therewith, including any expert fees or expenses any fees and expenses incurred in connection with any appeal or confirmation or enforcement of any award or judgment.

No extension of the time for the payment of this Note or any installment hereof made by agreement with any person now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability under this Note if Lender or the Note holder are not a party to such agreement.

Failure to pay any part of the principal, interest, or any other sums due under this Note when due, or uncured failure to carry out any of the material terms, material covenants, or material conditions of the Loan Agreement or this Note, including, without limitation, any Default, any Event of Default, or uncured failure to materially perform any other agreement between Lender and Borrower in connection with the Loan Agreement or this Note, shall authorize Lender to accelerate and declare as immediately due and payable the then-unpaid principal, interest and all other amounts due to Lender and to exercise any and all of the rights and remedies provided by the Loan Agreement, this Note, any other agreement between Borrower and Lender, as well as all other rights and remedies either at law or in equity possessed by the Lender.

This Note is secured by the Collateral. Reference is hereby made to the Security Agreement for a description of the Collateral, the nature and extent of the security for this Note and the rights of the holder of this Note in respect to such security.

The failure to exercise any such rights, powers and remedies or the acceptance by Lender of any payment hereunder which is less than payment in full shall not constitute a waiver of the right to exercise any of Lender's rights, powers or remedies at that time or any subsequent time.

In case any provision in this Note, the Loan Agreement or any other accompanying document or agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions or obligations shall not in any way be affected or impaired thereby.

This Note may not be changed, modified, amended or terminated, except by a writing signed by Borrower and Lender.  This Note shall bind and inure to the benefit of the respective successors and assigns of Borrower and Lender.

This Note is executed under and shall be governed by and construed in accordance with the laws of the state of New York without reference to conflicts of law principles in the state of New York.


[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned have executed this Note as of the Effective Date.

**LOCK THE DOOR, LLC**

By: _____
Name: David Brown
Its: Authorized Signatory

SCHEDULE 1
TO
LOAN AND SECURITY AGREEMENT

<u>LIST OF POST-CLOSING COVENANTS</u>

The Borrower shall use its best commercial efforts to take the following actions within 30 days after the Closing Date (provided such actions shall in any event be taken within 45 days after the Closing Date):

1.  Deliver to the Lender a fully executed copy of the Laboratory Control Agreement for each Laboratory.

2.  Deliver to the Lender a fully executed copy of the CAMA; provided that if the fully executed copy of the CAMA has not been signed by the applicable guilds, the Borrower shall have entered into arrangements satisfactory to the Lender providing for interim distributions to be made to the Lender of Collateral proceeds subject to adequate reserves being maintained for payment of residuals.

3.  Deliver to the Lender evidence of compliance with the requirements of <u>Section 6.5,</u> including delivery of insurance certificates showing the Lender as an additional assured.

4.  Deliver to the Lender fully executed copies of Notices of Assignment for all Distribution Agreements.

# EXHIBIT B

EXECUTION VERSION

<u>SECURITY AGREEMENT</u>

**"THE COLL3CTED"**

This Security Agreement ("<u>Security Agreement</u>"), dated as of December 31, 2019, is made between 8th Wonder Pictures, LLC, a Delaware limited liability company, ("<u>Secured Party</u>") and Lock the Door, LLC, a California limited liability company, ("<u>Debtor</u>"), and is made with reference to the following facts:

A.   Secured Party and Debtor are parties to that certain Loan Agreement, dated on or about the date hereof (as it may be amended, supplemented, modified, renewed and/or restated from time to time, the "<u>Loan Agreement</u>"; capitalized terms used herein without definition having the respective meanings assigned such terms in the Loan Agreement) and the other Loan Documents, pursuant to which, among other things, Secured Party agreed (subject to the terms and conditions set forth therein) to provide financing in connection with the <u>Picture</u>).

B.   Secured Party requires, under the terms of the Loan Agreement, that Debtor grant to Secured Party a security interest in the Collateral (as defined below) to secure all of the Obligations.

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, the parties agree as follows:

1.   **Grant of Security:** As security for the full payment and performance, whether direct or indirect, absolute or contingent, or now or hereafter due or arising, of all of the Obligations, Debtor hereby mortgages, assigns, transfers, sets over, conveys, grants and delivers to Secured Party a security interest, copyright mortgage and lien (collectively, the "<u>Security Interest</u>") in and to all of Debtor's right, title and interest in and to the collateral described in Exhibit A attached hereto, wherever located, whether now in existence or hereafter created, and whether now owned or hereafter acquired (collectively, the "<u>Collateral</u>").

2.   **Covenants, Representations and Warranties:** Debtor covenants with, and represents and warrants to Secured Party as follows:

   2.1.   Debtor is a California limited liability company, duly organized or incorporated and validly existing and in good standing under the laws of California, with entity number 201915110457, and Debtor has the full power, authority and legal right, and all requisite governmental licenses, permits and franchises, to own the Collateral and grant the Security Interest.

   2.2.   The execution and delivery of this Security Agreement by Debtor, and the grant of the Security Interest, have been duly authorized by all necessary organizational action of Debtor.

   2.3.   This Security Agreement has been validly executed and delivered by Debtor, and is the legal, valid and binding obligation of Debtor, enforceable against Debtor in accordance with its terms.

   2.4.   The provisions of this Security Agreement are effective to grant to Secured Party a valid security interest in the Collateral securing payment and performance of the Obligations, enforceable against Debtor in all of Debtor's right, title and interest in and to the Collateral, subject to no security interest, copyright mortgage, mortgage, lien, pledge, charge, encumbrance, limitation, restriction, right, claim, license, lease, sale, purchase or assignment in, to, of or upon any of the Collateral, other than Permitted Liens. Debtor shall not grant, or suffer to exist, any security interest, copyright mortgage, mortgage, lien, pledge, charge, encumbrance, limitation, restriction, right, claim, license, lease, sale, purchase or assignment, in, to, of or upon any of the Collateral to any individual, corporation, trust, estate, partnership, joint venture, company, association, league, group, government bureau, agency or subdivision thereof or other entity (incorporated or unincorporated) (collectively, "<u>Person</u>"), the effect of which would be to supersede, cause to be subordinated, take priority over, or participate on an even

AmericasActive:14290627.4

priority with, the Security Interest other than in accordance with the provisions of the Loan Agreement and/or the interparty agreement between, inter alios, the Secured Party and Debtor in relation to the Picture dated on or about the date hereof.

2.5. Upon the recordation of the Copyright Mortgage (defined below) in the United States Copyright Office and the filing of the Financing Statement (defined below) in the filing offices of the jurisdiction identified in paragraph 2.1 above, the Security Interest will be perfected, to the extent a security interest in the Collateral can be perfected by the recordation of the copyright mortgage in the United States Copyright Office and the filing of a financing statement in the applicable filing office.

2.6. Debtor shall pay all taxes, assessments and other charges that may be levied or assessed against the Collateral.

2.7. Debtor shall promptly give written notice to Secured Party (and, upon request, furnish a copy to Secured Party) of any litigation filed against the Collateral. Debtor shall, at its own expense, appear and defend any and all actions and proceedings affecting any of the Collateral, or otherwise affecting the Security Interest, and shall obtain and furnish to Secured Party from time to time, upon demand, such releases and subordinations of claims and liens, which may be required to maintain the priority of Secured Party's rights and liens hereunder.

2.8. Debtor shall not make any change to its corporate, limited liability company or other name, as applicable, or in its jurisdiction of organization, unless Secured Party has received from Debtor written notice of such change at least thirty days prior to the effective date of such change and prior to the effective date of such change, Debtor shall have executed and delivered to Secured Party such documents for filing with the United States Copyright Office, and shall have authenticated such financing statements for filing in such jurisdictions as Secured Party may reasonably deem necessary to preserve the perfection of the Security Interest.

2.9. Debtor shall keep its place of business or, if it has more than one place of business, its chief executive office, and the offices where Debtor keeps its records, at the address for Debtor set forth in this Security Agreement, or at such other locations of which Secured Party shall have received written notice from Debtor not later than thirty days prior to the effective date of any change to any of such other locations.

2.10. Debtor has had no corporate, partnership, limited liability company or other name, and no trade names, fictitious names, assumed names or "doing business as" names in the United States or in any other jurisdiction in the past five years other than its current corporate, partnership, limited liability company or other name referenced herein, and shall not have or use any of the same until the Obligations have been paid and performed in full.

2.11. Concurrently with the execution and delivery of this Security Agreement, Debtor shall deliver to Secured Party the following items: (a) a duly executed and acknowledged Copyright Mortgage and Assignment in proper form for recording in the United States Copyright Office (the "Copyright Mortgage"); and (b) evidence of the submission to, and receipt by, the United States Copyright Office of the documentation necessary to register the copyright of the screenplay for the Picture in the name of Debtor.

2.12. Debtor, as debtor of record with respect to that certain UCC Financing Statement (the "Financing Statement") to be filed in the filing office identified in paragraph 2.1 above, a copy of which has been provided to Debtor concurrently herewith, hereby authenticates the Financing Statement, and Debtor hereby authorizes the filing of the Financing Statement in the applicable filing office, and in such other

2

offices in such other jurisdictions as Secured Party deems to be appropriate in order to perfect the Security Interest.

3.  **Further Assurances:** Debtor shall from time to time at the reasonable request of Secured Party execute, acknowledge, have witnessed or otherwise formalize, and deliver, or cause to be executed, acknowledged, witnessed or otherwise formalized, and delivered, to Secured Party any and all documents and/or instruments consistent herewith, and otherwise take such actions, that Secured Party deems reasonably necessary or appropriate to further perfect, protect, evidence, effectuate, renew, terminate and/or continue the Security Interest consistent herewith. If Debtor fails to execute, acknowledge, have witnessed or otherwise formalize, and deliver any such documents or instruments within ten (10) business days after Secured Party's written request therefor, Secured Party may execute, acknowledge, have witnessed or otherwise formalize, and deliver such documents and instruments consistent herewith as Debtor's appointed attorney-in-fact, which appointment for such purposes is hereby made irrevocably and coupled with an interest with full rights of substitution and delegation to execute, acknowledge, have witnessed or otherwise formalize, and deliver, any such documents consistent herewith in the name of Debtor. Secured Party shall promptly furnish to Debtor copies of any documents or instruments executed pursuant to the foregoing power of attorney.

4.  **Payments and Actions:** If Debtor fails to make any payment or to take any action that is an Obligation, or fails to make any other payment or take any other action reasonably required under the circumstances to preserve the priority and value of Secured Party's rights under this Security Agreement and in accordance with the Loan Agreement, then Secured Party may (but shall not be obligated to) make such payments and take such actions as Secured Party in its reasonable discretion under the circumstances deems necessary to protect the Security Interest in the Collateral, and Secured Party is hereby authorized (without limiting the general nature of the authority hereinabove conferred), if Debtor has so failed to make payment or take action within three (3) business days after Secured Party gives Debtor written notice that such payment or action is required and has not been made or taken, to pay, purchase, contest or compromise any security interest or lien which in Secured Party's reasonable discretion under the circumstances appears to be prior or superior to, or of equal priority with, the Security Interest, or to pay, purchase, contest or compromise any security interest or lien which in Secured Party's reasonable discretion under the circumstances appears to give its holder, or any other Person, any right the exercise of which could adversely affect the priority and/or value of the rights of Secured Party under the Loan Documents and/or this Security Agreement.

5.  **Duty to Hold in Trust:** Upon Default, Debtor shall, upon receipt by it of any revenue, income or other sums in which a security interest is granted to Secured Party under this Security Agreement, or of any check, draft, note, trade acceptance or other instrument evidencing an obligation to pay any such sum, hold the same in trust for Secured Party, in precisely the form received, and shall forthwith endorse, transfer and deliver any such sums or instruments, or both, to Secured Party for application to the satisfaction of the Obligations.

6.  **Default:** Any of the following shall constitute a "Default":

    6.1.   A Default or an Event of Default has occurred.

    6.2.   Debtor terminates, disaffirms, rejects or repudiates, or attempts to terminate, disaffirm, reject or repudiate the Loan Documents, this Security Agreement, and/or the Obligations prior to full payment, performance, or discharge of the Obligations.

7.  **Remedies:** Upon the occurrence of Default, Secured Party shall have all of the rights and remedies of a secured party under the California UCC, and all other rights and remedies under all other applicable laws, and, without limiting the generality of the foregoing, Secured Party may in its sole discretion:

AmericasActive:14290627.4

7.1.   Take possession of the Collateral, and may demand and receive such possession from any Person who has possession thereof, and Secured Party may take such measures as it may deem reasonably necessary or proper for the care or protection thereof, including the right to remove, keep and/or store all or any portion of the Collateral or put a custodian in charge thereof.

7.2.   With or without taking possession, sell, lease, license, or otherwise dispose of, at any time, and from time to time, as Secured Party may determine, any or all of the Collateral, in its present condition or following any commercially reasonable preparation or processing, in its entirety or in parcels, either at public or private disposition, at such price and on such terms as Secured Party may deem best. Secured Party may be the purchaser, lessee, licensee or acquirer of any or all of the Collateral at any such disposition and shall be entitled, for the purpose of bidding and making settlement or payment of the price for all or any portion of the Collateral disposed of at any such disposition, to use and apply any of the Obligations as a credit on account of the price of any Collateral payable by Secured Party at such disposition. Debtor shall not have any right of redemption subsequent to any such disposition or Secured Party's entering into a contract for any such disposition, and Debtor hereby expressly waives any such right.

7.3.   Institute any proceeding at law, in equity, or otherwise for the foreclosure of the Collateral or any part thereof. To the extent permitted by law, any disposition thereof shall be held in the same manner, with the same effect and subject to the same terms and conditions as specified in paragraph 7.2 hereof. Secured Party may, in its sole discretion, from time to time, at any time and in any order, choose to institute a proceeding for foreclosure on some portion of the Collateral and a disposition under paragraph 7.2 hereof on other portions of the Collateral, without being deemed to have made an election of remedies or to have waived any other rights or remedies, and without in any other way limiting any rights or remedies which it may otherwise have.

7.4.   In its name or in the name of Debtor or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for or make any compromise or settlement deemed desirable with respect to any of the Collateral, but shall be under no obligation to do so, and Secured Party may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of or release any of the Collateral, without thereby incurring responsibility to or discharging or otherwise affecting any liability of Debtor.

7.5.   Petition any court for the appointment of a receiver for any part of or all of the Collateral, for the purpose of preserving, protecting and retaining the Collateral and the value of the Collateral, and for the purpose of facilitating Secured Party's exercise of any other of Secured Party's rights and remedies under this Security Agreement, the California UCC and/or any other applicable law.

8.   **Termination:** All rights of Secured Party hereunder, the Security Interest, and all of the Obligations, shall be and remain in full force and effect irrespective of any change in the time, manner or place of payment or performance of, or in any other term of, all or any of the Obligations or any obligation the failure of performance of which constitutes a Default or Event of Default, or any other amendment or waiver of or any consent to any departure from the Loan Documents, until such time, if any, as all of the Obligations, have been indefeasibly paid and/or performed in full and the Loan Agreement has terminated. At such time, the Security Interest in all of the Collateral shall automatically terminate, whereupon Secured Party shall promptly execute such documents and instruments as Debtor shall reasonably request to evidence such termination, at Debtor's sole cost and expense.

9.   **Waivers:** Debtor acknowledges and agrees that, in the course of the performance by the Debtor of the Obligations, Secured Party may from time to time waive or excuse various conditions or payments or installments constituting all or any portion or portions of the amount due thereunder, or various other of its

4

obligations, Secured Party may informally agree with the Debtor, or any other Person, to vary their performance under the Loan Documents from the express provisions thereof, and Secured Party may refrain from enforcing any or all of its rights or remedies from time to time available to it under the Loan Documents, and as a result of any or all of the foregoing, any rights of Debtor in the nature of subrogation or other claims against any other Debtor upon or following any exercise by Secured Party of any of its rights or remedies hereunder, may be unavailable to Debtor, or may have been destroyed, or may otherwise be impaired, diminished or curtailed.  Debtor expressly waives and agrees not to assert any claim, defense and/or excuse, and expressly waives and agrees not to assert any right or claim of offset, setoff, reduction, modification or exoneration of or against the Security Interest, based upon any event or matter described in the preceding sentence, or any other event or matter, whether similar or dissimilar to any of the events or matters described in the preceding sentence, upon which Debtor might otherwise base any such claim, defense, or excuse, or right of offset, setoff, reduction, modification or exoneration.   Without limiting the generality of the foregoing, Debtor hereby expressly waives: (a) notice of the acceptance of this Security Agreement by any Person; (b) notice of the Obligations now existing or which may hereafter exist or be created; and, (c) notice of any adverse change in the financial condition of Debtor or of any other fact that might increase Debtor's risk hereunder. Neither Secured Party's acceptance of this Security Agreement and the Security Interest, nor any exercise by Secured Party of any of its rights hereunder, shall extinguish, release, mitigate, diminish or reduce in any manner whatsoever any claim, cause of action or other right or remedy Secured Party has, claims, or may at the date hereof or hereafter have or claim, against the Debtor or any other Person, whether arising out of the Loan Documents or otherwise. No delay on the part of Secured Party in exercising any power or right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any power or right hereunder preclude other or further exercise thereof or the exercise of any other power or right.

10. **Damages and Expenses:** Debtor shall pay to Secured Party the amounts of all damages incurred by Secured Party arising out of the breach of any of the Obligations or the failure of any representation or warranty under the Loan Documents and/or this Security Agreement; and all fees, costs and expenses, including reasonable outside attorneys' fees actually incurred, of or arising out of the enforcement of any provisions of this Security Agreement.  Debtor agrees to indemnify Secured Party from and against any and all claims, losses and liabilities in any way relating to, arising out of or resulting from this Security Agreement and the transactions contemplated hereby (including without limitation enforcement of this Security Agreement), except to the extent such claims, losses or liabilities result solely from Secured Party's gross negligence or willful misconduct as finally determined by a nonappealable judgment of a court of competent jurisdiction.  The obligations of Debtor in this paragraph shall survive the termination of this Security Agreement and the discharge of the Obligations.

11. **Assignment:** All terms and provisions of this Security Agreement shall be binding upon Debtor and its successors in interest, and shall inure to the benefit of Secured Party and the transferees, successors and assigns of Secured Party. Secured Party may, at any time and from time to time, without the consent of or notice to Debtor, sell, transfer, assign or grant participations in any or all of its rights and obligations hereunder, and Debtor authorizes Secured Party to forward to such assignee, transferee, assignee or participant or prospective participant all documents and information relating to Debtor as Secured Party determines necessary or desirable.  Debtor may not assign any of its rights or obligations hereunder without the prior written consent of Secured Party and any purported assignment in derogation hereof shall be void and of no force or effect.

12. **Notices:** Any notice or other communication required or permitted hereunder will be given in writing at the applicable address set forth below, and will be deemed given and received on the date of delivery if by mail, courier or messenger, or on the date of transmission if by email.

  To Secured Party:  8th Wonder Pictures, LLC

|                    | 1805 West Avenue<br>Austin, TX 78701<br>Attn: Andrew Townsend |
|--------------------|---|
| With a copy to:    | Winston & Strawn LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>Attn: Warren R. Loui |
| To Debtor:         | Lock the Door, LLC<br>827 N Hollywood Way, #512<br>Burbank, CA 91505<br>Attn: David Brown |
| With a copy to:    | Creativ Law, P.C.<br>8730 Wilshire Blvd, Suite 350<br>Beverly Hills, CA 90211 |

13. **Other Provisions:** Sections 13.3, 13.4 and 13.5 of the Loan Agreement are hereby incorporated by reference *mutatis mutandis*.

14. **Governing Law:** THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OR CHOICE OF LAW PRINCIPLES, PROVIDED THAT SECURED PARTY SHALL RETAIN ALL RIGHTS ARISING UNDER FEDERAL LAW.

15. **Severability:** Whenever possible, each provision of this Security Agreement shall be interpreted in such a manner as to make such provision valid and enforceable under applicable law, but if any provision hereof shall be or become invalid or unenforceable under any applicable law, such provision shall be ineffective to the extent of such invalidity or unenforceability only, without thereby invalidating the remainder of such provision or of any of the remaining provisions hereof. This Security Agreement shall be subject and subordinate to the IPA at all times, and in the event of a conflict between any provision herein and the Loan Agreement, the terms of the Loan Agreement shall prevail.

16. **Signature:** This Security Agreement may be signed in two or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument. Signed electronic copies of this Security Agreement will be treated as originals for all purposes, fully binding and with full legal force and effect, and the parties hereby waive any rights they may have to object to such treatment. This Security Agreement may be amended only by a written agreement executed by the parties.

*[Signature Pages Follow]*

AmericasActive:14290627.4

IN WITNESS WHEREOF, this Security Agreement is executed as of the date set forth above.

"Debtor"                                  "Secured Party"
LOCK THE DOOR, LLC                        8TH WONDER PICTURES, LLC

By: _____            By: _____
Name: __David Brown_____            Name: _____
Its: __Authorized Signer_____            Its: _____

*Security Agreement*

IN WITNESS WHEREOF, this Security Agreement is executed as of the date set forth above.

"Debtor"                                "Secured Party"
LOCK THE DOOR, LLC                      8TH WONDER PICTURES, LLC


By: _____            By: _Andrew Townsend_____
Name: _____            Name: _Andrew Townsend___
Its: _____           Its: _Managing Member_____

*Security Agreement*

**EXHIBIT A**

All of Mortgagor's right, title and interest in and to that certain feature-length theatrical motion picture currently entitled "*The Coll3cted*" by whatever name such motion picture may become known (the "**Picture**"), whether now owned or hereafter acquired and wheresoever located, including, without limitation, all accessions thereto and proceeds thereof, and all of the properties thereof, tangible and intangible, and all domestic and foreign copyrights and all other rights therein and thereto, of every kind and character, whether now in existence or hereafter to be made or produced, and whether or not in possession of such Mortgagor, including with respect to the Picture, distribution and exploitation rights in the Picture and without limiting the foregoing language, each and all of the following particular rights and properties of the Picture referenced in clauses "(1)" through "(19)" below to the extent they are now owned or hereafter created or acquired by or otherwise licensed to such Mortgagor (all of the foregoing and following items or types of property, shall be referred to herein collectively as the "**Collateral**"):

1.      that certain screenplay currently titled "The Coll3cted" by Marcus Dunstan and Patrick Melton (the **"Screenplay")** and all rights in and relating to the Screenplay;

2.      all rights in and to any literary, musical, dramatic or other material upon which the Screenplay and/or the Picture is/are based or which is used or included in the Picture, and all other preliminary and final scripts, scenarios, screenplays (including the Screenplay), bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts or other properties or materials of any kind or nature, and all rights pursuant to any and all documents pursuant to which any Mortgagor secured any right, title or interest in and to any of the foregoing (collectively, the "**Literary Property**");

3.      all collateral, allied, ancillary, subsidiary, publishing and merchandising rights of every kind and nature, without limitation, derived from, appurtenant to or related to the Picture or the Literary Property, including, without limitation, all production, exploitation, or reissue, remake, sequel, serial or production rights by any means and in any medium now known or hereafter devised, whether based upon, derived from or inspired by the Picture, the Literary Property or any part thereof; all rights to use, exploit and license others to use or exploit any and all novelization, publishing, commercial tie-ups and merchandising rights of every kind and nature, including, without limitation, all novelization, publishing, merchandising rights and commercial tie-ups arising out of or connected with or inspired by the Picture or the Literary Property, the title or titles of the Picture, the characters appearing in the Picture or said Literary Property and/or the names or characteristics of said characters, and including further, without limitation, any and all commercial exploitation in connection with or related to the Picture, all remakes or sequels thereof and/or said Literary Property;

4.      all rights of every kind or nature, present and future, in and to all agreements and understandings (whether or not evidenced in writing) relating to the Screenplay, the Picture, and the development, production, completion, delivery, distribution and exploitation of the Picture, including, without limitation, all agreements for personal services, including the services of writers, directors, cast, producers, special effects personnel, personnel, animators, cameramen and other creative, artistic and technical staff and agreements for the use of studio space, equipment, facilities, locations, animation services, special effects services and laboratory contracts, and any and all rights derived therefrom or relating thereto;

5.      all materials and items prepared in connection with the pre-production of the Picture, including the following:  budget, production schedule, location scouting reports, set designs, research, and all other tangible and intangible materials prepared during pre-production of the Picture (collectively, the "**Existing Pre-Production Items**");

6.      all tangible personal property and physical properties of every kind or nature whatsoever of or relating to the Picture (including, without limitation, (A) all exposed film, developed film, positives, negatives, prints, answer prints, trailers, soundtracks, music and effects tracks, video masters, video and audio recordings (collectively, the "**Physical Elements**"), and (B) copies of all (1) continuity lists, (2) dialogue lists, (3) spotting lists, (4) synchronization licenses, (5) composers agreements, (6) contracts relating to the acquisition and production of the Picture, (7) cast lists, (8) still photographs and artwork, (9) press books, (10) story synopses, (11) credit requirements lists, (12) posters, (13) advertising, and (14) publicity materials), and all versions thereof

8

(including, without limitation, all foreign language versions) and all of Mortgagor's rights of access to and use of the foregoing (collectively and together with the Physical Elements, the "**Physical Properties**");

7.      all rights (including without limitation all motion picture, television and other production rights) in and to any and all lyrics, music and musical compositions created for, used in or to be used in connection with the Picture, including, without limitation, all copyrights therein, and further including, without limitation, all rights to record, rerecord, produce, reproduce and/or synchronize all of said lyrics, music and musical compositions in and in connection with motion picture, television and other productions (collectively, the "**Music Rights**");

8.      the title of the Picture and all marks and devices connected with or related to the Picture or used or to be used in connection with the exploitation of the Picture, and all rights of Mortgagor to the use of all of the foregoing, including, without limitation, rights protected pursuant to trademark, service mark, unfair competition and/or the rules and principles of law pertaining thereto or to any other applicable statutory, common law, or other rule or principle of law;

9.      all insurance and insurance policies heretofore or hereafter placed upon the Picture, the Physical Properties or the insurable properties thereof and/or upon any individual, corporation, trust, estate, partnership, joint venture, company, association, league, group, government bureau, agency or subdivision thereof or other entity of whatsoever kind or nature (incorporated or unincorporated) (collectively, "**Person**") or Persons engaged in the development, production, completion, delivery, distribution or exploitation of the Picture and the proceeds thereof;

10.      all rights in and to all agreements and commitments relating to the development, production, completion, delivery, distribution and exploitation of the Picture, including, without limitation, all agreements and commitments for personal services, including the services of all members of the casts and crews;

11.      all statutory and common-law copyrights, domestic and foreign, and all renewals and extensions of any such copyrights, and all rights and interests in such copyrights, renewals and extensions, obtained or to be obtained on the Picture, the Literary Property and/or the Music Rights, together with any and all copyrights, domestic and foreign, and all renewals and extensions of any such copyrights, and all rights and interests in such copyrights, renewals and extensions, obtained or to be obtained in connection with the Picture or any underlying or component elements of the Picture, including without limitation the Literary Property and the Music Rights, together with the right to copyright and all rights to renew or extend such copyrights and the right to sue in the name of Mortgagor, or in Mortgagee's name, for past, present and future infringements of copyright, upon the Picture, and/or the Literary Property and/or the Music Rights and/or any part thereof;

12.      all rights to produce, acquire, finance, release, sell, distribute, subdistribute or otherwise exploit the Picture, the Literary Property, the Music Rights, the Physical Properties, the Existing Pre-Production Items and any and all rights therein in any manner, in any media throughout the universe, in perpetuity;

13.      all rights under contract or any other commitment or agreement which grant to any Person (including without limitation all rights under contract or any other commitment or agreement which grant to Mortgagee) any right to produce, acquire, finance, release, sell, distribute, subdistribute or otherwise exploit the Picture or any rights in or to the Picture, and all accounts and general intangibles arising out of the exploitation of the Picture or otherwise associated with or relating to the Picture, including without limitation all rights to receive any sums payable under any such contract, commitment, agreement, accounts or general intangibles;

14.      the production account, including collection accounts (or, if there is more than one, the production accounts) for the Picture, and all funds in or to be credited to the production account or accounts or any other bank account into which the proceeds of the loan made pursuant to the Loan Agreement dated December 31, 2019, by and between Mortgagor, on the one hand, and Mortgagee, on the other hand, and/or the proceeds of any other loans made by Mortgagee shall be or shall have been credited;

15.      all tax rebates, credits and/or other incentives issued, to be issued or issuable in connection with the Picture (whether federal, state, city or otherwise) and all rights relating to any such tax rebates, credits and incentives, including the right to receive the proceeds thereof;

9

16.     all of Mortgagor's accounts and payment intangibles now owned and hereafter created or acquired, including without limitation all rights now owned and hereafter created or acquired to receive commissions and other payments in connection with or relating to motion pictures, and licenses, leases and distribution agreements relating to motion pictures and/or rights in motion pictures, and all rights related to all of the foregoing under collection account management agreements, payment directions, notices of assignment, intercreditor agreements, interparty agreements and any and all other agreements, documents and instruments of any kind or nature whatsoever;

17.     all general intangibles, accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, and money;

18.     any security interest, copyright mortgage, mortgage, lien, pledge, charge, encumbrance, limitation, restriction, right, claim, license, lease, sale, purchase or assignment of any kind or nature in, to, of or upon any of the foregoing; and

19.     all results, products and proceeds of any kind or character of any and all of the foregoing.

AmericasActive:14290627.4

# **EXHIBIT C**

## PLEDGE AGREEMENT

This PLEDGE AGREEMENT (this "Agreement"), dated as of December 31, 2019, is made by and between CLEAR HORIZON ENTERTAINMENT LLC, a limited liability company duly formed and validly existing under the laws of the State of Wyoming (the "Member"), and 8TH WONDER PICTURES, LLC (the "Secured Party").

### RECITALS:

A.      Pursuant to that certain Loan and Security Agreement, dated as of the date hereof (the "LSA") between Lock the Door, LLC (the "Borrower") and the Secured Party, the Secured Party has agreed to extend credit to the Borrower in the amounts specified and on the terms and subject to the conditions set forth therein.

B.      It is a requirement under the LSA that the Member shall have executed and delivered this Agreement.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Member and the Secured Party hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.01    Certain Defined Terms.

(a)      Each capitalized term used and not otherwise defined herein shall have the meaning assigned to such term (whether directly or by reference to another agreement or document) in the LSA as in effect on the date hereof (or as modified with the consent of the Secured Party).  The provisions of Sections 1.2 through 1.4 of the LSA are hereby incorporated by reference as if fully set forth herein.

(b)      In addition to the terms defined in the LSA, the preamble and the recitals, the following terms shall have the following respective meanings:

"Agreement" has the meaning assigned to that term in the Preamble.

"Borrower" has the meaning assigned to that term in the Recitals.

"Borrower LLC Agreement" means that certain Limited Liability Company Agreement of the Borrower dated as of June 17, 2019.

"Collateral" has the meaning assigned to that term in Section 2.01.

"Equity Collateral" has the meaning assigned to that term in Section 2.01(a)(ii).

"Instrument" has the meaning assigned to that term in Article 9 of the UCC.

"LSA" has the meaning assigned to that term in the Recitals.

"Material Adverse Effect" means a change or effect that (a) could have a material and adverse effect upon (i) the operations, business, properties, assets, liabilities (actual or contingent) or financial or other condition of the Member, or (ii) the prospects of the Member, (b) materially impairs the legal right, power or authority of the Member or any of its Affiliates to perform its obligations under this Agreement, (c) materially impairs the ability of the Member to perform its obligations under this Agreement, (d) materially impairs the legality, validity, binding effect or enforceability of, or materially impairs the rights, remedies and benefits available to the Secured Party under the this Agreement, or (f) results in the Secured Party not having a first priority perfected Lien in all of the Collateral; provided, however, that any event or condition will be deemed to have a "Material Adverse Effect" if such event or condition when taken together with all other events and conditions occurring or in existence at such time (including all other events and conditions which, but for the fact that a representation, warranty or covenant is subject to a "Material Adverse Effect" exception, would cause such representation or warranty contained herein to be untrue or such covenant to be breached) could be expected to result in a "Material Adverse Effect" hereunder even though, individually, such event or condition would not do so.

"Member" has the meaning assigned to that term in the Preamble.

"Pledged Equity" has the meaning assigned to that term in Section 2.01(a).

"Proceeds" has the meaning assigned to that term in Article 9 of the UCC.

"Secured Obligations" shall mean (a) all Obligations, (b) and all indebtedness, liabilities, and other obligations of the Member of whatever nature and however evidenced, owed to the Secured Party under or pursuant to this Agreement, in each case, direct or indirect, primary or secondary, fixed or contingent, now or hereafter arising out of or relating to any such document.

"Uniform Commercial Code" or "UCC" shall mean the Uniform Commercial Code as in effect in the State of New York from time to time or, by reason of mandatory application, any other applicable jurisdiction.

ARTICLE II
THE COLLATERAL

Section 2.01    Grant.    As collateral security for the performance and prompt payment in full when due (whether at stated maturity, upon acceleration, upon any optional or mandatory prepayment or otherwise) of the Secured Obligations, the Member hereby pledges and grants to the Secured Party, a security interest in all of the Member's right, title and interest in, to and under the following, whether now owned or in the future acquired by the Member and whether now existing or in the future coming into existence (collectively, the "Collateral"):

(a)    all membership interests of whatever class or character in the Borrower, whether now or hereafter owned by the Member, and all certificates evidencing the same, if any (the "Pledged Equity"), together with:

(i)    all membership interests, securities, moneys or property representing a dividend on any of the Pledged Equity, or representing a distribution or return of capital upon or in respect of the Pledged Equity, or resulting from a

2

split-up, revision, reclassification or other like change of the Pledged Equity or otherwise received in exchange therefore, and any subscription, warrants, rights or options issued to the holders of, or otherwise in respect of the Pledged Equity; and

(ii)     without affecting the obligations of the Member under any provision prohibiting such action hereunder or under the LSA, in the event of any consolidation or merger in which the Borrower is not the surviving entity, all ownership interests of any class or character in the successor entity (unless that successor entity is the Member itself), formed by or resulting from that consolidation or merger (the Pledged Equity, together with all other certificates, shares, securities, properties or moneys as may from time to time be pledged hereunder pursuant to this clause (ii) and clause (i) above being herein collectively called the "Equity Collateral"); and

(b)     all Proceeds and products in whatever form of all or any part of the Collateral, including all rents, profits, income and benefits and all proceeds of insurance and all condemnation awards and all other compensation for any event of loss with respect to all or any part of the Collateral (together with all rights to recover and proceed with respect to the same), and all accessions to, substitutions for and replacements of all or any part of the Collateral.

Section 2.02     Perfection.  Concurrently with the execution and delivery of this Agreement, the Member consents that UCC financing statements may be filed describing the Collateral.

Section 2.03     Delivery and Other Perfection.  The Member shall:

(a)     if any Pledged Equity constituting part of the Collateral is received by the Member, promptly (i) deliver to the Secured Party the certificates or instruments representing or evidencing the same, duly indorsed in blank or accompanied by such instruments of assignment and transfer in such form and substance as the Secured Party may reasonably request, all of which thereafter shall be held by the Secured Party, pursuant to the terms of this Agreement, as part of the Collateral and (ii) take such other action as the Secured Party may reasonably deem necessary or appropriate to duly record or otherwise perfect the security interest created hereunder in such Collateral; provided, however, upon receipt of any certificates or instruments representing or evidencing replacement Pledged Equity, duly indorsed in blank or accompanied by such instruments of assignment and transfer and otherwise in form reasonably acceptable to the Secured Party as replacement Pledged Equity, the Secured Party shall return to the Member, upon the Member's request, for cancellation the original certificates representing or evidencing such Pledged Equity being replaced and such instruments of assignment and transfer related thereto previously delivered to it;

(b)     deliver to the Secured Party all Instruments constituting part of the Collateral in which the Member purports to grant a security interest hereunder, indorsed and/or accompanied by such instruments of assignment and transfer in such form and substance as the Secured Party may reasonably request.

(c)     give, execute, deliver, file, record, authorize or obtain all such financing statements, notices, instruments, documents, agreements or consents or other papers as may be

3

necessary or desirable in the reasonable judgment of the Secured Party to create, preserve, perfect or validate the security interest granted pursuant hereto or to enable the Secured Party to exercise and enforce its rights hereunder with respect to such pledge and security interest, including, without limitation, upon the occurrence and during the continuation of an Event of Default causing any of the Equity Collateral to be transferred of record into the name of the Secured Party or its nominee;

(d)     keep full and accurate books and records relating to the Collateral, and stamp or otherwise mark such books and records in such manner as the Secured Party may reasonably require in order to reflect the security interests granted by this Agreement;

(e)     forward copies of any written notices received by the Member with respect to the Collateral, all in such manner as the Secured Party may reasonably require; and

(f)     execute and deliver and cause to be filed, such continuation statements, and do such other acts and things, as may be necessary to maintain the perfection of the security interest granted pursuant hereto.

Section 2.04   <u>Other Financing Statements and Liens</u>.  Without the written consent of the Secured Party, the Member shall not file or suffer to be on file, or authorize or permit to be filed or to be on file, in any jurisdiction, any financing statement or like instrument with respect to any of the Collateral in which the Secured Party is not named as the sole secured party.

Section 2.05   <u>Preservation and Protection of Security Interests</u>.   The Member shall:

(a)     following the acquisition by the Member of any Collateral, promptly (i) take such action with respect to that Collateral as is specified in <u>Section 2.03</u> and (ii) take all such other actions, and authenticate or sign and file or record such other records or instruments, as are necessary or as the Secured Party may reasonably request to create, perfect and establish the priority of the Liens granted by this Agreement in all of the Collateral, to preserve the validity, perfection or priority of the Liens granted by this Agreement in all of the Collateral or to enable the Secured Party to exercise its rights, remedies, powers and privileges under this Agreement;

(b)     promptly authorize, give, authenticate, execute, deliver, file or record all financing statements, notices, contracts, agreements or other records or instruments, obtain all applicable permits, and take all such other actions, as are necessary or as the Secured Party may reasonably request to create, perfect and establish the priority of the Liens granted by this Agreement in the Collateral, to preserve the validity, perfection or priority of the Liens granted by this Agreement in all of the Collateral or to enable the Secured Party to exercise its rights, remedies, powers and privileges under this Agreement, including upon the occurrence and during the continuation of any Event of Default, causing any or all securities to be transferred of record into the name of the Secured Party or its nominee.

Section 2.06   <u>Attorney-in-Fact</u>.

(a)     The Member hereby constitutes and appoints the Secured Party, and any officer or agent thereof, as its true and lawful attorney-in-fact, effective as of the date of this Agreement, with full power and authority in the place and stead of the Member and in the name

4

of the Member or in its own name, for the purpose of carrying out the provisions of this Agreement, to take any appropriate action and to execute any document or instrument that may be necessary or desirable to accomplish the purposes of this Agreement, to preserve the validity, perfection and priority of the Liens granted by this Agreement, and to exercise its rights, remedies, powers and privileges under this Agreement; provided, however, that so long as no Event of Default has occurred, the Secured Party shall not exercise any of the foregoing rights or remedies. This appointment as attorney-in-fact is coupled with an interest and is irrevocable. Without limiting the generality of the foregoing, the Member hereby gives the Secured Party the power and right, on behalf of the Member, without notice to or assent by the Member, upon the occurrence and during the continuation of any Event of Default to receive, endorse and collect all checks made payable to the order of the Member representing any dividend, payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same.

(b)     The reasonable expenses of the Secured Party incurred in connection with actions undertaken as provided in this Section 2.06, shall be payable by the Member to the Secured Party within five (5) Business Days following written demand and shall constitute Secured Obligations and be secured by this Agreement.

(c)     The Member hereby ratifies all lawful acts that said attorneys shall lawfully do or cause to be done pursuant to, and in accordance with, the appointment under this Section 2.06 and applicable laws.

Section 2.07     Special Provisions Relating to the Equity Collateral.

(a)     The Member shall cause the Equity Collateral to constitute at all times 100% of the total number of shares, partnership, membership or other ownership interests in the Borrower.

(b)     So long as no Event of Default has occurred and is continuing and the Secured Party shall have given notice to the Member of the Secured Party's intent to exercise its rights under this Section 2.07(b) (it being acknowledged and agreed that the Secured Party shall not be required to deliver any such notice (i) from and after acceleration of the Obligations or (ii) if the Member is the subject of a Bankruptcy Proceeding), the Member shall have the right to exercise all voting, consensual and other powers of ownership pertaining to the Equity Collateral for all purposes not inconsistent with the terms of the LSA, provided that the Member shall not vote the Equity Collateral in any manner that is inconsistent with the terms of the LSA; the Secured Party shall, at the Member's expense, execute and deliver to the Member or cause to be executed and delivered to the Member all such proxies, powers of attorney, dividend and other orders and other instruments, without recourse, as the Member may reasonably request for the purpose of enabling the Member to exercise the rights and powers that it is entitled to exercise pursuant to this Section 2.07(b).

(c)     If an Event of Default has occurred and is continuing, the Secured Party shall have the right, to the fullest extent permitted by applicable law, to exercise all voting, consensual and other powers of ownership pertaining to the Equity Collateral as if the Secured Party were the sole and absolute owner thereof (and the Borrower agrees to take all such action as may be appropriate to give effect to such right).

(d)     Until indefeasible payment in full of the Secured Obligations and termination of the LSA, all dividends and other distributions on the Equity Collateral shall be paid directly to the Secured Party and retained by it as part of the Equity Collateral, subject to the terms of this Agreement, and, if the Secured Party so requests in writing, the Member shall execute and deliver to the Secured Party appropriate additional dividend, distribution and other orders and instruments to that end.

Section 2.08   Rights and Obligations.  No reference in this Agreement to proceeds or to the sale or other disposition of Collateral shall authorize the Member to sell or otherwise dispose of any Collateral except to the extent permitted by the terms of the LSA. The Secured Party shall not be required to take steps necessary to preserve any rights against prior parties to any part of the Collateral.

Section 2.09   Termination.  Upon the indefeasible payment in full of the Secured Obligations and termination of the LSA, this Agreement and the security interest granted hereby shall automatically terminate, all rights to the Collateral shall automatically revert to the Member without any further action by the parties hereto, and the Secured Party shall forthwith cause to be assigned, transferred and delivered, against receipt but without any recourse, warranty or representation whatsoever, any remaining Collateral and money received in respect of the Collateral to or on the order of the Member.  The Secured Party shall also execute and deliver to the Member, at the Member's expense, upon such termination such UCC termination statements and other documentation as shall be reasonably requested by the Member to effect the termination and release of the Liens created under this Agreement.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

The Member represents and warrants to the Secured Party as follows:

Section 3.01   Organization; Power; Authorization; Validity.

(a)     The Member has the power and authority to execute, deliver and perform this Agreement and to grant to the Secured Party Liens upon and in the Collateral.  The Member has taken all necessary action (including, without limitation, obtaining approval of its members and managers if necessary) to authorize its execution, delivery, and performance of this Agreement.  No consent, approval, or authorization of, or declaration or filing with, any governmental authority, and no consent of any other Person, is required in connection with the Member's execution, delivery and performance of this Agreement, except for those already duly obtained.

(b)     This Agreement has been duly executed and delivered by the Member, and constitute the legal, valid and binding obligation of the Member, enforceable against it in accordance with its terms without defense, setoff or counterclaim, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other similar laws affecting creditors' rights generally and by general principles of equity.

6

(c) The Member's execution, delivery, and performance of this Agreement party do not and will not conflict with, or constitute a violation or breach of, or constitute a default under, or result in the creation or imposition of any Lien upon the property of the Member by reason of the terms of (i) any contract, mortgage, lease, agreement, indenture, or instrument to which the Member is a party or which is binding upon it, (ii) any judgment, law, statute, rule or governmental regulation applicable to the Member, or (iii) the certificate of formation or the operating agreement of the Member.

(d) The provisions of this Agreement create legal and valid Liens on all the Collateral in favor of the Secured Party and such Liens constitute perfected and continuing Liens on all the Collateral, having priority over all other Liens on the Collateral, securing all the Secured Obligations, and enforceable against the Member.

(e) The Member (a) is duly formed and organized and validly existing in good standing under the laws of the State of Wyoming, (b) is qualified to do business as a foreign limited liability company and is in good standing in each jurisdiction in which the failure to so qualify or be in good standing could reasonably be expected to have a material adverse effect on the Member's property, business, operations, prospects or condition (financial or otherwise), and (c) has all requisite power and authority to conduct its business and to own its property.

(f) All financial statements, projections, estimates, information, and other data furnished by the Member to the Secured Party in connection with the Borrower's application for credit hereunder, if any, are, in all material respects, accurate and correct and accurately reflect, in all material respects, the financial condition of the Person to whom such statements relate as of the date thereof.

(g) The Borrower is solvent prior to and will remain solvent after giving effect to the Loans on the Closing Date and shall remain solvent during the term hereof.

(h) Annex 1 correctly sets forth the Member's full and correct legal name, type of organization, jurisdiction of organization, organizational identification number (if applicable), chief executive office, place of business and mailing address as of the date of this Agreement.

(i) The Member has not (i) changed its location (as defined in Section 9-307 of the UCC), (ii) previously changed its name and (iii) previously become a "new debtor" (as defined in the UCC) with respect to a currently effective security agreement entered into by another Person.

Section 3.02   Pledged Equity.

(a) The Pledged Equity identified in Annex 2 is, and all other Pledged Equity in which the Member shall hereafter grant a security interest pursuant to Section 2.01 will be, duly authorized, validly existing, fully paid and nonassessable, and is owned by the Member free and clear of all Liens, and none of the Pledged Equity is or will be subject to any contractual restriction, or any restriction under the organizational documents of the Borrower, upon the transfer of such Pledged Equity (except for any such restriction contained in the LSA).

(b) The Pledged Equity identified in Annex 2 constitutes all of the issued and outstanding equity interests or other interests of the Class B interests and a majority of the Class

A interests in the Borrower (whether or not registered in the name of the Member), and there are no other classes of membership interests in the Bororwer, and <u>Annex 2</u> correctly identifies the Pledged Equity and the respective number (and registered owners) of the interests identified in <u>Annex 2.</u>

           (c)      No Person other than the Member is the registered owner of the Pledged Equity.

           Section 3.03   <u>Consent to Transfer</u>.   The Member, as the sole member of the Borrower and as the owner of all of the issued and outstanding Class B membership interests and a majority of the issued and outstanding Class A membership interests in the Borrower, hereby irrevocably consents (for all purposes under the Borrower LLC Agreement and notwithstanding anything to the contrary set forth in the Borrower LLC Agreement) to the transfer of the Pledged Equity to any Person upon exercise by the Secured Party of its remedies under <u>Sections 5.01</u> and <u>5.02</u>.

## ARTICLE IV
## COVENANTS; WAIVERS

           Section 4.01   <u>Further Assurances</u>.   Until indefeasible payment in full of the Secured Obligations and termination of the LSA, the Member agrees that, from time to time upon the written request of the Secured Party, the Member shall execute and deliver such further documents and do such other acts and things as the Secured Party may reasonably request in order fully to effect the purposes of this Agreement.  The Member shall always own all of the Class B membership interests and a majority of the Class A membership interests of the Borrower and shall not permit the issuance of any other class of membership interests of the Borrower other than to the Member.

           Section 4.02   <u>Suretyship Waivers</u>.   The Member consents and agrees that the Secured Party may, at any time and from time to time, without notice or demand, and without affecting the enforceability or continuing effectiveness hereof: (a) amend, extend, modify, renew, compromise, discharge, accelerate, forbear from the exercise of its rights with respect to or otherwise change the time for payment or the terms of the Obligations or any part thereof, (b) take, hold, exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any security for the payment of any Obligations, (c) apply such security and direct the order or manner of sale thereof as the Secured Party in its sole discretion may determine and (d) release or substitute one or more of any endorsers or other guarantors of any of the Obligations. Without limiting the generality of the foregoing, the Member consents to the taking of, or failure to take, any action which might in any manner or to any extent vary the risks of the Member under this Agreement or which, but for this provision, might operate as a discharge of the Member.  The Member waives (a) any defense arising by reason of any disability or other defense of the Borrower or any other guarantor, or the cessation from any cause whatsoever (including any act or omission of the Secured Party) of the liability of the Borrower other than indefeasible payment and performance in full of the Obligations, (b) any defense based on any claim that Member's obligations exceed or are more burdensome than those of the Borrower, (c) the benefit of any statute of limitations affecting the Member's liability hereunder, (d) any right to require the Secured Party to proceed against the Borrower, proceed against or exhaust any security for the Obligations, or pursue any

other remedy in the Secured Party's power whatsoever, (e) any benefit of and any right to participate in any security now or hereafter held by the Secured Party and (f) to the fullest extent permitted by law, any and all other defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties. The Member expressly waives all setoffs and counterclaims and all presentments, demands for payment or performance, notices of nonpayment or nonperformance, protests, notices of protest, notices of dishonor and all other notices or demands of any kind or nature whatsoever with respect to the Obligations, and all notices of acceptance of this Agreement or of the or incurrence of new or additional Obligations. Until the indefeasible repayment in full of the Secured Obligations and termination of the LSA, (i) the Member hereby postpones and agrees not to exercise any right of subrogation that the Member has or may have as against the Borrower with respect to the Obligations; (ii) the Member hereby postpones and agrees not to exercise any right to proceed against the Borrower or any other Person now or hereafter liable on account of the Obligations for contribution, indemnity, reimbursement, or any other similar rights (irrespective of whether direct or indirect, liquidated or contingent); and (iii) the Member hereby postpones and agrees not to exercise any right it may have to proceed or to seek recourse against or with respect to any property or asset of the Borrower or any other Person now or hereafter liable on account of the Obligations.

## ARTICLE V
## REMEDIES

Section 5.01   Events of Default, Etc.  Subject to the terms of the LSA, if any Event of Default shall have occurred and be continuing:

(a)     The Secured Party in its reasonable discretion may require the Member to, and the Member shall, assemble the Collateral owned by it at such place or places, reasonably convenient to both the Secured Party, designated in the Secured Party's reasonable and written request;

(b)     The Secured Party in its reasonable discretion may make any reasonable compromise or settlement it deems desirable with respect to any of the Collateral and may extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, all or any part of the Collateral;

(c)     The Secured Party in its reasonable discretion may, in its name or in the name of the Member or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for all or any part of the Collateral, but shall be under no obligation to do so;

(d)     The Secured Party in its reasonable discretion may, upon ten (10) days' prior written notice to the Member of the time and place, with respect to all or any part of the Collateral which shall then be or shall thereafter come into the possession, custody or control of the Secured Party or any of its agents, sell, lease or otherwise dispose of all or any part of such Collateral, at such place or places as the Secured Party deems best, for cash, for credit or for future delivery (without thereby assuming any credit risk) and at public or private sale, without demand of performance or notice of intention to effect any such disposition or of time or place of any such sale (except such notice as is required above or by applicable statute and cannot be waived), and the Secured Party or any other Person may be the purchaser, lessee or recipient of any or all of the

Collateral so disposed of at any public sale (or, to the extent permitted by law, at any private sale) and thereafter hold the same absolutely, free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise), of the Member, any such demand, notice and right or equity being hereby expressly waived and released. The Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the sale may be so adjourned;

(e) The Secured Party shall have, and in its discretion may exercise, all of the rights, remedies, powers and privileges with respect to the Collateral of a secured party under the UCC (whether or not the UCC is in effect in the jurisdiction where such rights, remedies, powers and privileges are asserted) and such additional rights, remedies, powers and privileges to which a secured party is entitled under the laws in effect in any jurisdiction where any rights, remedies, powers and privileges in respect of this Agreement or the Collateral may be asserted, including the right, to the maximum extent permitted by law, to exercise all voting, consensual and other powers of ownership pertaining to the Collateral as if the Secured Party were the sole and absolute owner of the Collateral (and the Member agrees to take all such action as may be appropriate to give effect to such right);

(f) The Secured Party in its discretion may, to the full extent provided by law, have a court having jurisdiction appoint a receiver, which receiver shall take charge and possession of and protect, preserve, replace and repair the Collateral or any part thereof, and manage and operate the same, and receive and collect all rents, income, receipts, royalties, revenues, issues and profits therefrom. The Member irrevocably consents and shall be deemed to have hereby irrevocably consented to the appointment thereof, and upon such appointment and following written notice to Member thereof, the Member shall promptly deliver possession of such Collateral to the receiver. The Member also irrevocably consents to the entry of an order authorizing such receiver to invest upon interest any funds held or received by the receiver in connection with such receivership. The Secured Party shall be entitled to such appointment as a matter of right, if it shall so elect, without the giving of notice to any other party and without regard to the adequacy of the security of the Collateral; and

(g) The Secured Party in its discretion may enforce one or more remedies hereunder, successively or concurrently, and such action shall not operate to estop or prevent the Secured Party from pursuing any other or further remedy which it may have hereunder or by law, and any repossession or retaking or sale of the Collateral pursuant to the terms hereof shall not operate to release the Member until full and final payment of any deficiency has been made in cash. The Member shall reimburse the Secured Party within five (5) Business Days following demand for, or the Secured Party may apply any proceeds of Collateral to, the costs and expenses (including reasonable attorneys' fees, transfer taxes and any other charges) incurred by the Secured Party in connection with any sale, disposition, repair, replacement, alteration, addition, improvement or retention of any Collateral.

Section 5.02    Private Sale.

(a) The Secured Party shall incur no liability as a result of the sale, or other disposition of all or any part of the Collateral at any private sale pursuant to Section 5.01 conducted in a commercially reasonable manner. The Member hereby waives any claims against the Secured

Party arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations, even if the Secured Party accepts the first offer received and does not offer the Collateral to more than one offeree.

       (b)     The Member recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable state securities laws, the Secured Party may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to distribution or resale. The Member acknowledges that any such private sales may be at prices and on terms less favorable to the Secured Party than those obtainable through a public sale without such restrictions, and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the respective issuer of such Collateral to register it for public sale.

       Section 5.03   <u>Application of Proceeds</u>.  Except as otherwise expressly provided in this Agreement, the Proceeds of, or other realization upon, all or any part of the Collateral by virtue of the exercise of remedies under Section 5.01, and any other cash at the time held by the Secured Party or under this Article V, shall be applied by the Secured Party as follows:

       <u>First</u>, to the payment of out-of-pocket costs and expenses of such exercise of remedies, including out-of-pocket costs and expenses of the Secured Party fees and out-of-pocket expenses of its agents and reasonable fees and expenses of its counsel, and all other amounts owed to the Secured Party under the LSA that have not been otherwise paid by Member, the Borrower or any of their respective Affiliates;

       <u>Next</u>, to the payment in full of the remaining Secured Obligations; and

       <u>Finally</u>, subject to the rights of any other holder of any Lien in the relevant Collateral, to the payment of the Member, or its respective successors or assigns, or as a court of competent jurisdiction may direct, of any surplus then remaining.

ARTICLE VI<br>MISCELLANEOUS PROVISIONS

       Section 6.01   <u>Communication</u>.  In order to be effective under the terms hereof, except as otherwise expressly provided herein, any notice, approval, authorization, consent, request, demand or other communication provided for hereunder to be given shall be in writing and shall be delivered personally, by certified mail, return receipt requested, postage prepaid, or by transmission by a telecommunications device, and shall be effective (a) on the day when personally served, including delivery by overnight mail and courier service, (b) on the third day after its deposit in the United States mail, postage paid, and (c) on the Business Day of confirmed transmission by telecommunications device.  The addresses of the parties hereto (until notice of a change thereof is served as provided in this <u>Section 6.01</u>) shall be as follows:

To the Member:

Clear Horizon Entertainment, LLC
c/o Clear Horizon
9350 Wilshire Blvd., Suite 203
Beverly Hills, CA 90212
Attn: David Brown (david@clearhorizonent.com)

To the Secured Party:

8th Wonder Pictures, LLC
1805 West Avenue
Austin, TX 78701
Attention: Andrew Townsend
Email: Andrew@ocelotcapital.com

With a courtesy copy to:

Creativ Law Professional Corp.
Attention: Harry Finkel, Esq.
8730 Wilshire Blvd, Suite 350
Beverly Hills, CA 90211
Email:  harry@creativlaw.com

With a courtesy copy to:

Winston & Strawn LLP.
Attention: Warren Loui, Esq.
333 South Grand Avenue
Los Angeles, CA 90071
Email:  warren.loui@winston.com

Section 6.02   Amendments.  No amendment of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Secured Party and the Member, such consent shall be effective only in the specific instance and for the specific purpose for which given.  The Secured Party shall not be obligated to enter into any amendment that affects its rights, duties or obligations under this Agreement.

Section 6.03   Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided, however, that (a) the Member may not assign or transfer any of its respective rights or interest in or under this Agreement or delegate any of its obligations under this Agreement without the prior written consent of the Secured Party and (b) the Secured Party shall transfer or assign its rights under this Agreement in connection with a resignation .or removal of such Person from its respective capacity in accordance with the terms of this Agreement and the LSA. Notwithstanding the foregoing, no party may assign its rights or obligations hereunder in contravention of the LSA.

Section 6.04   Survival.    All agreements, statements, representations and warranties made by the Member herein or in any certificate or other instrument delivered by the Member or on its behalf under this Agreement shall be considered to have been relied upon by the Secured Party and shall survive the execution and delivery of this Agreement and the LSA regardless of any investigation made by or on behalf of the Secured Party.

Section 6.05   No Waiver; Remedies Cumulative.  No failure or delay on the part of the Secured Party or the Secured Party to exercise and no delay in exercising, and no course of dealing with respect to any right, remedy, power or privilege hereunder shall operate as a waiver of such right, remedy, power or privilege nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights and remedies herein expressly provided

are cumulative and not exclusive of any rights or remedies which the Secured Party would otherwise have.

Section 6.06    Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same instrument.

Section 6.07    Severability.  In case any one or more provisions contained in this Agreement or obligation under this Agreement shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions or obligations contained herein, and any other application thereof, shall not in any way be affected or impaired thereby.

Section 6.08    Governing Law; Waiver of Jury Trial; Jurisdiction and Process.

(a)    This Agreement and the other Loan Documents and all other documents provided for therein and the rights and obligations of the parties thereto shall be governed by and construed and enforced in accordance with, the laws of the State of New York without reference to its conflict or choice of law principles.

(b)    Any legal action or proceeding with respect to this Agreement or any other agreement, document or other instrument executed in connection herewith or therewith, or any action or proceeding to execute or otherwise enforce any judgment obtained against the Member or any of its properties, may be brought in the state or federal courts of the State of New York, as the Secured Party may elect, provided always that suit also may be brought in the courts of any country or place where the Member or any of its assets may be found, and, by execution and delivery of this Agreement, the Member irrevocably submits to each such jurisdiction.  The Member irrevocably waives any objection which it may now or hereafter have to the venue of any suit, action or proceeding, arising out of or relating to this Agreement or any other agreement, document or other instrument executed in connection herewith brought in the state or federal courts of the State of New York, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Notwithstanding the foregoing, New York shall be the sole venue for any dispute the Member initiates against the Secured Party.

(c)    TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE MEMBER AND THE SECURED PARTY HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY. THE MEMBER FURTHER WAIVES ANY RIGHTS OF SETOFF, AND THE RIGHT TO IMPOSE COUNTERCLAIMS (OTHER THAN  THOSE RIGHTS OF SETOFF AND COUNTERCLAIMS ARISING SOLELY AND DIRECTLY FROM THIS AGREEMENT) IN ANY LITIGATION IN ANY COURT WITH RESPECT TO, IN CONNECTION WITH, OR ARISING OUT OF THIS AGREEMENT, THE SECURED OBLIGATIONS OR THE COLLATERAL, OR ANY INSTRUMENT OR DOCUMENT DELIVERED PURSUANT HERETO OR THERETO, OR ANY OTHER CLAIM OR DISPUTE HOWSOEVER ARISING, BETWEEN THE MEMBER, ON THE ONE HAND, AND THE SECURED PARTY ON THE OTHER HAND.  Each of the parties expressly agrees that service of process in any judicial or other proceeding (including proceedings to judicially confirm any arbitration award) may be made in accordance with the provisions of this Section 6.09 and shall be deemed effective as provided therein.

(d)       THE PARTIES SHALL NOT ASSERT, AND HEREBY WAIVE, ANY CLAIMS AGAINST THE OTHER ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS AGREEMENT, ANY AGREEMENT OR INSTRUMENT CONTEMPLATED HEREBY OR THEREBY, OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

Section 6.09   Entire Agreement.  This Agreement, together with the LSA executed in connection with this Agreement, is intended by the parties as a final expression of their agreement as to the matters covered by this Agreement and is intended as a complete and exclusive statement of the terms and conditions of such agreement.

Section 6.10   Independent Obligations.  The Member's obligations under this Agreement are independent of those of any other Person.  The Secured Party may bring a separate action against the Member without first proceeding against The Borrower or any other Person or any other security held by the Secured Party and without pursuing any other remedy.

Section 6.11   Expenses.  The Member agrees to pay or to reimburse the Secured Party for all reasonable and documented, out-of-pocket costs and expenses (including reasonable attorney's fees and expenses) that may be incurred by the Secured Party in any effort to enforce any of the provisions of Article V, or any of the obligations of the Member in respect of the Collateral or in connection with (a) the preservation of the Liens on, or the rights of the Secured Party to the Collateral pursuant to this Agreement or the other Collateral Documents, or (b) any actual or attempted sale, lease, disposition, exchange, collection, compromise, settlement or other realization in respect of, or care of, the Collateral, including all such costs and expenses (and reasonable attorney's fees and expenses) incurred in any bankruptcy, reorganization, workout or other similar proceeding.

Section 6.12   Duty of the Secured Party.  The Secured Party's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession, under the UCC or otherwise, shall be to deal with it in the same manner as the Secured Party deals with similar property for its own account.  The Secured Party shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to the Member for any act or failure to act hereunder, except for its or their own gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction.  Except for reasonable care and preservation of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Secured Party shall have no duty as to the collection or protection of the Collateral or any income thereon, nor as to the preservation of rights against prior parties, nor as to the preservation of any rights pertaining thereto beyond the safe custody thereof.

Section 6.13   Reinstatement.  This Agreement and the obligations of Member hereunder shall automatically be reinstated if and to the extent that for any reason any payment made pursuant to this Agreement is rescinded or must otherwise be restored or returned, whether as a result of any proceedings in bankruptcy or reorganization or otherwise with respect to Member or any other Person or as a result of any settlement or compromise with any Person (including the Borrower) in respect of such payment, and Member shall pay the Secured Party on demand all of

its  costs and expenses (including reasonable fees of counsel) incurred by the Secured Party in connection with such rescission or restoration.

**[SIGNATURES TO FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective authorized officers as of the date first written above.

MEMBER:

**CLEAR HORIZON ENTERTAINMENT LLC,**
a Delaware limited liability company

By: _____

Name: **David Brown**

Title: **Owner**

*Member Pledge Agreement*

SECURED PARTY:

**8TH WONDER PICTURES, LLC**,


By: _____
     Name: Andrew Townsend
     Title: Managing Member

**Annex 1**

**Organization and Chief Executive Office of the Member**

Member's Legal Name, Type and Jurisdiction of Organization, and Organizational Identification Number:

| | |
|---|---|
| Full and Correct Legal Name | Clear Horizon Entertainment LLC |
| Type of Organization | limited liability company |
| Jurisdiction of Organization | Wyoming |
| Organizational ID Number | 7717512 |
| Mailing Address | c/o Clear Horizon<br>9350 Wilshire Blvd., Suite 203<br>Beverly Hills, CA 90212<br>Attn: David Brown (david@clearhorizonent.com) |
| Place of Business | Same as Mailing Address |
| Location of Chief Executive Office | Same as Mailing Address |
| Change of name | None. |

MEMBER PLEDGE AGREEMENT

Error! Unknown document property name.

**Annex 2**

**Pledged Equity**

Issuer:

Lock the Door, LLC

Pledged Equity:

100% of the Class B membership interests and 19.25 units of the Class A membership interests in Lock the Door, LLC. The Member is the registered owner of such membership interests.

MEMBER PLEDGE AGREEMENT